IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KENNETH MCPHERSON AND            )
ERIC SIMMONS,                    )
                                 )
            Plaintiffs,          )
                                 )
v.                               )
                                 )
BALTIMORE POLICE                 )            JURY DEMAND
DEPARTMENT, DETECTIVE            )
ROBERT PATTON, DETECTIVE         )
DAVE NEVERDON, DETECTIVE         )
FRANK BARLOW, DETECTIVE          )
RICHARD GARVEY, DETECTIVE        )
GILBERT, AND UNKNOWN             )
EMPLOYEES OF THE BALTIMORE       )
POLICE DEPARTMENT                )

            Defendants.

## COMPLAINT

Plaintiffs KENNETH MCPHERSON and ERIC SIMMONS, by their

undersigned attorneys, complain of Defendants, BALTIMORE POLICE

DEPARTMENT, DETECTIVE ROBERT PATTON, DETECTIVE DAVE

NEVERDON, DETECTIVE FRANK BARLOW, DETECTIVE RICHARD GARVEY,

DETECTIVE GILBERT,  AND UNKNOWN EMPLOYEES OF THE BALTIMORE

POLICE DEPARTMENT, as follows:

### Introduction

1.      Plaintiffs Kenneth McPherson and Eric Simmons, two brothers,

each spent more than 20 years in prison for a murder they had nothing to do with,

and of which they were completely innocent.

2.      Plaintiffs' wrongful convictions did not come about by happenstance or mistake. Instead, their convictions resulted from a deliberate effort by the Defendants to build a false case against Plaintiffs.

3.      In particular, the Defendants fabricated false statements from two vulnerable witnesses, one of whom was only 13 years old, and used those two statements to pursue criminal charges against the Plaintiffs.

4.      The prosecution's case was shockingly thin: there was no physical evidence tying Plaintiffs to the crime and no credible evidence of guilt whatsoever.

5.      Additionally, the Defendants gathered evidence during their investigation that excluded the Plaintiffs. This exculpatory evidence included descriptions from actual eyewitnesses that did not match Plaintiffs, and an unequivocal admission from the real perpetrator that he, and not Plaintiffs, committed the crime.

6.      Rather than disclose the exculpatory evidence they had gathered, the Defendants suppressed it, as it did not fit the false case they were building against Plaintiffs. In addition, the Defendants did not disclose their role in fabricating evidence of guilt, which would have served as powerful evidence to impeach the credibility of the only witnesses who ever implicated Plaintiffs.

7.      Throughout this ordeal, the Plaintiffs maintained their innocence. They repeatedly appealed their baseless convictions but were unsuccessful. Eventually, they sought re-investigation by the Conviction Integrity

Unit ("CIU") of the Baltimore City State's Attorney's Office. Through the efforts of the CIU and Plaintiffs' *pro bono* post-conviction counsel, Plaintiffs eventually obtained previously undisclosed evidence that demonstrated their innocence.

8.     Mr. McPherson and Mr. Simmons were finally able to secure their release from prison in May 2019.  This lawsuit seeks redress for their injuries and for the Defendants' misconduct.

## Jurisdiction and Venue

9.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution, and pursuant to Maryland state law to redress Defendants' tortious misconduct.

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.  Venue is proper under 28 U.S.C. § 1391(b).  The events giving rise to this Complaint occurred in this judicial district.

## The Parties

11.     Plaintiff Kenneth McPherson is a 46-year-old resident of Baltimore, Maryland. He was born and raised in Baltimore, where he resides today with his family. Plaintiff McPherson currently works as a porter for Blue Ocean Property Management.

12.     Plaintiff Eric Simmons is a 49-year-old resident of Baltimore, Maryland. He was born and raised in Baltimore, where he resides with his wife and

other family members. Plaintiff Simmons is currently working on his certification to become a personal trainer.

13.    At all times relevant hereto, Defendants Patton, Neverdon, Barlow, Garvey, and Gilbert were police officers in the Baltimore Police Department (hereinafter "BPD Officer Defendants"). All are sued in their individual capacities and acted under color of law and within the scope of their employment during the investigation of the murder at issue.

14.    Defendant Baltimore Police Department (hereinafter "BPD" or "Police Department") is or was the employer of each of the BPD Officer Defendants. The Police Department is a person within the meaning of 42 U.S.C. § 1983.

### The Crime

15.    On August 31, 1994, a man named Anthony Wooden was walking up Washington Street in Baltimore, after midnight, when a group of men approached him from behind in order to rob him. Mr. Wooden, realizing he was being pursued, pulled out a gun, at which point he and the offenders shot at each other. The botched robbery ended tragically: Mr. Wooden was struck in the head and killed. The shooting took place on the 1600 block of Washington, by the intersection of North Washington Street and Federal Street.

