**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| KENNETH MCPHERSON AND<br>ERIC SIMMONS | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 20-CV-795-SAG |
| | ) | |
| BALTIMORE POLICE DEPARTMENT,<br>et al., | ) | |
| | ) | |
| Defendants. | ) | |

**OFFICER DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Robert Patton and Frank Barlow ("Officer Defendants"), by and through their

undersigned counsel, hereby submit the below memorandum of law in support of their motion

for summary judgment.

DATED: February 15, 2023                    Respectfully submitted,


                                            _____/s/_____
                                            Shneur Nathan, Bar No. 20707
                                            Avi T. Kamionski, Bar No. 20703
                                            Judson Arnold, Bar No. 21296
                                            Michael J. Elliker, Bar No. 20810
                                            Alexander S. Rothstein, Bar No. 23228
                                            Nathan & Kamionski LLP
                                            575 S. Charles St., Suite 402
                                            Baltimore, MD 21201
                                            Phone: (410) 885-4349
                                            Fax: (952) 658-3011
                                            snathan@nklawllp.com
                                            akamionski@nklawllp.com
                                            jarnold@nklawllp.com
                                            melliker@nklawllp.com
                                            arothstein@nklawllp.com

                                            *Counsel for Officer Defendants*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................**Error! Bookmark not defined.**

FACTUAL BACKGROUND........................................................**Error! Bookmark not defined.**

LEGAL STANDARD.....................................................................**Error! Bookmark not defined.**

I.    No Material Facts Suggest that Officer Defendants Knowingly or Recklessly Fabricated Any Evidence........................................................................................................................ 15

   A.    There is No Evidence that Officer Defendants Fabricated Diane Bailey's or Keisha Thompson's Identifications of Plaintiffs or Diane Bailey's Testimony ............................... 15

     i.    There is No Credible Evidence that Diane Bailey's Account is False ............... **Error! Bookmark not defined.**

     ii.    Even if Diane Bailey's Account Were False, There is No Evidence That Officer Defendants Recklessly Relied on Her Statement...............**Error! Bookmark not defined.**

     iii.    Plaintiffs Developed No Evidence Thompson's Presence During Bailey's First Interview Caused Their Convictions ..................................**Error! Bookmark not defined.**

   B.    Plaintiffs Have No Viable Fabrication Claim Based on King's Recorded Statement **Error! Bookmark not defined.**

II.    Plaintiff's *Brady* Claims Fail Because No Material Facts Suggest that Officer Defendants Suppressed any Material Evidence in Bad Faith. ......................**Error! Bookmark not defined.**

   A.    Plaintiffs Cannot Establish that Patton Withheld Any Evidence from the State's Attorney's Office. .................................................................**Error! Bookmark not defined.**

   B.    Plaintiffs' Purportedly Suppressed Evidence Does Not Support Their *Brady* Claims Because the Evidence Lacked Material Exculpatory and Impeachment Value, Was Not Suppressed in Bad Faith, or Could have been Discovered by Plaintiffs' Trial Counsel Through Due Diligence.........................................................**Error! Bookmark not defined.**

     i.    There are No *Brady* Issues Surrounding the Evidence that Plaintiffs Allege Was Fabricated and Even if There Were, *Brady* Offers No Relief for Lack of Due Diligence by Plaintiffs' Trial Counsel..............................................**Error! Bookmark not defined.**

     ii.    Handwritten Notes from Interview of Sandra Jackson Lack Exculpatory or Impeachment Value ......................................................................................................... 23

     iii.    Handwritten notes from Daniel Ellison's Interview Are Cumulative and Thus Lack Materiality..................................................................**Error! Bookmark not defined.**

     iv.    Plaintiffs' Remaining *Brady* Allegations are Deficient. .......... **Error! Bookmark not defined.**

III.    Plaintiffs' Malicious Prosecution And Detention Without Probable Cause Claims Fail Because The Undisputed Facts Established Probable Cause for their Arrests And Plaintiffs Have Not Shown that Officer Defendants Acted with Malice ..**Error! Bookmark not defined.**

   A.    Diane Bailey Established Probable Cause for Plaintiffs' arrests. **Error! Bookmark not defined.**

   B.    Plaintiffs developed no evidence that undermines the probable cause established by Diane Bailey's and Keisha Thompson's statements.............**Error! Bookmark not defined.**

   C.    Plaintiffs Developed No Evidence to Support an Inference of Malice........................ 28

IV.    Plaintiffs' Conspiracy Claims Fail Because They Developed No Dispute of Material Fact That Tpr. Ressin Agreed to Violate Plaintiffs' Constitutional Rights ....**Error! Bookmark not defined.**

V.    There is No Evidence that Officer Defendants Failed to Intervene Since There is No Evidence of an Underlying Constitutional Violation.................**Error! Bookmark not defined.**

VI.    Plaintiffs' IIED Claim Must Fail Because Plaintiffs Developed No Evidence that Defendants' Actions were Intentional or Reckless and Extreme and Outrageous. ........... **Error! Bookmark not defined.**

VII.    Alternatively, Officer Defendants are Entitled to Qualified Immunity ................. **Error! Bookmark not defined.**

CONCLUSION ............................................................................**Error! Bookmark not defined.**

# TABLE OF AUTHORITY

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 14

*Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985) ...................................................... 16, 32

*Blankenship v. United States*, No. 5:18-cv-00591 2020 WL 247313 (S.D.V.V. Jan. 15, 2020) .. 22

*Bourchart v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514 (4th Cir. 2003) ............................ 14

*Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994) ..................................................... 20

*Burgess v. Baltimore Police Dep't.*, Civ. No. RDB-15-0834, 2016 WL 795975 (D. Md. Mar. 1, 2016) ................................................................................................. 30

*Cannon v. Polk County*, 68 F.Supp.3d 1267 (D. Or. 2014) ........................................... 21

*Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462 (D. Md. 2002) ...................................... 33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................. 14, 15

*Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019) ............................................ 15

*Cone v. Bell*, 556 U.S. 449 (2009) ................................................................ 20

*De Leon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229 (4th Cir. 1989) .................................. 14

*District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) .............................................. 27

*Estate of Bryant v. Baltimore Police Dep't.*, 2020 WL 673571 (D. Md. Feb. 10, 2020) ............ 30

*Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012) .................................................. 26

*Exxon Corp. v. Kelly*, 381 A.2d 1146 (Md. 1978) .............................................. 26, 28

*Farasat v. Paulikas*, 32 F. Supp. 2d 244 (D. Md. 1997) .............................................. 33

*Gennell v. Denny's Corp.*, 378 F. Supp. 2d 551 (D. Md. 2005) ...................................... 33

*Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019) ...................................... 15, 21, 27

*Hafner v. Brown*, 983 F.2d 570 (4th Cir. 1992) ................................................... 29

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................ 34

*Harrington v. Richter*, 562 U.S. 86 (2011) ........................................................ 21

*Henderson v Simms*, 223 F.3d 267 (4th Cir. 2000) .................................................. 27

*Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416 (4th Cir. 1996) .............................. 29, 32

*Hoffman v. Stampler*, 867 A.2d 276 (Md. 2005) .................................................... 29

*Howard v. City of Durham*, 487 F. Supp. 3d 377 (M.D.N.C. 2020) ...................... 15, 17, 19, 20

*Humbert v. O'Malley*, Civil No. WDQ-11-0440, 2014 WL 126673 (D. Md. Mar. 25, 2014) ..... 27

*Illinois v Gates*, 462 U.S. 213 (1983) ............................................................. 27

*Jackson v. Carin*, No. 8:19-cv-00564-PWG, 2022 WL 17812643 (D. Md. Dec. 19, 2022) ........ 28

*Johnson v. Folino*, 705 F.3d 117 (3d Cir. 2013) .................................................... 25

*Jones v. United Health Grp.*, 2019 WL 3037854 (D. Md. July 11, 2019) ............................ 16

*Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8 (Md. 1992) ...................... 33

*Kyles v. Whitley*, 514 U.S. 419 (1995) ............................................................ 21

*Lloyd v. Gen. Motors Corp.*, 916 A.2d 257 (Md. 2007) ............................................. 29

*Manuel v. City of Joliet*, 580 U.S. 357 (2017) .................................................... 26

*Marshall v. James B. Nutter & Co.*, 758 F.3d 537 (4th Cir. 2014) .................................. 29

*Marshall v. Odom*, 156 F.Supp.2d 525 (D. Md. 2001) ............................................... 29

*Martin v. Conner*, 882 F. Supp. 2d 820 (D. Md. 2012) .............................................. 18

*Massey v. Ojaniit*, 759 F.3d 343 (4th Cir. 2014) .................................................. 15

*McNeal v. Montgomery Cnty.*, 307 Fed. Appx. 766 (4th Cir. 2009) ............................................ 14

*Pearson v. Callahan*, 555 U.S. 223 (2009) ................................................................................... 34

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) .............................................................. 20

*Randall v. Prince George's Cty.*, 302 F.3d 188 (4th Cir. 2002) .................................................. 32

*Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751 (D. Md. 2011) ..................... 33

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015) .................................................................... 31

*Smith v. Cain*, 565 U.S. 73 (2012) ................................................................................................ 20