16.    Plaintiffs had absolutely nothing to do with this terrible crime.

### The Police Investigation

17.    A BPD officer located the victim's body on the 1600 block of North Washington at around 12:30 am.

18.     Defendants Patton, Neverdon, Barlow, and Garvey arrived on the scene shortly thereafter. Defendant Barlow was partnered with Defendant Patton, who was designated as the lead detective on the Wooden homicide. The BPD Officer Defendants worked closely together during the investigation and shared all relevant information as it was gathered.

19.     The BPD Officer Defendants began interviewing bystanders and learned that the shooting started at the corner of Washington and Federal, the corner of the block where the victim's body was found.

20.     For instance, BPD Officer Defendants, including Defendants Barlow and Patton, interviewed a woman named Sandra Jackson. Ms. Jackson told them that she saw three black males encounter two other black males at the intersection of Federal and Washington. She said that one of the five men then started firing a gun at the victim. Prior to the shooting, Ms. Jackson heard another male tell the shooter that if he was going to hesitate, to give the gun back because "I'm going to do what I'm going to do."

21.     Ms. Jackson gave the BPD Officer Defendants detailed physical descriptions of the men involved in the shooting. Those descriptions do not match the descriptions of Plaintiffs.

22.     In addition, Ms. Jackson told the BPD Officer Defendants that she was willing to participate in an identification procedure and pick out the suspects she observed participate in the shooting.

23.     Ms. Jackson also told the BPD Officer Defendants that she believed one of the suspects had robbed her niece about a week prior. She disclosed her niece's name and contact information.

24.     Corroborating Ms. Jackson's account of the shooting, another bystander named Crystal White told BPD Officer Defendants, including Defendant Barlow, that the victim was at Federal and Washington running north when shots rang out and the victim fell down. She, like Ms. Jackson, told police she saw two black men at the Federal and Washington intersection just before the shooting started.

25.     Ms. White also provided the BPD Officer Defendants with a description of one of the suspects.

26.     The BPD Officer Defendants also obtained a witness statement from James Martin, who was sitting on his steps when the shots were fired and reported that the shooting occurred by the intersection of Federal and Washington.

### Defendants Are Approached By An Informant, Who Agrees To Falsely Identify Plaintiffs

27.     Following the murder, a woman named Diane Bailey approached the BPD Officer Defendants. At the time, she lived on the third floor of 1421 North Washington, more than a block away from the murder.

28.     Ms. Bailey had not seen the shooting and had no first-hand knowledge about it. The only information about the shooting Ms. Bailey had came from overhearing a conversation between people who were discussing the murder at the neighborhood store. Ms. Bailey overheard people discussing that two men

named Daniel Ellison and Nicholas Richards were involved in the shooting, and that those two men had intended to commit a robbery. In the overheard conversation neither Eric Simmons nor Kenneth McPherson's names were mentioned.

29.     Ms. Bailey met with BPD Officer Defendants, including Defendants Patton and Barlow. Neither Defendants Patton, Barlow, nor any other BPD Officer Defendant disclosed any notes documenting what Ms. Bailey told them, or what they said to her, during this initial conversation.

30.     As a result of this meeting, BPD Officer Defendants arranged for Ms. Bailey to view a photographic line-up in order to "identify" the people involved.

31.     At the time they did this, however, the BPD Officer Defendants were well aware that Ms. Bailey did not and could not have seen the shooting, and therefore, any identifications they made were meaningless.

32.     The BPD Officer Defendants also knew that Ms. Bailey was financially vulnerable and would be willing to say whatever they wanted her to say. Ms. Bailey had been an informant before and received benefits from BPD. At the time of the Wooden homicide, Ms. Bailey lived with her eleven children and one grandchild in their Baltimore apartment and was eager to receive financial assistance and possibly move out of that neighborhood.

33.     Accordingly, instead of conducting a legitimate police investigation into the murder and following up on the leads provided by actual eyewitnesses Sandra Jackson, Crystal White, and James Martin, the police took an

easier route: stretching the rumors Ms. Bailey heard in which only two individuals (not Plaintiffs) were named into a full-on "eyewitness" identification of five people, including Plaintiffs.

34.     The BPD Officer Defendants, including Defendant Patton, also interviewed Ms. Bailey's daughter, Keisha Thompson, jointly with Ms. Bailey, rather than take separate statements from these two supposed witnesses.

35.     The BPD Officer Defendants interviewed Ms. Bailey and Ms. Thompson together because they were not interested in getting Ms. Thompson's independent information about what she knew and did not know; rather they were only interested in getting Ms. Thompson to adopt and purport to corroborate Ms. Bailey's statement.