*Stanton v.* Sims, 134 S.Ct. 3 (2013) ............................................................................................. 34

*Taylor v. Farmer*, 13 F.3d 117 (4th Cir. 1993) ............................................................................ 27

*United States v. Augers*, 427 U.S. 97 (1976) ............................................................................... 20

*United States v. Bosyk*, 933 F.3d 319 (4th Cir. 2019) .................................................................. 27

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) ................................................................... 20

*United States v. Davis*, 787 F.2d 1501 (11th Cir. 1986) .............................................................. 23

*United States v. Ortiz*, 669 F.3d 439 (4th Cir. 2011) ................................................................... 27

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010) ............................................................ 21

*United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990)). ..................................................... 22

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005) .......................................................... 15, 17

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) ............................................................ 31

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) .................................................................................... 30

**Rules**

Fed. R. Civ. P. 56(c) ..................................................................................................................... 14

## INTRODUCTION

In 1995, a Baltimore City Jury convicted Kenneth McPherson and Eric Simmons ("Plaintiffs") for their roles in a conspiracy to murder Anthony Wooden. Their convictions were primarily based on the eyewitness testimony of Diane Bailey and the confession of Marcus King. At trial, Bailey identified Plaintiffs and testified about what she observed from her third-floor bedroom window as the conspiracy formed across the street. According to Bailey, Plaintiffs were part of a group of five people who, while brandishing firearms, chased Wooden up the street just before he was shot. Although King recanted his statement at trial, the State played a recording in which he said that he retrieved a bag of guns at McPherson's request, that Plaintiffs were both armed when they chased Wooden, and that another co-conspirator shot him. Notwithstanding Plaintiffs' claimed alibis that were presented at trial, they were both convicted.

Diane Bailey died in 2011 having never recanted her trial testimony. Marcus King also died years before this lawsuit having never elaborated on his trial testimony. Plaintiffs filed direct appeals and post-conviction petitions, none of which succeeded. Nevertheless, Plaintiffs' convictions were vacated decades later based on a Joint Petition for Writ of Actual Innocence ("Joint Petition") that they filed with the State's Attorney's Office for Baltimore City ("SAO"). The Joint Petition touted Plaintiffs' innocence based on vague assertions that the SAO's Conviction Integrity Unit ("CIU") characterized as new evidence following its extrajudicial review. The Circuit Court for Baltimore City granted the Joint Petition without hearing any testimony. Plaintiffs then filed this lawsuit alleging claims of fabrication of evidence (Count I), failure to disclose exculpatory evidence (Count I), malicious prosecution (Counts II & VII), detention without probable cause (Count III), failure to intervene (Count IV), conspiracy (Counts V & IX), and intentional infliction of emotional distress (Count VIII).

Discovery in this case suggests that the assertions in the Joint Petition were, at best, dubious. The CIU's myopic "reinvestigation" was limited by the sheer fact that Bailey and King were long deceased. In their stead, the CIU relied on witnesses who Plaintiffs knew about before their trial—Bailey's daughter (who still endorses her mother's version of events), a co-defendant, and Plaintiffs' family members and former girlfriends—and substituted their own evaluation of Bailey's credibility for that of the jury.[1] At bottom, Officer Defendants are entitled to summary judgment because the undisputed evidence establishes that the police investigation of the Wooden homicide was conducted in good faith; that Bailey's and King's statements were not knowingly fabricated; that there was probable cause for Plaintiffs' arrests and prosecutions; and that Officer Defendants withheld no material exculpatory or impeachment evidence.

## FACTUAL BACKGROUND

On August 31, 1994, at 12:25 a.m., Baltimore Police Department ("BPD") Officer Garry Brown heard gunshots that he believed came from the 1600 or 1700 block of N. Washington Street ("Washington"). Ex. 2 (Excerpts from Homicide File) at Legal Images Scan Homicide File 0210. As he drove down the 1600 block of Washington, he was met by Crystal White who stated that she also heard the shots. *Id.* Officer Brown then located Anthony Wooden lying on the sidewalk on Washington, north of its intersection with Federal Street ("Federal"). *Id.* Wooden had been shot in the head. *Id.* He was transported to Johns Hopkins Hospital and was declared dead. *Id.* at 033.

Homicide detectives Robert Patton and David Neverdon arrived on scene at 12:50 a.m. *Id.* The crime scene was processed and items including a gym bag and a red baseball cap found next

---

[1] The SAO went beyond joining Plaintiffs' request for a new trial in the Joint Petition by certifying that Plaintiffs are actually innocent. It does not appear that the SAO ever considered Plaintiff Kenneth McPherson's 2014 confession that he participated in the conspiracy to murder Anthony Wooden. Ex. 1 (Patuxent Evaluation) at MS003087.

to Mr. Wooden were recovered. *Id.* at 0209-211. A .32 caliber revolver containing six spent .32 cartridge casings was also recovered next to Mr. Wooden. *Id.*

**Initial Information Learned From Witnesses**

Several witnesses were located and interviewed. *Id.* James Martin stated that he was sitting on the front steps of 1640 Washington when he heard three gunshots. Ex. 2 at 0800. Although his view was blocked by a pickup truck, he saw the victim returning fire as he ran north on Washington and that a suspect shot at the victim from the northeast corner of Federal and Washington.[2] *Id.*

Crystal White was talking with a neighbor while sitting on her steps two blocks north of Washington and Federal when she heard gunshots. Ex. 2 at 0428.[3] She saw the victim crossing Federal, running towards her on Washington. *Id.* She also saw two males on the northeast corner of Federal and Washington before the shooting and that after the shooting, a suspect fled east on Federal. *Id.* at 0429.

Sandra Jackson was standing at the corner of Wolfe Street and Federal before the shooting, about one block west of Washington and Federal.[4] Ex. 2 at 0419. About fifteen minutes before the shooting, she saw a group of three males walk past her heading towards Washington. *Id.* at 0420. One of the males handed a large black handgun to another member of the group. *Id.* at 0421. The group approached two other males at the corner of Washington and Federal. The two males ran north on Washington as someone in the group fired a gun. *Id.* at 0420-21. After hearing the gunshots, Jackson ran towards Washington and saw a shirtless male with a large gun running towards her on Federal. *Id.* at 0421.

---

[2] *See* Ex. 3 (Toby Terpstra's Expert Report) at 1; 21-22 for Martin's vantage point during the Wooden murder.
[3] *See* Ex. 3 at 1; 24 for White's vantage point.
[4] *See* Ex. 3 at 1; 22-23 for Jackson's vantage point.

Patton spoke with Jackson by phone shortly after her first interview. Ex. 4 (trial transcripts) at MS SAO 000534. A paper in the homicide file styled "follow up notes" documented that Jackson stated the shirtless man who ran from the shooting was the same person who robbed her niece "weeks ago." Ex. 2 at 0424. The notes provided the location of the robbery and the name and address of Jackson's niece. *Id.*

**Diane Bailey and Keisha Thompson Come to BPD to Give a Statement**

Nearly 24 hours after the murder, Bailey contacted the homicide office and reported that she and her daughter, Keisha Thompson, witnessed the murder. Ex. 2 at 0040. Bailey and Thompson went to the homicide office and were interviewed together.[5] *Id.* According to a report prepared by Patton ("September 1 Report"), Bailey was in her daughter's third-floor bedroom at 1421 Washington. *Id.* at 0474. She saw a group of men standing in front of Lin's Carryout ("Lin's"), at the intersection of East Oliver Street ("Oliver") and Washington, diagonally across from Bailey's house.[6] *Id.* Bailey provided the street names of the men in the group including: "Country," "Marcus" "Whitey," "JR," and "JR's brother," who she though was called "Black." *Id.*

When Bailey heard JR yell out "Marcus go get the guns, go get the guns," Bailey saw Marcus split from the group and run across the street. *Id.* Bailey watched as Marcus ran towards Alfred Costley's house.[7] *Id.* Both Bailey and her daughter watched Marcus return with a bag. *Id.* JR, Country, and Whitey reached into the bag and retrieved guns; Black reached for the rear of his waist area as if he already had a gun. *Id.*

---

[5] Bailey and Thompson were interviewed together because Thompson "didn't want to be away from her mother. She was afraid to be in the police station." *See* Ex. 4 at 0487. Patton recognized that separating witnesses was the preferred interview method but was not concerned in this instance because "they were totally consistent throughout the investigation with what they had to say to us." *Id.* at 0486–88.

[6] *See* Ex. 3 at 2; 17-18 for Bailey's vantage point from the bedroom.

[7] Alfreda Costley, Kenneth McPherson's girlfriend at the time, and Timothy Simmons, Plaintiffs' uncle, also resided at the house. Ex. 2 at 0088, 0336.

Bailey explained that both she and her daughter saw three guys turn north from Oliver onto Washington. *Id*. One of the guys wore a red hat and carried a bag on his shoulder. *Id*. Bailey believed that he was walking separately from the other two. *Id*. She heard Country yell and then saw Country, Whitey, JR, Black, and Marcus chase the men towards Federal. *Id*. Country, Whitey, JR, and Black each fired guns and the person in the red hat started running after the shooting started. *Id*. Bailey did not say that she saw the victim get shot. *See id*.