36.     Just as the BPD Officer Defendants had planned, after Ms. Bailey gave police her version of events, her daughter Ms. Thompson parroted back what Ms. Bailey said.

37.     In addition, as promised, Ms. Bailey and Ms. Thompson viewed a photographic line-up and falsely identified photographs of Plaintiffs Kenneth McPherson and Eric Simmons, as well as Ellison and Richards (the two men whose names Bailey had overheard in the shop), and a child named Marcus King who used to hang around with Ellison and Richards.

38.     The BPD Officer Defendants then directed Ms. Bailey and her daughter Ms. Thompson to repeat their false identifications of Plaintiffs at a live line-up.

39.     At the time Ms. Bailey and Ms. Thompson made their identifications, the BPD Officer Defendants knew that these two women had not seen the shooting and had no basis to make a truthful, accurate or reliable eyewitness identification of anyone involved.

40.     Based solely on Ms. Bailey and her daughter's false statements about  Plaintiffs' involvement in Wooden's murder, the BPD Officer Defendants arrested Plaintiffs, Marcus King, and the two men who Ms. Bailey overheard were involved in the murder, and caused them to be detained.

### Defendants Fabricate a "Corroborating" Witness Account From Child Witness Marcus King

41.     At the direction of the BPD Officer Defendants, Plaintiffs and Marcus King were arrested on September 6, 1994.

42.     Because of Marcus' young age and vulnerabilities, the BPD Officer Defendants and Trooper First Class Jody Ressin pursued him first. Marcus was only 13-years old at the time.

43.     After his arrest for the Wooden murder, 13-year-old Marcus was brought to the police station, handcuffed to a chair, and placed in leg irons.

44.     Marcus had no parent present for the first two hours of his detention.

45.     The BPD Officer Defendants and Trooper Ressin left Marcus handcuffed to his chair for approximately two-and-a-half hours before they began interrogating him.

46.     The BPD Officer Defendants, including Defendant Patton, and Trooper Ressin, observed Marcus crying multiple times, both before and during the interrogation.

47.     During the course of the interrogation, the BPD Officer Defendants, including Defendant Patton, in cooperation with Trooper Ressin screamed at Marcus, stood up on the desk and yelled at him, told Marcus they did not believe him, and slammed their fists on the table, among other coercive tactics.

48.     Defendant Patton has admitted that their goal during this interrogation was to break the "weak link." At trial, Defendant Patton admitted to feeding him facts and using coercive techniques.

49.     Marcus' mother later arrived at the police station, but her presence did not deter the harsh interrogation tactics used by the BPD Officer Defendants.

50.     Interspersed between their extreme psychological intimidation and coercive tactics, the BPD Officer Defendants, including Defendants Patton and Barlow, alongside Trooper Ressin, fed Marcus "facts" about the crime. They did this to get Marcus to adopt those facts and make a statement which they knew to be false, implicating Plaintiffs in the shooting.

51.     For instance, the BPD Officer Defendants and Trooper Ressin told Marcus to say that Plaintiffs were involved in the murder. Marcus told the BPD Officer Defendants and Trooper Ressin that he was with Plaintiff McPherson on a different block at the time of the murder and they had nothing to do with it. Marcus

further told the BPD Officer Defendants and Trooper Ressin that he saw Plaintiff Simmons come to check on his brother after he heard the shots fired and therefore Simmons, too, could not have had anything to do with the murder.

52.     When Marcus said Plaintiffs had nothing to do with the murder, the BPD Officer Defendants and Trooper Ressin told Marcus he was wrong, and insisted that he give a different answer.

53.     The BPD Officer Defendants and Trooper Ressin also fed Marcus information that would fit what Ms. Bailey overheard, such as that there was a "bag full of guns." These details also ensured that Marcus' statement would match Ms. Bailey's statement. The BPD Officer Defendants and Trooper Ressin told Marcus that he was involved in the murder, that Plaintiffs were involved in the murder, and forced Marcus to adopt that version of events.

54.     Despite his young age and intense fears, Marcus initially resisted the BPD Officer Defendants and Trooper Ressin's tactics. He told the police truthfully that he was not involved, and denied their false accusations.

55.     As a result of their coercive tactics, however, by the end of their interrogation of Marcus, the BPD Officer Defendants, including Defendants Patton and Barlow, and Trooper Ressin succeeded in forcing Marcus to adopt a false statement that corroborated Ms. Bailey's statement.

56.     After more than 13 hours of being held in police custody, BPD Officer Defendants finally permitted Marcus to be transported to juvenile detention.

57.     The BPD Officer Defendants and Trooper Ressin knew that Marcus' statement was false because, among other reasons, multiple people confirmed Plaintiffs' alibis, Plaintiffs did not match the detailed physical descriptions of the suspects given by an actual eyewitness, and there was no physical evidence or other legitimate evidence implicating Plaintiffs in the shooting.