After the shooting, Bailey saw the suspects running on Washington back towards Lin's. *Id*. She saw Country run into his house on Gay Street and that the other suspects turned west on Oliver towards Chapel Street ("Chapel"). *Id*. Bailey saw each of the suspects return to the crime scene once the police responded. *Id*. Bailey did not learn that anyone was killed until she overheard the next day that Country had killed someone the night before on Federal and Washington. *Id*.

Bailey and her daughter provided descriptions of where they believed each of the men they saw outside Lin's lived. *Id*. Bailey explained where the suspects hung out and that they frequented Alfred Costley's house. *Id*. Bailey believed that they sold drugs for Country. *Id*. She also told Patton that she would try to gather more information about them. *Id*.

The next day, Bailey and Thompson each individually participated in photo array identification procedures. *Id*. at 0449-62, 0478-93. Both Bailey and Thompson identified Nicholas Richards as "Country" and Marcus King as "Marcus." *Id*. at 0449-58, 0478-79, 0484-85. Five days later, Bailey and Thompson again viewed photo arrays and identified Kenneth McPherson as "JR" and Eric Simmons as his brother, "Black." *Id*. at 0459-62, 0488-89, 0492-93.

**Plaintiffs McPherson and Simmons Are Arrested and Interviewed**

Four days after the homicide, Patton obtained arrest warrants for Daniel Ellison AKA "Whitey" and Nicholas Richards AKA "Country." *Id*. at 0405-06. Two days later, Ellison, Richards, and King were arrested. *Id*. at 0285, 0407-08. Patton also obtained and executed search

and seizure warrants at several addresses related to the investigation. *Id*. at 0099, 0186, 0280, 0405-06. That same day, Plaintiffs were arrested on view and charged in connection with drugs and a gun recovered in their house during a consent search. *Id*. at 0243, 0245-49, 0343.

During McPherson's interview with detectives, he confirmed that he went by the nickname "JR." *Id*. at 0336. McPherson claimed that at the time of the murder, he was socializing with friends in the 1500 block of Chapel.[8] Ex. 5 (McPherson Interview) at MS010386. McPherson stated that after he heard the shots, he ran into Ms. Joanne's house, on Chapel, and then to Alfred Costley's house.[9] *Id*. at MS010387. McPherson stated that he went to the crime scene with his brother after leaving Costley's house. *Id*. He stated that he saw Country at the crime scene along with several other people from the neighborhood. *Id*.

During Simmons's interview with detectives, he confirmed that he went by the nickname "Black Child." Ex. 6 *(*Simmons Interview) at MS010091-92. Simmons claimed that he was asleep in his house when the shooting occurred and that his mother woke him to go look for his brother. *Id.* at MS010091. He found McPherson after he went to Ms. Joanne's house and to Costley's house. *Id*. Simmons then went to the crime scene and saw the victim lying in the street. *Id*.

During Ellison's interview, he confirmed he went by the nickname "Whitey." Ex. 7 (Ellison Interview) at MS009583; Ex. 2 at 0280. Ellison stated that he observed Country, a man named "Rome," and an unidentified male walk up to the corner of Washington and Federal from the direction of Lin's. Ex. 7 at MS009584. The individuals told Ellison that they wanted to rob someone, and Ellison followed them because he wanted to see what they would do. *Id*. Ellison watched Rome order the victim to come to him, and the victim immediately start shooting. *Id*.

---

[8] Chapel runs a short block to the east of and parallel to Federal.

[9] Ms. Joanne is Joanne Crandall, who testified as an alibi witness for Kenneth McPherson. *See* Ex. 4 at 812.

Ellison stated that Country, Rome, and the unidentified male returned fire. *Id*. Ellison ran around the corner during the shootout. *Id*. According to Ellison, Marcus, JR, and Black were not present during the shooting. *Id*. at MS009584-85.

Alfred Costley told detectives that he was with McPherson and King in West Baltimore around the time of the shooting and that ambulances were at the crime scene by the time they returned. Ex. 2 at 0507-08. Costley stated that although he did not want to implicate anyone in the murder, he could not say where Richards was at the time of the murder. *Id*. at 0509.

Detectives Frank Barlow and Patton interviewed King with his mother, Phyllis Smith. *Id*. at 0187. Maryland State Police Trooper Jody Ressin was also present for the interview.[10] *Id*. King's mother was transported to the homicide office shortly after King's arrival. *Id*. at 0384. King was allowed to consult his mother and he was advised of his rights with his mother present. Ex. 8 (Trial Exhibits) at NK DEF 010540-51. From 11:50 a.m. until 1:28 p.m., an interview was conducted in his mother's presence that was memorialized as a sixteen-minute recorded statement.[11] Ex. 2 at 0383-87.

In the recorded statement, King implicated McPherson, Simmons, Ellison, and Richards in the murder. Ex. 4 at 0318-325. King also stated that McPherson told him to "go get the gun," and that he retrieved two guns from Costley's house. *Id*. at 0319-20. King advised that he returned with the guns in a bag and that Simmons and McPherson already had guns. *Id.* at 0322-23. King described the victim walking in the same direction as two people behind him and that Ellison and Richards shot at the victim while McPherson and Simmons shot at the other individuals. *Id. at*

---

[10] Ressin was detailed to the training/ride-along program that the Maryland State Police had with the Baltimore City Homicide unit. Ex. 9 (Ressin Dep., Jan. 13, 2022), at 11:5-11; 39:13-22.

[11] King's recorded statement was not preserved, but it is memorialized in Plaintiffs' trial transcript because the recording was introduced substantively as evidence by the State and published. Ex. 4 at 0315-34.

0324-25. King stated that Ellison shot the victim in the back and that the victim did not immediately fall. *Id.* at 329. He stated that Richards then shot the victim in the head. *Id.*

About a month after the arrests, Bailey testified in front of the grand jury and repeated her observations regarding Plaintiffs. Ex. 10 (Grand Jury Transcript) at MS008383-8391. A grand jury indicted Richards, Ellison, McPherson, and Simmons. Ex. 11 (Grand Jury Indictment) at MS0628-29. Marcus King was charged as a juvenile but his charges were later dismissed. Ex. 12 (King Court records) at MS Juv. Court Subp. 0002.

**Plaintiffs' Criminal Trial Results in Their Convictions**

Plaintiffs and Richards were tried together before a jury.[12] Attorney Warren Brown jointly represented Plaintiffs.[13] The State's main evidence was the testimony of Bailey and King's audio-recorded statement, which was introduced substantively after he recanted. Neither party called Keisha Thompson to testify.

King was the first witness called by the State. He testified that he was with McPherson and his cousin Raheem on Chapel at the time of the murder and that they ran into Ms. Joanne's house when they heard the shooting. Ex. 4 at 175-176. According to King, Richards, Ellison, and Ellison's friend "Reggie" were involved in the murder. *Id*. at 178. King also stated that he learned from Ellison the facts of the murder that he (King) told the police in his recorded statement. *Id*. at 0179, 0201-202, 0229-30. King testified that Simmons was at home during the murder and ran down to the area of the shooting because he thought something had happened to his brother. *Id*. at 182. King repeatedly testified that Plaintiffs had nothing to do with the murder. *Id.* at 0198-200.

---

[12] Co-defendant Ellison separately pled guilty to 2nd degree murder. Case no. 194290008.
[13] Before trial, defense counsel for Plaintiffs and Richards called Diane Bailey to testify during a brief suppression hearing. Ex. 4 at 0110-34. Neither moved to suppress her identifications. *Id*.

King testified that he was not asked questions by the police until his mother arrived and was not questioned outside her presence. *Id.* at 0195, 0220. Even so, when asked about his statement, King claimed that the officer forced him to say what he said on the tape.[14] *Id.* at 0177. Still, King specified much of the information in his statement came from Ellison and that his mom knew he was lying. *Id.* at 0203-04, 0224-25. King stated that the "white detective" was making him say stuff in front of his mother. *Id.* at 0183-84. King testified that the officer would not accept his initial denials and kept telling him to tell the truth. *Id.* at 0199-200. King stated that the detective did not tell him (King) what he (the officer) wanted him to say, but that the detective screamed at him and told him that he (King) had gone to get a bag full of guns. *Id.* at 0204, 0224. King also testified that he said what was on the tape because he (King) was mad. *Id.* at 0224-25.

The State introduced King's recorded statement into evidence via Detective Patton. *Id.* at 0315-333.[15] Patton testified at length regarding the King interrogation, including the sequence of events before the recording. *Id.* at 0398-400. Patton testified that King was handcuffed to a chair because there was no other place to safely secure him as all the interview rooms were full. *Id.* at 0291-92. Patton also explained that he questioned King because he believed King was the "weak link" of the group. *Id.* at 0401. He believed that King did not initially tell the truth even after King was told he would be charged as a juvenile. *Id.* at 0296-298. Patton acknowledged yelling at King, banging his fist on the table, and seeing him cry during the interview. *Id.* at 0299-302. Patton also explained that he told King that he knew King went to get the guns to demonstrate to him that the

---

[14] King also accused officers of forging his and his mother's initials on his explanation of rights form. Ex. 4 at 0189. And he accused the trial prosecutor of instructing him to testify consistently with his taped statement. *Id.* at 0226.