58.     Almost immediately after the abusive interrogation ended, Marcus recanted his statements implicating the Plaintiffs in the shooting.

59.     Marcus King told multiple third-parties during his juvenile proceedings that the BPD Officer Defendants and Trooper Ressin forced him to adopt a false statement.

### Defendants Bury The Evidence
### That Excluded Plaintiffs As Suspects

60.     The BPD Officer Defendants never conducted photographic or live line-up identification procedures with Sandra Jackson, Crystal White, or James Martin, even though these individuals had actually seen the shooting.

61.     Ms. Jackson in particular had given a very detailed description of the men involved and had volunteered to participate in identification procedures.

62.     The BPD Officer Defendants did not seek to obtain legitimate identifications from Ms. Jackson, Ms. White or Mr. Martin because they knew the identifications would contradict the fabricated identifications they had obtained from Ms. Bailey and Ms. Thompson.

63.     Instead, the BPD Officer Defendants suppressed the descriptions Sandra Jackson provided and failed to disclose those descriptions to the prosecution or defense.

64.     Additionally, the BPD Officer Defendants did not disclose the existence of an important witness -- Ms. Jackson's niece -- who likely could have identified one of the men involved in the shooting.

**Plaintiffs' Arrests and Indictment**

65.     On September 6, 1994, Plaintiffs were arrested and taken to the police station, where they were interrogated by the BPD Officer Defendants, including Defendants Patton, Barlow, Gilbert, and Garvey.

66.     During their interrogations, Plaintiffs denied any involvement in the crime, and gave the BPD Officer Defendants information about their whereabouts during the murder.

67.     Both of Plaintiffs' alibis were corroborated by multiple people, including witnesses who eventually testified at their trial.

68.     Daniel Ellison, who was also arrested on September 6, gave the BPD Officer Defendants a statement in which he admitted to his participation in the murder. Ellison gave police details about the crime and identified the other individuals involved, none of whom were Plaintiffs.

69.     In response to direct questions from the BPD Officer Defendants, including Defendants Patton and Barlow, Ellison unequivocally stated

that Plaintiff McPherson, Plaintiff Simmons, and Marcus King were each <u>not</u> involved in the murder.

70.     Despite this unequivocal exclusion by an admitted participant in the murder, the BPD Officer Defendants brought Diane Bailey and her daughter back to the station to view live line-ups of Plaintiffs. As detailed above, Ms. Bailey and her daughter parroted their false identification of Plaintiffs again during the live line-up.

71.     The BPD Officer Defendants presented the Baltimore City State's Attorneys' Office with their false evidence, including Ms. Bailey's and Mr. King's fabricated identifications, in order to secure indictments of Plaintiffs for the Wooden murder.

72.     On October 17, 1994, Plaintiffs were indicted.

**Plaintiffs' Wrongful Convictions**

73.     Plaintiffs' trial lasted one week, after which they were found guilty of conspiracy to murder Anthony Wooden, but not guilty of murder. The only evidence used against them were the two false witness statements from Bailey and King.

74.     Marcus even testified truthfully at Plaintiffs' trial that neither he nor they had anything to do with the shooting. However, Marcus's prior false statement implicating Plaintiffs was introduced as evidence against them, and was used to inculpate Plaintiffs and corroborate Diane Bailey's fabricated statement inculpating them.

14

75.    Plaintiffs were convicted on May 18, 1995.

76.    Plaintiffs were sentenced to life in prison, for a crime with which they had no involvement.

77.    At their sentencing hearings, Plaintiffs Simmons and McPherson adamantly maintained their innocence and made moving statements to the Court to that effect. Plaintiff Simmons told the Court that,

> I just want to put on the record that I did not kill anyone. I did not conspire to kill anyone. I didn't even know my Co-defendant, Nicholas Richards, until the day I was arrested. I did not even know this guy on the street.
>
> \*      \*      \*
>
> And that if it's the mercy of the Court, that I may not spend the rest of my life in prison for something I didn't do, that my mother and family may get the chance to see me again because just as well as the young man's family's hurting, my family [sic] hurt too, not solely because I'm going to prison but solely because I'm going to prison for something I didn't do.

78.    During his sentencing, Mr. McPherson unhesitatingly pronounced his innocence and appealed to the mercy of the Court not to send him to prison for a crime he did not commit, a prison sentence that would have taken him away from his son:

> But if no one else know[s] that me and my brother ain't commit this murder, God knows…
>
> \*      \*      \*
>
> And I would just ask Your Honor that – mercy of the Court as far as me, my son, my family and my brother that you will not send me to jail for the rest of my life for something I had nothing to do with.