[15] Patton also testified that King repeated the version of events in the taped statement on May 11, 1995 in the presence of the trial ASA. *Id.* at 0337-39.

police knew about his involvement. *Id.* at 0490. Patton testified that, to avoid tainting King's statement, he corrected nothing that King said in the recording. *Id.* at 0492-493.

Bailey, consistent with her prior statements, described seeing Ellison, McPherson, Simmons, Richards, and King on the corner in front of Lin's and identified each of the defendants for the jury. *Id.* at 0604, 0607, 0609. She also recounted sticking her head out the window after hearing McPherson scream at Marcus to get the guns. *Id.* at 0604, 0636, 0651, 0687. She described seeing Marcus return with a bag and watched McPherson, Ellison, and Richards reach for guns. *Id.* at 0608. Bailey explained that Simmons did not reach for a gun but had his hand on his hip as though he had one. *Id.* at 0610. She also described the three individuals who turned onto Washington from Oliver, and hearing Country yell, and the group chasing the men north on Washington, guns in hand. *Id.* at 0614. Bailey testified that gunfire erupted just after the three men turned onto Washington. *Id.* at 0615; 0618; 0641. Bailey testified that she did not see the victim get shot. *Id.* at 0619, 0633, 0641-42. After the gunfire stopped, Bailey saw Richards go into his house on Gay Street and saw the other four run towards Chapel. *Id.* at 0619.

Bailey described in great detail at trial and marked on an exhibit just how far she could see. *Id.* at 0618-19; Ex. 8 at NK 010542. She testified that she could not see to Federal from her window. Ex. 4 at 0643. Upon cross-examination by Plaintiffs' counsel, Bailey remained firm that she could not testify about what happened beyond her sightline but that she could see the corner of Washington and Oliver and saw the pursuit towards Federal. *Id.* at 0631-34. Bailey also explained that she continued to hear gunfire after people were out of her line of sight. *Id.* at 0648.

Bailey testified about benefits she received related to being relocated by the State for her safety. *Id.* at 0698-704.[16] She testified about witnessing another murder in the Hollander Ridge public housing community. *Id.* at 0656-57, 0667-69, 0716. And she explained that she initially did not agree to participate in the witness protection program but changed her mind after someone threatened to shoot her daughter. *Id.* at 0658, 0668-69. Bailey testified that at the time of the Wooden homicide, she was still in the witness protection program but did not feel she was being adequately protected. *Id.* at 0665. Still, she did not request to be moved until she overheard a conversation in a store that caused her concern. *Id.* at 0676. She explained that she was relocated a second time on the day she testified before the Grand Jury for the Wooden case. *Id.*

Bailey explained to the jury that she did not immediately learn that someone died during the shooting she witnessed. *Id.* at 0622. And she voiced that she did not want to go down to the crime scene when police arrived for fear of being hurt. *Id.* When asked why she went to see police the next day, Bailey stated that, as a mother, she would want to know if one of her children had been killed. *Id.* When pressed, Bailey stated that she hesitated to call the police "for the simple fact, I live in the neighborhood that these guys live in. You don't. I know what—I see some of the things that they do to other people, you don't." *Id.* at 0682.

Plaintiffs called several alibi witnesses in their defense. McPherson's witnesses testified that they saw McPherson on Chapel before the shooting and that he ran into a house on Chapel after the gunshots and that Simmons came looking for him. Simmons's witnesses was asleep in

---

[16] Both defense attorneys raised issues with the State's failure to disclose a list of pre-trial benefits provided to Bailey. Ex. 4 at 0658-664. Defense counsel later introduced a benefits memorandum as an exhibit during trial. Ex. 8 at NK DEF 010539; Ex. 4 at 0137.

his house and went looking for McPherson after the shooting.[17] *Id.* at 761-763, 765, 779; 788-90; 815-818; 837-840; 850-54

On May 18, 1995, Plaintiffs and Richards were convicted of conspiracy to commit murder in the first degree but were acquitted for the murder itself. *Id.* at 0965-966. Plaintiffs received sentences of life imprisonment. *Id.* at 1023.

**CIU Extrajudicially Reinvestigates the Wooden Homicide and Joins the Joint Petition**

The CIU launched its reinvestigation at Plaintiffs' requests. Ex. 14 (CIU Memo) at NK 011520. In the Joint Petition, the CIU and Plaintiffs asserted that "new evidence" from witnesses (identified only by initials) undermined confidence in the jury's verdicts. Ex. 15 (Joint Petition) at 0630-40. But these witnesses were well known to Plaintiffs before trial.[18] Still, Lauren Lipscomb, then the chief of the CIU, made several representations to the court that the CIU's evidence was newly discovered or undisclosed. Ex. 16 (Joint Petition Hearing) at MS008401-24.

Even minimal probing of the CIU's findings quickly reveals that the evidence it trumpeted was anything but "new." For example, during the Joint Petition hearing, Lipscomb represented to the court that E.P. [Ebony Paige] provided newly discovered alibi evidence. *Id.* at MS008405-06. Lipscomb also represented that no defense attorney could have located her with due diligence. *Id.* at MS008409. Yet according to the CIU's reinvestigation, Paige *told them* that Plaintiffs' trial counsel told her she could not testify because she was not credible. Ex. 14 at NK011527. And in

---

[17] Notably, McPherson unsuccessfully tried to post-convict his trial counsel for calling his mother, Janice McPherson to testify for Simmons. He claimed that her testimony contradicted his witnesses. Ex. 13 (Pro Se Post-Conviction Petition) at 0358-360.

[18] The witnesses highlighted by the CIU included Ebony Paige (Simmons's girlfriend), Alfred Costley (identified as an alibi witness by Plaintiffs' trial counsel), Alfreda Costley (McPherson's girlfriend and Alfred's twin), Daniel Ellison (co-defendant), and Keisha Thompson (discussed *infra*). Ex. 15 at 0637-39.

opening arguments, Plaintiffs' counsel told the jury the substance of Paige's "newly discovered evidence"— after the gunshots, Simmons' mother told her to wake him up.[19] Ex. 4 at 0159.

The only conceivable "new" evidence in the Joint Petition was the CIU's claim that Keisha Thompson, Bailey's daughter, stated that she did not observe the incident. Ex. 15 at MS000638. But the CIU did not disclose to the court that its "interview" with Thompson, who the CIU characterized as "actively avoid[ing] contact with our office,"[20] was an exchange of text messages and brief phone calls, in many of which she expressed that she "did not know anything" and that the CIU "should have spoken to [Bailey]." Ex. 14 at NK 011525. Astoundingly, the CIU's documents show that Thompson told them that "she was at the house the night of the murder *and saw something*[.]" *Id.* (emphasis added). Even though Thompson did not wish to cooperate with the reinvestigation and never discredited Bailey, the CIU represented that Thompson's last statement over the phone that she "did not see anything" rebuked Bailey's unblemished testimony.[21] Ex. 15 at MS000638.

---

[19] Lipscomb also made erroneous representations at the hearing that implied that *Brady* violations occurred—representations that she has since walked back. For example, at the Joint Petition hearing, she represented that statements made by Alfreda Costley AC1 in the Joint Petition, were not disclosed by the State. Ex. 16 at 08410-8413. But at her deposition, Lipscomb conceded that she "really can't say one way or the other" whether Alfreda Costley's statement was disclosed. Ex. 17 (Lipscomb Depo., Jun. 29, 2022), at 113-14.

[20] Thompson was similarly uncooperative in in this lawsuit. She failed to appear for her deposition and Plaintiffs filed an unopposed Motion for a Rule to Show Cause against her. ECF 68. Thompson eventually testified at a deposition at the courthouse amidst the show cause hearing. Though as with the CIU, she claimed not to remember anything and told Plaintiffs' counsel that they should have talked with her mother. *See* Ex. 18 (Thompson Depo., Jul. 18, 2022) at 80:24-81:9.

[21] The CIU stated in the Joint Petition that after "multiple visits to the area to evaluate the scene," "it would have been impossible for Witness DB [Bailey] to have heard and seen what she purported." Ex. 15 at MS000638. The CIU went to the scene twice and performed a "test" where one person stood in front of Bailey's house and called out to the other person who stood in front of where Lin's was to see if they could hear one another. Ex. 14 at NKDEF 011524. The CIU concluded that "it is possible to hear that someone is yelling but not actual words." *Id*. The CIU also stated that it was impossible for Bailey to see the crime scene that it specified was the 1600 block of Washington. *Id*. As stated *supra*, Bailey never stated she saw the shooting. Even so, at

Based on the CIU's represented, the Court granted the Joint Petition SAO, and the SAO dismissed Plaintiffs' indictments. Ex. 16 at MS008422.

**LEGAL STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). To determine whether there is a genuine issue of material fact, courts construe the record in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). Neither "[u]nsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment[.]" *Id.*

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49. Further, "[u]nsupported allegations as to motive do not confer talismanic immunity from Rule 56." *De Leon v. St. Joseph Hosp., Inc.*, 871 F.2d 1229, 1236 (4th Cir. 1989). And "mere speculation by the plaintiff that the defendant had a discriminatory motive is not enough to withstand a motion for summary judgment." *McNeal v. Montgomery Cnty*, 307 Fed. Appx. 766, 774 (4th Cir. 2009).