## Plaintiffs' Exonerations

79.     From day one, Plaintiffs insisted on their innocence. They continued to fight for their release throughout their many years of painful incarceration.

80.     Eventually, they filed a *pro se* request for the Conviction Integrity Unit ("CIU") of the Baltimore City State's Attorneys' Office. CIU began investigating their convictions.

81.     The Mid-Atlantic Innocence Project ("MAIP") and the University of Baltimore School of Law's Innocence Project Clinic represented Plaintiff McPherson and Plaintiff Simmons in connection with this reinvestigation.

82.     During the reinvestigation, the State determined that numerous pieces of evidence indicating Plaintiffs' innocence of this crime had not been provided to the Plaintiffs.

83.     In addition to the suppressed information describe above, the BPD Officer Defendants withheld from prosecutors the identifies of additional eyewitnesses, a message from a member of the victim's family identifying the shooter to the BPD Officer Defendants as someone different than either Plaintiff, and notes from Daniel Ellison's interview that contained additional exculpatory information not memorialized in Ellison's taped statement.

84.     As a result of the reinvestigation, the State of Maryland joined the Plaintiffs in petitioning the Circuit Court for Baltimore City, Maryland for a

writ of actual innocence and for a new trial.  On May 3, 2019, the Circuit Court

granted the writ and ordered a new trial.

85.     That same day, the State of Maryland dismissed its prosecution

and entered a *nolle prosequi* as to all charges against Plaintiffs. In so doing, the

State represented that "as to Mr. McPherson and Mr. Simmons, that multiple

credible pieces of evidence, exculpating evidence, support that neither Mr.

McPherson nor Mr. Simmons conspired to commit nor committed this murder."

86.     On or near March 4, 2020, Plaintiffs sent a notice of claim to the

Baltimore City Solicitor and the Chief of Office of Legal Affairs for the Baltimore

Police Department.

### Baltimore's Policy and Practice of
### Conducting Flawed Investigations

87.     The constitutional violations that caused Plaintiffs' wrongful

convictions were not isolated events. To the contrary, they were the result of the

BPD's longstanding policies and practices of pursuing wrongful convictions through

reliance on profoundly flawed investigations.

88.     By the time of Mr. Wooden's death and the investigation that led

to Plaintiffs' wrongful arrest and prosecution, those policies were firmly entrenched.

In a race to clear murder cases, the BPD cut corners and rushed to judgment.

89.     Sometimes those constitutional errors were exposed prior to

prosecution. For example, in 1988, nearly 10 percent of Baltimore's 234 homicides

were cleared by the BPD through arrest, but later dropped by the State's Attorney's

Office prior to indictment.

90.     Other times, however, the BPD's unconstitutional conduct was not exposed until long after a prosecution and a conviction had been obtained.

91.     For example, in 1968, Walter Lomax was convicted of robbing a food market and fatally shooting the market's evening manager. It was later discovered that several key pieces of evidence were not disclosed to Mr. Lomax's trial attorney, including a BPD report that showed that an eyewitness identified someone else as the gunman. A separate police report contained notes from a witness interview in which the witness's description of the gunman did not match Mr. Lomax. Mr. Lomax was granted a new trial in 2014 on the basis of these constitutional violations, and the State dismissed the charges.

92.     Similarly, Wendell Griffin was convicted of the 1981 murder of James Wise. Upon information and belief, in 2011, Mr. Griffin discovered numerous documents in the BPD file that were never turned over to him, including exculpatory reports that showed that the two key witnesses in the case had failed early in the investigation to identify Mr. Griffin as the perpetrator.

93.     In 1987, Gary Washington was convicted for the murder of Faheem Ali. Almost a decade later, the only eyewitness to the murder recanted his testimony, explaining that BPD officers coerced him into falsely identifying Mr. Washington as the murderer. In 2018, the court vacated Mr. Washington's convictions and in 2019, the State dismissed the charges.

94.     James Owens's February 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that BPD detectives

withheld evidence of several inconsistent statements by their star witness. In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million.

95. Jerome Johnson was convicted of the 1988 murder of Aaron Taylor. In 2018, he was finally exonerated after it was learned that the key witness against him had given a different account of events on the very day the crime occurred, and a BPD officer had recorded that statement in an official report, but that report had been buried.

96. Sabein Burgess was convicted of the 1994 murder of his girlfriend. But the BPD had highly exculpatory evidence that was never turned over—in particular, exculpatory information that the FBI had provided, and a statement from the victim's son who had seen the killers and told officers that Mr. Burgess was not one of them. In 2014, Mr. Burgess' conviction was overturned. In 2017, a jury awarded him $15 million in his lawsuit against the BPD and one of its detectives. During that civil suit, BPD detectives testified that the BPD policies and practices did not require detectives to document investigative steps, record all evidence in official reports, or turn over all documents to prosecutors.

97. Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's post-conviction counsel discovered that BPD officers failed to disclose exculpatory evidence that indicated Pettiford was not involved in the murder. Mr. Pettiford's conviction was ultimately vacated and charges against him were dismissed.

98.     In 1998, Rodney Addison was wrongfully convicted of a 1996 murder. In October 2005, after nine years in prison, Mr. Addison was released when it was revealed that three exculpatory witness statements to BPD officers had been withheld from Addison's counsel. Two of the exculpatory witnesses testified at the post-conviction hearing. Following the post-conviction hearing, a spokeswoman for the prosecutor's office agreed that one of the factors that contributed to Addison's wrongful conviction was the possibility that all evidence for police was not transferred to prosecutors.

99.     In 1999, Malcolm Bryant was convicted of a 1998 murder and assault that he did not commit. Mr. Bryant was exonerated in 2016. On information and belief, Mr. Bryant's post-conviction proceedings uncovered BPD officers' failure to disclose exculpatory evidence, including evidence impeaching the only "eyewitness" as well as evidence of the likely true perpetrator.

100.    In 1999, Garreth Parks was convicted of the murder of Charles Hill. Mr. Parks was later exonerated after it came to light that BPD officers had suppressed a police report in which another man confessed to being the shooter.

101.    In Plaintiff's case, the unconstitutional fabrication of false inculpatory evidence, withholding of exculpatory information, and bad-faith destruction of exculpatory or potentially exculpatory information was undertaken pursuant to, and caused by a policy and practice on the part of the BPD.

102.    The unlawful misconduct described in this Complaint occurred systematically, pursuant to policies and practices, and accordingly occurred in other cases as well.

103.    Indeed, in 2000, BPD finally acknowledged that the Homicide Unit was in a state of disarray. As such, in January 2000, then-Commissioner Daniel asked BPD officer Stephen Tabeling to prepare a report on the state of the Unit ("Tabeling Report"). In that report, Tabeling found that investigatory files were in a general state of disarray; that there was no procedure for ensuring that all material about an investigation had been recorded and filed appropriately; and that the Unit's practices with the assembly, storage, retrieval, confidentiality, and security of case folders was highly deficient.

104.    Consistent with the municipal policies and practices described in the cases referenced in the preceding paragraphs as well as others, BPD Officer Defendants in this case manufactured false witness statements, suppressed evidence that impeached those "eyewitness" statements, and suppressed evidence that exculpated Plaintiffs. None of this misconduct was disclosed by the Defendants to the State or to Plaintiff's trial counsel.

105.    Policymakers were deliberately indifferent to the violation of constitutional rights described herein and condoned the practices described above. By condoning these practices, policymakers caused Plaintiff's injuries.

106.    The BPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. It

thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

### Failure to Train, Supervise, and Discipline

107.   The constitutional violations described above were also caused by the BPD's failure to train, supervise, and discipline its police employees.

108.   The BPD's failure to train, supervise, and discipline its employees effectively condoned, ratified, and sanctioned the kind of misconduct that the BPD Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case were encouraged and facilitated as a result of the BPD's practices and *de facto* policies, as alleged above.

109.   Indeed, the Tabeling Report found numerous deficiencies in training, including in many basic legal and investigative concepts.

110.   For example, there was a failure during the relevant time period to train police employees on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and that case's progeny and extensions, notwithstanding the obvious necessity of such training.

111.   Additionally, the BPD failed to properly supervise and discipline its police employees. As a result, employees continued to violate citizens' rights in the manner described more fully above, with impunity.

112.   The failure to train, supervise and discipline BPD employees was consciously approved at the highest policy-making level by policymakers who

were deliberately indifferent to the violations of constitutional rights described herein, and was a cause of the injuries suffered here by Plaintiff.

113.   The BPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiffs' ongoing injuries.

### Plaintiffs' Damages

114.   Plaintiffs each spent more than 20 years in prison for a murder that they had nothing to do with.  During those years, they suffered unimaginable hardships.

115.   They were forcibly separated from their loved ones and missed countless milestones, holidays, births, funerals and other life events. They were forced to exist inside a prison cell year after year, in terrifying and oppressive prison conditions. At times, Plaintiffs' hope for receiving justice was severely tested. The emotional pain and suffering caused by losing more than 20 years in the prime of their lives has been substantial.

116.   Plaintiffs also were deprived of the opportunity to meaningfully work or develop valuable skills. Being trapped in a prison for more than 24 years has caused Plaintiffs to endure many difficulties as they adjust to a new society and new norms. They must achieve financial security without having meaningful employment history and with the stain of their wrongful convictions on their records.