---

the deposition of the CIU's investigator, Brian Ellis, he conceded that he could see the intersection of Washington and Federal from the front of Bailey's house. Ex. 19 (Ellis Dep., Jun. 23, 2022) at 163:9-16.

If a plaintiff will be unable to satisfy the legal requirements necessary to establish a cognizable claim, summary judgment is not only proper, but mandated. *See Celotex*, 477 U.S. at 322.

## I.   No Material Facts Suggest that Officer Defendants Knowingly or Recklessly Fabricated Any Evidence

To survive summary judgment, Plaintiffs must point to evidence that Officer Defendants fabricated evidence or induced a witness to provide false information and that Plaintiffs' convictions were a reasonably foreseeable result of Officer Defendants' actions. *See Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005); *Gilliam v. Sealey*, 932 F.3d 216, 240 (4th Cir. 2019), *cert. denied* 140 S.Ct. 2641 (2020); *Coleman v. City of Peoria*, 925 F.3d 336, 344, 348 (7th Cir. 2019) (describing a fabrication claim as "a high bar to clear" because it requires proof not only that the officer defendants knew that the evidence was false but also that it was "manufactured"). A plaintiff may prove a fabrication claim by showing that an officer fabricated false evidence "deliberately or with reckless disregard for the truth." *Howard v. City of Durham*, 487 F. Supp. 3d 377, 404-05 (M.D.N.C. 2020) (quotation omitted). Fabrication is shown where an officer "entertained serious doubts as to the truth of [the] statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* at 405 (quoting *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014)).

Plaintiffs' fabrication theories in this case fail because no evidence shows that Officer Defendants knowingly or recklessly fabricated any evidence.

### A.   There is No Evidence that Officer Defendants Fabricated Diane Bailey's or Keisha Thompson's Identifications of Plaintiffs or Diane Bailey's Testimony

Within 24 hours of the murder, Diane Bailey contacted BPD and voluntarily came to headquarters to be interviewed with her daughter, Keisha Thompson. Neither Bailey nor Thompson ever alleged that Officer Defendants provided either of them with information about

15

the Wooden homicide. Notwithstanding the plausible account that Bailey provided about the events just before the homicide, Plaintiffs ask this Court to draw inference upon inference to invalidate Bailey's account: (1) that Bailey was less likely to tell the truth because she received benefits as a witness to another homicide; (2) that she was dissatisfied with the benefits she was receiving; (3) that she was willing to lie to receive more benefits; and (4) that Officer Defendants knew or should have known, despite testimony to the contrary, she was lying for more benefits. ECF 1 at ¶¶ 28, 32-33. The Court should not credit such rank speculation. *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) ("[t]he nonmoving party [] cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another"); s*ee also Jones v. United Health Grp*., 2019 WL 3037854, *1 (D. Md. July 11, 2019) ("The Court need not draw inferences in the nonmoving party's favor where those inferences would be based only on speculation, rather than the factual record").

### i.   There is No Credible Evidence that Diane Bailey's Account is False

Without support, Plaintiffs allege that Bailey only had second or third-hand information about the homicide. ECF 1 at ¶ 28. But Plaintiffs developed no evidence to undermine several key facts establishing that Bailey witnessed the conspiracy form: (1) people with guns gathered in front of Lin's; (2) Lin's was clearly visible from Bailey's window; (3) the suspects began chasing Wooden from outside of Lin's; and (4) and those involved in the shooting returned to the crime scene. *See* Ex. 15 at MS000631; Ex. 2 at 474–76; Ex. 20 at 219:17–227:22 (Deposition of Eric Simmons); Ex. 21 at 211:8–10 (Deposition of Kenneth McPherson). Bailey's story remained consistent from when she first came to homicide through testifying in front of the grand jury and at trial. Bailey's photo identifications of Plaintiffs, Richards, and King confirmed that she knew the individuals that she previously identified by street names.

As there is no reliable evidence that Bailey could not have seen or heard what she testified she observed Plaintiffs doing outside of Lin's, Plaintiffs' fabrication claim fails because they cannot demonstrate that Bailey's statements in police reports or that any of Bailey's testimony was false. *See Washington*, 407 F.3d at 282.

### ii.  Even if Diane Bailey's Account Were False, There is No Evidence That Officer Defendants Recklessly Relied on Her Statement

Assuming for purposes of argument that Bailey lied to Patton on the day after the murder, there is no evidence that he knew or should have known that Bailey was not telling him the truth. Bailey voluntarily came to headquarters to be interviewed. She had no connection to the victim or to the suspects that should have caused officers to question her motivation. And Bailey provided a plausible account with specific details about actions that she attributed to each suspect. Patton testified that Bailey expressed fears for her safety but that she never requested benefits to cooperate with the investigation. Ex. 4 at 0499-501. Indeed, nothing in the record supports an inference that Bailey asked Officer Defendants or the SAO for benefits in connection with the homicides she witnessed until after she or her family members were threatened.[22] *See id.* at 0668-670, 0674. With no evidence that Bailey's plausible account related to any apparent financial motivation or obvious bias, Plaintiffs cannot show that Officer Defendants ever had reason to doubt her account. *See Howard*, 487 F. Supp. 3d at 405.

### iii.  Plaintiffs Developed No Evidence That Keisha Thompson's Presence During Diane Bailey's First Interview Caused Their Convictions

Thompson has not disavowed any statements attributed to her during her joint interview with Bailey. Thus, it is entirely speculative that any of her statements were false. But assuming

---

[22] Notably, the benefits memorandum corroborates Bailey's testimony that her family was not moved from Washington until well after the murder. *See* Ex. 8 at NK DEF 010556.

that Thompson was interviewed with Bailey to get her to adopt Bailey's memory of the night, it did not affect Plaintiffs' convictions. Thompson knew all of the suspects before the murder. Ex. 21 at 119:14-122:20; 167:4-20. And she later confirmed the street names of the suspects she already knew during photo arrays. Ex. 2 at 0488-89, 0492-93. Still, because Thompson did not testify at Plaintiffs' trial, her presence for Bailey's interview had no nexus to Plaintiffs' convictions. *See Martin v. Conner*, 882 F. Supp. 2d 820, 847 (D. Md. 2012) (requiring that the fabrication result in deprivation of liberty).

### B. Plaintiffs Have No Viable Fabrication Claim Based on Marcus King's Recorded Statement

For the same reasons that Bailey's statement and testimony were reliable, there is no evidence that King's taped statement, which mostly mirrors what she said, is inaccurate.[23] King gave the statement after both he and his mother agreed that telling the truth was the best thing to do. Ex. 4 at 0318. King's statement closely tracked Bailey's description of what she saw outside her window: he described being with the same people at the same corner; that McPherson told him to get the guns; that he retrieved them from across the street; and that he carried them back in a bag. *Id.* at 0318-321. Consistently with Bailey's statement, King also testified that each of the suspects had guns before Wooden and the other two individuals turned onto Washington and that they pursued them on Washington. *Id.* at 0323-25.

Assuming that King's recorded statement were false, there is no evidence that Officer Defendants knew of the statement's falsity or that detectives had an ulterior motive. Patton's testimony showed that he intended for King to state what Patton believed was the truth. Ex. 4 at 0401-02, 0490-93. And Patton's reason for interviewing King first was innocuous—"Marcus King

---

[23] Plaintiff McPherson's 2014 confession also reinforces that Bailey's testimony and King's confession were factually accurate. Ex. 1.

would be the most likely one to tell what happened." *Id*. at 0401. Although Patton banged his fist on the table and raised his voice, it was because he wanted King to stop lying and tell the truth. *Id*. at 0401-02. Patton was clear that he told King he knew that he went to get the guns because he needed to "give [King] a fact that I know that [King] knows is true" to get King to tell the truth. *Id*. at 0490. Even when asked why he did not correct an error in King's recorded statement, Patton explained that "[t]he errors that you're talking about errors aren't actually errors. Marcus actually believed that the guy was shot in the back, so I cannot dispute what he believed. That was his statement. If I corrected him, it would not be his true statement." *Id*. at 0492-93.

King's own testimony reinforced that the officers wanted King to tell the truth. *Id*. at 0199-200. King testified that the officer kept telling him to tell the truth. *Id*. And King was clear that although the officer told him that he knew King had gone to get a bag of guns, the officer did not tell King what he wanted him to say. *Id*. at 0204, 0224. Even according to King, the facts that he provided to the police were learned from Ellison, not police officers. *Id*. at 0179, 0201-04, 0229-30. As the facts contained in King's taped statement were not provided by the police, it is not a reasonable inference that Officer Defendants should have known that the version King gave them was false. And absent evidence of coercion, Plaintiffs' unsupported speculation to the contrary are not entitled to favorable inferences. *See Howard*, 487 F. Supp. 3d at 406-07 ("to attack sworn trial testimony at [the summary judgment] stage there must be some evidence or basis from which a jury could reasonably conclude that *the law enforcement officer* improperly influenced the witness or had serious doubts about the truthfulness of his or her testimony") (emphasis in original).