117.    As a result of the foregoing, Plaintiffs have suffered tremendous damage, including physical sickness and injury and emotional damages, all proximately caused by Defendants' misconduct.

### Count I – 42 U.S.C. § 1983
### Violation of Due Process (Against BPD Officer Defendants)

118.    Each paragraph of this Complaint is incorporated as if restated fully herein.

119.    As described more fully above, the BPD Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiffs of their constitutional right to a fair trial.

120.    In the manner described more fully above, the BPD Officer Defendants, individually, jointly, and/or in concert and in conspiracy fabricated false reports and false evidence, including fabricating a false statement from Marcus King.

121.    In the manner described more fully above, the BPD Officer Defendants also deliberately withheld exculpatory evidence.  In doing so, the BPD Officer Defendants violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

122.    Absent the BPD Officer Defendants' misconduct, the prosecution of Plaintiffs could not and would not have been pursued, and Plaintiffs would not have been convicted.

123.    The BPD Officer Defendants' misconduct directly and proximately resulted in the unjust and wrongful criminal conviction of Plaintiffs and their continuing wrongful imprisonment, thereby denying them their constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

124.    As a direct and proximate result of this violation of their constitutional right to a fair trial, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical sickness and injury, and psychological and emotional distress.

125.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiffs' clearly established constitutional rights.

### Count II – 42 U.S.C. § 1983
### Federal Malicious Prosecution (Against BPD Officer Defendants)

126.    Each paragraph of this Complaint is incorporated as if restated fully herein.

127.    In the manner described above, the BPD Officer Defendants caused and continued a seizure of the Plaintiffs pursuant to legal process that was unsupported by probable cause.

128.    The criminal proceedings terminated in Plaintiffs' favor.

129.    In the alternative, Plaintiffs were denied the right to effectively defend themselves at trial and the State does not provide an adequate remedy.

130.   Also in the alternative, the BPD Officer Defendants' conduct shocked the conscience.

131.   As a direct and proximate result of the BPD Officer Defendants' malicious prosecution, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and psychological and emotional distress. These BPD Officer Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

132.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiffs' clearly established constitutional rights.

### Count III – 42 U.S.C. § 1983
### Detention without Probable Cause (Against BPD Officer Defendants)

133.   Each paragraph of this Complaint is incorporated as if restated fully herein.

134.   In the manner described above, the BPD Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, detained Plaintiffs.

135.   There was no probable cause for Plaintiffs' detention. Instead, they secured Plaintiffs' arrests through false, manufactured evidence.

136.   As a result of the BPD Officer Defendants' actions, Plaintiffs' Fourth Amendment rights were violated, and they suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and psychological and emotional distress.

137.    The misconduct described in the Count was objectively unreasonable and was undertaken intentionally, in bad faith and with willful indifference to Plaintiffs' rights.

138.    The misconduct described in this Count by the BPD Officer Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

### Count IV – 42 U.S.C. § 1983
### Failure to Intervene (Against BPD Officer Defendants)

139.    Each paragraph of this Complaint is incorporated as if restated fully herein.

140.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, one or more of the BPD Officer Defendants stood by without intervening to prevent the violation of Plaintiffs' constitutional rights, even though they had the opportunity to do so.

141.    As a direct and proximate result of the BPD Officer Defendants' failure to intervene to prevent the violation of Plaintiffs' constitutional rights, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical injury and sickness, and psychological and emotional distress. These BPD Officer Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

142.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiffs' clearly established constitutional rights.

## Count V – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights
### (Against BPD Officer Defendants)

143.    Each paragraph of this Complaint is incorporated as if restated fully herein.

144.    After the murder of Anthony Wooden, the BPD Officer Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals, including Trooper Jody Ressin, to act in concert in order to deprive Plaintiffs of their constitutional rights, including their rights to due process and to a fair trial, all as described in the various paragraphs of this Complaint.

145.    Additionally, before and after Plaintiffs' conviction, the BPD Officer Defendants agreed among themselves and with other individuals, including Trooper Jody Ressin, and further conspired to deprive Plaintiffs of exculpatory information to which they were lawfully entitled and which would have led either to their not being charged, their acquittal, or their more timely exoneration.

146.    In this manner, the BPD Officer Defendants, acting in concert with Trooper Jody Ressin and other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

147.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, withholding exculpatory evidence,

and committing perjury during hearings and trials – and was an otherwise willful participant in joint activity.

148.    As a direct and proximate result of the illicit prior agreement and actions in furtherance of the conspiracy referenced above, Plaintiffs' rights were violated, and they suffered injuries, including but not limited to loss of liberty, physical sickness and injury, and psychological and emotional distress.