Even if King's statement were procured through aggressive questioning, this allegation does not amount to an actionable fabrication claim under the 14th Amendment because there is no evidence that the tactics were in reckless disregard for the truth. *See Howard*, 487 F. Supp. 3d at

404-05. As the Seventh Circuit explained, "[c]oercing witnesses to speak . . . is a genuine constitutional wrong, but the persons aggrieved [are the witnesses] rather than [the arrestee]." *Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994); *see also Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) ("[c]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial," because "[e]vidence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true") (internal quotation omitted). As Patton never had reason to doubt the accuracy of King's statement, Plaintiffs cannot rightfully claim that Patton's methods in arriving at the truth violated *their* rights. The most Plaintiffs can point to is an inference that Patton used suspect techniques to encourage King to tell him what he believed was the truth, not that Patton fabricated falsified evidence. Therefore, summary judgment should be granted as to Plaintiffs' fabrication of evidence claim.

## II.     Plaintiff's *Brady* Claims Fail Because No Material Facts Suggest that Officer Defendants Suppressed any Material Evidence in Bad Faith

The Government violates due process when it suppresses evidence favorable to the defense and is material to a criminal defendant's guilt or punishment. *Smith v. Cain*, 565 U.S. 73, 75 (2012). But "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Augers*, 427 U.S. 97, 109-10 (1976). Speculation that evidence is material is insufficient. *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010). Evidence is material when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).

A reasonable probability is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The standard is satisfied if "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial or the suppression casts serious doubt on the proceedings' integrity." *Gilliam*, 932 F.3d at 238 (cleaned up). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

That said, "police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Gilliam*, 932 F.3d at 238. To prevail on their *Brady* claim, Plaintiffs must prove that Officer Defendants suppressed material exculpatory evidence in bad faith and that "the alleged wrongful acts caused [Mr. Simmons and McPherson's] loss of liberty and the loss of liberty was a reasonably foreseeable result of the act." *Id.*

## A.   Plaintiffs Cannot Establish that Patton Withheld Any Evidence from the State's Attorney's Office

A police officer's *Brady* duty is satisfied through an officer's disclosure to prosecutors. *See United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010); *Cannon v. Polk Cnty.*, 68 F.Supp.3d 1267, 1279 (D. Or. 2014) (explaining that police officers fulfill their *Brady* obligation through disclosure of evidence to the prosecutor even if the defense never receives it). The uncontroverted evidence in the record shows that documents included in the homicide file would have been made available to the SAO. Sharon Holback, the trial ASA, testified that she had no reason to doubt that Patton would have made the homicide file available to her upon her request. Ex. 22 (Holback Dep., Mar. 22, 2022) at 48-49, 55-56. Because Plaintiffs cannot establish that the trial ASA did not review particular documents in the homicide file, Plaintiffs' *Brady* claims that Officer Defendants suppressed any documents must fail.

**B. Plaintiffs' Purportedly Suppressed Evidence Does Not Support Their *Brady* Claims Because the Evidence Lacked Material Exculpatory and Impeachment Value, Was Not Suppressed in Bad Faith, or Could have been Discovered by Plaintiffs' Trial Counsel Through Due Diligence**

Plaintiffs cannot show that Officer Defendants ever suppressed any evidence, let alone that they did so in bad faith. Plaintiffs also cannot demonstrate how the evidence that they allege was suppressed could not have been discovered with due diligence. Even if this were not the case, an analysis of each piece of allegedly exculpatory evidence confirms that the evidence would not have actually exculpated Plaintiffs.

**i. There are No *Brady* Issues Surrounding the Evidence that Plaintiffs Allege Was Fabricated and Even if There Were, *Brady* Offers No Relief for Lack of Due Diligence by Plaintiffs' Trial Counsel**

As there is no evidence that Officer Defendants fabricated any evidence, Plaintiffs lack a basis for a reasonable inference that Officer Defendants failed to notify the ASA that any evidence was fabricated. Thus, any *Brady* claim premised on fabricated evidence must fail. Even so, there is no evidence that Thompson would have testified any differently than Bailey and the State disclosed Bailey's witness protection benefits in time for Plaintiffs' trial counsel to explore them in great detail at trial. Ex. 4 at 0698-704. Plaintiffs offer only speculation that any purportedly suppressed evidence connected to Thompson or Bailey was material.

In any event, the Fourth Circuit has "firmly established" that the *Brady* rule does not apply where "suppressed evidence is both available to the defendant and in a source where a reasonable defendant would look." *Blankenship v. United States*, No. 5:18-cv-00591 2020 WL 247313, *8 (S.D.V.V. Jan. 15, 2020) (citing *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990)). This is particularly true where exculpatory evidence lies with a witness who a criminal defendant would reasonably be expected to have interviewed in preparation for trial. *See Wilson*, 901 F.2d at 380-81 (affirming there was no *Brady* violation when the defendant could have interviewed a witness

likely to have exculpatory evidence); *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986) (affirming there was no *Brady* violation where the defendant knew the government's witnesses' identities before trial and had reasonable access to them so that they could have discovered inconsistent statements).

The SAO made Thompson available to Plaintiffs' trial counsel. Ex. 4 at 0137. Thus, even if there were fabrication issues related to Thompson, Plaintiffs developed no evidence that their trial counsel attempted to interview her to uncover the circumstances of her statement or whether she had impeachable reasons for coming forward. Due to the lack of due diligence exercised by Plaintiffs' trial counsel, their *Brady* claims concerning Thompson fail.

Similarly, *Brady* claims surrounding King's numerous recantations also fail. Plaintiffs developed no evidence that their trial counsel exercised due diligence to interview King about the circumstances of his recorded statement or otherwise probe for exculpatory evidence. Separately, Plaintiffs' trial counsel was notified before the trial that King had told the SAO that "Eric [Simmons] and them didn't have nothing to do it." Ex. 23 (SAO Disclosure) at MS009138. Plaintiffs' trial counsel was also notified that King had made statements in juvenile proceedings that might have been exculpatory for Plaintiffs. *Id.* As Plaintiffs' counsel was put on notice regarding these statements, and King stated several times at trial that Plaintiffs were not involved in the crime, there is no evidence that the jury's knowledge of any other pretrial recantations would have influenced its decision. The jurors also considered King's testimony that the officers used aggressive techniques to get him to "lie" on the taped statement and still convicted Plaintiffs. As Plaintiffs generated no reasonable inference of a different outcome based on any of King's purportedly suppressed statements, Plaintiffs' *Brady* claims premised on them fail.

ii.    **Handwritten Notes from the Interview of Sandra Jackson Lack Exculpatory or Impeachment Value**

Without support, Plaintiffs allege that the descriptions that Sandra Jackson provided to Officer Defendants and the existence of her niece as a potential witness were suppressed. ECF 1 at ¶¶ 63-64. The notes attributed to Jackson lack materiality given that they do not contradict Bailey's version of events or suggest that Plaintiffs did not participate in the conspiracy to commit the murder.[24] *See* Ex. 2 at 0419-24. In a light most favorable to Plaintiffs, Jackson's niece might have said that neither Plaintiff robbed her weeks ago. But her statement still would not have eliminated them as one of the several people who gathered in front of Lin's and chased Wooden with guns, as Bailey described.

There is also no evidence that notes attributed to Jackson were ever suppressed in bad faith. Jackson was disclosed as witness pretrial by the SAO. Ex. 24 (SAO Disclosure) at MAIP 046-47. And at trial, Patton read from the notes of her statement and Plaintiffs' trial counsel raised no issue about not having received them. Ex. 4 at 0452-459, 0462-64. As Detective Patton freely testified that he talked to Jackson shortly after her interview, it is not a reasonable inference that he suppressed any notes from her interview in bad faith. *Id*. at 0534.

### iii.  Handwritten Notes From Daniel Ellison Interview are Cumulative and Thus Lack Materiality

It is undisputed that Plaintiffs' co-conspirator, Daniel Ellison, gave an audio recorded statement claiming to exculpate Plaintiffs and that this statement was provided to Plaintiffs pretrial. Even so, Plaintiffs allege that notes from the interview containing exculpatory evidence not memorialized in his statement were suppressed. ECF 1 at ¶ 83. This allegation was not supported by the facts developed in discovery. The only conceivable note alluded to by Plaintiffs would be

---

[24] As the events that Bailey observed in front of Lin's could not be seen from where Sandra Jackson reported she stood before the shooting, Jackson could contradict Bailey's assertions about what happened across from her house. Ex. 3 at 1, 23.

that "Antoine/Reggie" knows "Rome" and can identify the shooters. Ex. 2 at 0287. But there is no

evidence that this note was ever suppressed. Regardless, Plaintiffs can only speculate that the note

had material value because Ellison explicitly exculpated Plaintiffs in evidence that was inarguably

disclosed. *See Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) ("Suppressed evidence that

would be cumulative of other evidence . . . is generally not considered material for *Brady*

purposes"). Additionally, Plaintiffs have no evidence that their trial counsel ever attempted to

interview Ellison, thus, as discussed above, *Brady* provides them no relief for lack of due

diligence.[25] Ex. 26 (Ellison Dep., Dec. 15, 2021) at 232:16-23.

### iv.   Plaintiffs' Remaining *Brady* Allegations are Deficient

In their Complaint, Plaintiffs allege that Officer Defendants suppressed a message from a

member of the victim's family that identified the shooter as someone different than either Plaintiff.