149.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiffs' rights.

## Count VI – 42 U.S.C. § 1983
## *Monell* Policy Claims (Against BPD)

150.    Each paragraph of this Complaint is incorporated as if restated fully herein.

151.    The actions of all the Defendants were undertaken pursuant to policies and practices of the Police Department, described above, which were ratified by policymakers with final policymaking authority.  These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.  The policies and practices also included the failure to turn over exculpatory evidence and to rely on fabricated evidence, including fabricated police reports.

152.    The policies and practices described in this Count were maintained and implemented by the Police Department with deliberate indifference to Plaintiffs' constitutional rights.

153.   As a direct and proximate result of the Police Department's actions, Plaintiffs' constitutional rights were violated and they suffered injuries and damages, as set forth in this Complaint.

154.   The Police Department is therefore liable for the misconduct committed by the Defendants.

### Count VII – State Law Claim
### Malicious Prosecution (Against BPD Officer Defendants)

155.   Each paragraph of this Complaint is incorporated as if restated fully herein.

156.   The BPD Officer Defendants accused Plaintiffs of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings.

157.   The BPD Officer Defendants caused Plaintiffs to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

158.   The BPD Officer Defendants fabricated evidence and withheld exculpatory evidence that would have demonstrated Plaintiffs' absolute innocence. The BPD Officer Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiffs in the murder of Anthony Wooden.

159.   The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

160.    On May 3, 2019, the prosecution terminated in Plaintiffs' favor when their convictions were vacated and the charges against them were dismissed.

161.    As a direct and proximate result of this misconduct, Plaintiffs sustained, and continue to sustain, injuries as set forth above, including loss of liberty, physical sickness and injury, and psychological and emotional distress.

**Count VIII – State Law Claim**
**Intentional Infliction of Emotional Distress (Against BPD Officer**
**Defendants)**

162.    The acts and conduct of the BPD Officer Defendants as set forth above were extreme and outrageous. The BPD Officer Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs, as is more fully alleged above.

163.    As a direct and proximate result of the BPD Officer Defendants' actions, Plaintiffs suffered and continue to suffer physical injuries, and psychological and emotional distress.

**Count IX – State Law Claim**
**Civil Conspiracy (Against BPD Officer Defendants)**

164.    Each paragraph of this Complaint is incorporated as if restated fully herein.

165.    As described more fully in the preceding paragraphs, the BPD Officer Defendants, acting in concert with Trooper Jody Ressin and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

166.    In furtherance of the conspiracy, the BPD Officer Defendants committed overt acts and were otherwise willful participants in joint activity including but not limited to the malicious prosecution of Plaintiffs and the intentional infliction of emotional distress upon them.

167.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

168.    As a direct and proximate result of the BPD Officer Defendants' conspiracy, Plaintiffs suffered damages, including physical sickness and injury, and psychological and emotional distress, as is more fully alleged above.

## Count X – State Law Claim
## Article 24 of the Maryland Constitution – Declaration of Rights (Against BPD Officer Defendants)

169.    Each paragraph of this Complaint is incorporated as if restated fully herein.

170.    As described more fully in the preceding paragraphs, the BPD Officer Defendants violated Plaintiffs' due process rights.

171.    As a direct and proximate result of the BPD Officer Defendants' actions, Plaintiffs were wrongfully imprisoned for over two decades for a crime that they did not commit.

172.    As a direct and proximate result of the BPD Officer Defendants' actions, Plaintiffs suffered damages, including physical sickness and injury, and psychological and emotional distress, as is more fully alleged above.

## Count XI – State Law Claim
## Indemnification (Against BPD)

173.   Each paragraph of this Complaint is incorporated as if restated fully herein.

174.   Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

175.   The BPD Officer Defendants are or were employees of the Baltimore Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiffs KENNETH MCPHERSON and ERIC SIMMONS respectfully request that this Court enter judgment in their favor and against Defendants BALTIMORE POLICE DEPARTMENT, DETECTIVE ROBERT PATTON, DETECTIVE DAVE NEVERDON, DETECTIVE FRANK BARLOW, DETECTIVE RICHARD GARVEY, DETECTIVE GILBERT, AND UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each of the BPD Officer Defendants, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiffs, KENNETH MCPHERSON and ERIC SIMMONS, hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**KENNETH MCPHERSON**
**ERIC SIMMONS**

By:     /s/ Gayle Horn
        *One of Plaintiff's Attorneys*

*Attorneys for Plaintiff*
Gayle Horn, Bar Number 07182
Jon Loevy*
Roshna Bala Keen*
Renee Spence*
LOEVY & LOEVY
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
gayle@loevy.com
**Pro hac vice* applications forthcoming