ECF 1 at ¶ 83. But as with their other claims, Plaintiffs speculate that the note was material. No

evidence suggests that a member of the Wooden's family witnessed the murder. All the same,

Plaintiffs were convicted of conspiring to murder Wooden, not for shooting him. Thus, the note

lacks materiality.

Plaintiffs also vaguely allege that Officer Defendants withheld other eyewitnesses from

them. ECF 1 at ¶ 83. It is unclear to whom Plaintiffs refer, but nothing in the record suggests that

any eyewitness who came forward was not interviewed and identified in the homicide file.[26]

---

[25] In his *pro se* October 5, 2005 Amended Post Conviction Petition, McPherson alleged that his trial counsel was ineffective for failing to call Ellison as a witness. Ex. 25 (Amended Post Conviction Petition) at MDCC Subpoena Response 000325-27.

[26] For the same reasons that Plaintiffs' individual *Brady* allegations each lack materiality, a collective analysis of their claims leads to the same result. *Wearry v. Cain,* 577 U.S. 385, 394 (2016).

As Plaintiffs failed to establish that Officer Defendants suppressed any evidence in bad faith, that the SAO was unaware of any favorable evidence, or that criminal defense counsel could not, through the exercise of due diligence, discover evidence purportedly suppressed by Officer Defendants, Plaintiffs' *Brady* claims all fail.[27]

### III.    Plaintiffs' Malicious Prosecution and Detention Without Probable Cause Claims Fail Because the Undisputed Facts Established Probable Cause for their Arrests and Plaintiffs Have Not Shown that Officer Defendants Acted with Malice

In Counts II, III, and VII of the Complaint, Plaintiffs assert claims under 42 U.S.C. § 1983 and Maryland law that they were unlawfully detained without probable cause and maliciously prosecuted. *See* ECF 1 at ¶¶ 25–27, 30–31. To establish their claims under § 1983, Plaintiffs must show that defendants "caused a seizure of the plaintiff[s] pursuant to legal process unsupported by probable cause, and criminal proceedings terminated in [plaintiffs'] favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012); *see also Manuel v. City of Joliet*, 580 U.S. 357, 369 (2017) (plurality opinion). To prove malicious prosecution under Maryland law, Plaintiffs must establish that (1) their criminal proceeding was instituted or continued by the defendants against them; (2) the proceeding terminated in their favor; (3) that the criminal proceeding lacked probable cause; and (4) "malice, or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Exxon Corp. v. Kelly*, 381 A.2d 1146, 1149 (Md. 1978).

---

[27] Plaintiffs do not appear to separately claim that Officer Defendants conducted a constitutionally deficient investigation by failing to adequately investigate their alibi witnesses or to identify alternate suspects. Regardless, law enforcement has no constitutional duty to "investigate independently every claim of innocence" or "perform an error-free investigation." *Baker v. McCollan*, 443 U.S. 137, 146 (1979). "While the Supreme Court in *Brady* held that the government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case." *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) (quoting *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir. 1990)).

26

As this Court recently explained, lack of probable cause is a "central component" of a malicious prosecution claim. *Johnson,* 2022 WL 9976525 at *60. Probable cause is "defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000). It is "not a high bar." *United States v. Bosyk*, 933 F.3d 319, 315 (4th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018). Probable cause requires less of a showing than the formal preponderance of the evidence standard. *United States v. Ortiz*, 669 F.3d 439, 444-45 (4th Cir. 2011). Importantly, probable cause is determined based on the totality of the circumstances. *Gilliam*, 932 F.3d at 234. It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v Gates*, 462 U.S. 213, 243-44, n.13 (1983). "Probable cause does not require officials to possess an airtight case before taking action, and officers must be given leeway to draw reasonable conclusions from information." *Taylor v. Farmer*, 13 F.3d 117, 121–22 (4th Cir. 1993) (quotation omitted).

### A.  Diane Bailey Established Probable Cause for Plaintiffs' Arrests

The testimony of a single eyewitness, if believed, is sufficient evidence to support a conviction. *See Humbert v. O'Malley*, Civil No. WDQ-11-0440, 2014 WL 126673 *9 (D. Md. Mar. 25, 2014) ("[T]he positive identification of a suspect by a witness is generally sufficient to establish probable cause for an arrest, unless officers have reason to believe the witness is unreliable or have other exculpatory evidence"). As discussed above, it is undisputed that: (1) Bailey contacted the homicide unit roughly 24 hours after the homicide to report that she witnessed the incident; (2) she voluntarily gave a statement; and (3) she identified Plaintiffs and their codefendants in photo arrays. *See* Ex. 2 at 0040–45, 0449-052, 0455-0466. Plaintiffs developed no evidence that Bailey was coerced or motivated to come forward for any reason other than to report

what she observed from her window. Thus, her unrebutted observations of Plaintiffs provided probable cause for their arrests and prosecutions.

**B. Plaintiffs Developed No Evidence That Undermines the Probable Cause Established by Diane Bailey's and Keisha Thompson's Statements**

As discussed, Bailey passed away in 2011 having neither recanted nor contradicted her trial testimony. And Thompson was the only other person who was with Bailey at the time of the shooting. *See* Ex. 4 at 0636. Thompson has never disavowed any statements attributed to her nor asserted that Bailey did not observe what she described when they were interviewed by the police.

Faced with the reality that Thompson has never cast doubt on Bailey's statement to police, Plaintiffs speculate that she did not see the incident and merely "parroted back" to investigators what Bailey said. *See* ECF 1 at ¶ 36. Yet Plaintiffs developed no evidence to support this theory. Even discounting Thompson's account of the events as echoes of her mother's statement, Bailey's statement and identification of Plaintiffs was enough to establish probable cause for their arrests and prosecution. There is no dispute as to the sufficiency of the probable cause their statements created. Thus, Plaintiffs' claims based on lack of probable cause should be dismissed. *See*, *e.g.*, *Jackson v. Carin*, No. 8:19-cv-00564-PWG, 2022 WL 17812643, *9-12 (D. Md. Dec. 19, 2022).

**C. Plaintiffs Developed No Evidence to Support an Inference of Malice**

Even if Officer Defendants lacked probable cause for Plaintiffs' arrests based on Bailey's and Thompson's statements, Plaintiffs' malicious prosecution claim based on state law cannot survive summary judgment for want of evidence of malice. *See Exxon Corp. v. Kelly*, 381 A.2d 1146, 1152 (Md. 1978) ("malice and lack of probable cause must concur in order to maintain an action for malicious prosecution…. the verdict cannot stand, whatever may be the conclusion as to probable cause, absent a showing of malice"). Plaintiffs developed no evidence that Officer Defendants had a "primary purpose in instituting the proceeding" other than to bring an offender

28

to justice. *Id.* at 1149 (quotation omitted). They uncovered no evidence that Officer Defendants were motivated to frame Plaintiffs or to withhold or fabricate evidence against them. As Plaintiffs developed no evidence of malice, Plaintiffs' state law malicious prosecution claim must fail.

## IV.   Plaintiffs' Conspiracy Claims Fail Because They Developed No Dispute of Material Fact That Jody Ressin Agreed to Violate Plaintiffs' Constitutional Rights

A § 1983 civil conspiracy claim requires evidence that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiffs'] deprivation of a constitutional right[.]" *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996). Plaintiffs carry "a weighty burden" to establish the claim. *Id.* Without direct evidence of a meeting of the minds, Plaintiffs must "come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." *Id.* An inference of a conspiracy agreement can flow from acquiescence when one police officer watches an open breach of the law and does nothing to stop it. *See Hafner v. Brown*, 983 F.2d 570, 576-78 (4th Cir. 1992). But "isolated acts by defendants that fail to evidence a shared understanding will not suffice to survive a motion for summary judgment." *Marshall v. Odom*, 156 F.Supp.2d 525, 532 (D. Md. 2001) (citing *Hinkle*, 81 F.3d at 421-23).

Under Maryland law, a civil conspiracy claim requires proof of "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007) (quotation omitted). "The agreement itself is not actionable under Maryland law 'but rather is in the nature of an aggravating factor' with respect to the underlying tortious conduct." *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014) (quoting *Hoffman v. Stampler*, 867 A.2d 276, 290 (Md. 2005)). "In addition to proving an agreement, 'the

29

plaintiff must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury.'" *Id.*

Here, the intracorporate conspiracy doctrine presents a significant hurdle for Plaintiffs to navigate. Under the doctrine, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). Because the doctrine bars Plaintiffs from basing their claim on a theory that Officer Defendants conspired only with one another, Plaintiffs' only hope for their claim to survive summary judgment lies in an inference that MSP Trooper Jody Ressin conspired with Officer Defendants.[28] *See* ECF 1 at ¶ 21. But no reasonable inference suggests that Ressin joined a conspiracy to violate Plaintiffs' constitutional rights.

Trooper Ressin was detailed to the training/ride-along program that the MSP had with Baltimore City Homicide. Ex. 9 at 11:5-11; 39:13-22. Her role in the program was to observe, "like a fly on the wall[.]" *Id.* at 31:21-32:15; 32:21-33:7; 35:15-17; 75:3-22. Plaintiffs developed no evidence of any communications between Officer Defendants and Ressin before, during, or after King's interrogation. At most, Plaintiffs have shown that she observed it. But as discussed above, there are no disputes of material fact suggesting that Officer Defendants fabricated evidence

---

[28] Although the intracorporate conspiracy doctrine developed in the antitrust context, this Court has recognized that it "applies with equal force to civil rights cases." *Burgess v. Baltimore Police Dep't.*, Civ. No. RDB-15-0834, 2016 WL 795975, *10 (D. Md. Mar. 1, 2016); *see also Estate of Bryant v. Baltimore Police Dep't.*, 2020 WL 673571, at *26 (D. Md. Feb. 10, 2020). There are two exceptions to the doctrine. *See Painters Mill Grille, LLC v. Brown*, 716 F.3d 342, 352 (4th Cir. 2013). But Plaintiffs' pleadings and the record support no reasonable inference that Officer Defendants had any personal stake in Plaintiffs' convictions. And Plaintiffs' *Monell* and indemnification claims hinge on establishing that Officer Defendants acted within the scope of their employment and in accordance with BPD's training and policies. Thus, neither exception applies here. *See Burgess*, 2016 WL 795975 at *11.

during King's interrogation. But even if they did, no reasonable inferences tie Ressin to evidence fabrication or suppression.[29]

Even if the Court found a dispute of fact over whether Officer Defendants fabricated evidence in Ressin's presence, Plaintiffs developed no evidence that she recognized that any portion of King's statement was fabricated. The record supports no inference that Ressin was aware of any facts of the investigation, let alone any inference that she knew she was observing an open breach of the law creating a duty to prevent harm. Thus, no reasonable inference suggesting that Ressin had a conspiracy agreement with Officer Defendants before King's interrogation flows from the fact that no one recalls her intervening during or after the interrogation.

And even if the Court drew inferences that Ressin recognized Officer Defendants fabricating evidence, Plaintiffs still lack any reasonable basis for an inference that *Ressin* acted in furtherance of the conspiracy. Plaintiffs' only evidence that Ressin engaged in a conspiracy with Officer Defendants stems from the alleged fabrication itself. And as explained above, "[n]ot every act of evidence fabrication offends one's due process rights." *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015); *cf Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) ("if an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest"). Plaintiffs developed no evidence that Ressin had any involvement in securing Plaintiffs' arrests or in preparing the case for prosecution. Because Plaintiffs developed no evidence that Ressin knew that King's statement would be used to deprive Plaintiffs of a liberty interest or that she agreed to remain silent about what she saw, it is not a

---

[29] Ressin had no recollection of King's interrogation and did not recall taking any notes. Ex. 9 at 75:13-16; 78:21-79:5.

reasonable inference that Ressin conspired with Officer Defendants to deny Plaintiffs their due process rights.

Plaintiffs' conspiracy claim must be dismissed for want of any inference that Ressin conspired with Officer Defendants. *See Hinkle,* 81 F.3d at 421-22 (affirming summary judgment when appellant produced no evidence generating inferences that defendants acted in concert to obstruct the plaintiff's access to the courts, communicated and agreed to commit any acts, wrongful, or otherwise, or shared the same conspiratorial objective). Because Plaintiffs' circumstantial evidence of Ressin's involvement in the alleged conspiracy is substantiated only through speculation and the piling of inferences, this Court should properly dismiss the claim in accordance with the intracorporate conspiracy doctrine. *See Beale*, 769 F.2d at 214.

## V.     There is No Evidence that Officer Defendants Failed to Intervene Since There is No Evidence of an Underlying Constitutional Violation

In the Fourth Circuit, a failure-to-intervene claim lies where an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002). Plaintiffs assert that Officer Defendants knew of constitutional violations being committed by other Officer Defendants and failed to act despite having the chance to do so. But Plaintiffs have no evidence that any Officer Defendant violated their constitutional rights. Probable cause supported Plaintiffs' arrests and Plaintiffs have no evidence that any Officer Defendant fabricated evidence that contributed to their convictions. Because Plaintiffs have no evidence that any Officer Defendant committed a constitutional violation of Plaintiffs' rights, let alone that an Officer Defendant *knew* that a fellow officer had violated their constitutional rights, Plaintiffs' failure to intervene claim must fail.

**VI.     Plaintiffs' IIED Claim Must Fail Because Plaintiffs Developed No Evidence that Defendants' Actions were Intentional or Reckless and Extreme and Outrageous.**

In Maryland, to prove intentional infliction of emotional distress ("IIED"), the plaintiff must establish that "(1) the conduct is intentional or reckless; (2) the conduct is extreme and outrageous; (3) there is a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress is severe." *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 481 (D. Md. 2002). The cause of action "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct," *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8, 11 (Md. 1992), and are generally disfavored, difficult to establish, and "rarely viable." *Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F. Supp. 2d 751, 757 (D. Md. 2011).

To meet this standard, a plaintiff must show that the defendant's behavior was "so outrageous in character, and extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Gennell v. Denny's Corp.*, 378 F. Supp. 2d 551, 560 (D. Md. 2005) (internal citation omitted). "[T]he conduct relied upon must strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 248 (D. Md. 1997), *aff'd*, 166 F.3d 1208 (4th Cir. 1998)(quotation omitted).

Plaintiffs failed to establish their claims that Officer Defendants withheld exculpatory material, fabricated evidence, maliciously prosecuted Plaintiffs, or detained them without probable cause, thus their IIED claim must fail. *See, e.g.*, *Johnson*, 2022 WL 9976525 at *64. But even if Plaintiffs established disputes of material fact over some of their claims, Plaintiffs developed no reasonable inferences that Officer Defendants' actions were intentional or reckless and extreme and outrageous.

33

The undisputed facts show that Officer Defendants believed that Bailey witnessed Plaintiffs order King to retrieve secreted guns then pursue the victim towards the area where the shooting took place and that her account was at least partially corroborated by Ellison's confession. No evidence suggests that Officer Defendants suspected that Bailey was unreliable. Ultimately, the probable cause created by Bailey's account negates any inference that Officer Defendants acted "beyond all possible bounds of decency" when they arrested Plaintiffs. Similarly, Plaintiffs developed no evidence that the exculpatory or impeachment value of any suppressed evidence was so obvious to create an inference that Officer Defendants acted in bad faith if they did not disclose it to the SAO. With no evidence or reasonable inference of intentional or reckless conduct that was extreme and outrageous, Plaintiffs' IIED claim must fail.

**VII.   Alternatively, Officer Defendants are Entitled to Qualified Immunity**

Qualified immunity gives officials "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013) (quotation omitted). The doctrine protects public officials such as police officers from suit under 42 U.S.C. § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). While assessing the applicability of a qualified immunity defense, the district court should consider (1) whether there was a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The court may consider these questions in any order. *Id*. For the same reasons discussed above, Plaintiffs cannot meet the first prong with respect to any of the alleged violations. As such, Officer Defendants are entitled to summary judgment.

## **CONCLUSION**

For these reasons, Officer Defendants respectfully request that this Honorable Court grant their motion for summary judgment and dismiss Plaintiffs' claims against them in their entirety.


DATED: February 15, 2023                    Respectfully submitted,


                                    /s/

Shneur Nathan, Bar No. 20707
Avi T. Kamionski, Bar No. 20703
Judson Arnold, Bar No. 21296
Michael J. Elliker, Bar No. 20810
Alexander S. Rothstein, Bar No. 23228
Nathan & Kamionski LLP
575 S. Charles St., Suite 402
Baltimore, MD 21201
Phone: (410) 885-4349
Fax: (952) 658-3011
snathan@nklawllp.com
akamionski@nklawllp.com
jarnold@nklawllp.com
melliker@nklawllp.com
arothstein@nklawllp.com

*Counsel for Officer Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2022, I caused the foregoing document to be electronically filed with the Court's CM/ECF system, which will send an electronic copy of the same to all counsel of record.

*/s/ Judson Arnold*

## EXHIBIT LIST

1. Patuxent Evaluation of Kenneth McPherson

2. Excerpts from BPD Homicide File

3. Toby Terpstra Rule 26 Report

4. Trial Transcript May 11-18, 1995

5. Kenneth McPherson Interview - 1994

6. Eric Simmons Interview - 1994

7. Daniel Ellison Interview - 1994

8. Trial Exhibits

9. Deposition Transcript of Jody Ressin

10. Grand Jury Transcript

11. Grand Jury Indictment

12. King Juvenile Court Records

13. McPherson Pro Se Petition - April 11, 2006

14. CIU Memorandum

15. Joint Petition for Writ of Actual Innocence

16. Joint Petition Hearing Transcript

17. Deposition Transcript of Lauren Lipscomb

18. Deposition Transcript of Keisha Thompson

19. Deposition Transcript of Daniel Ellison

20. Deposition Transcript of Eric Simmons

21. Deposition Transcript of Kenneth McPherson

22. Deposition Transcript of Sharon Holback

23. SAO Amended Disclosure - January 26, 1995

24. SAO Amended Disclosure - January 9, 1995

25. McPherson Amended Post Conviction Petition - October 5, 2005

26. Deposition Transcript of Daniel Ellison