# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KENNETH MCPHERSON and ERIC SIMMONS, | Case No. 20-cv-00795-SAG |
| Plaintiffs | |
| v. | Judge Stephanie Gallagher |
| BALTIMORE POLICE DEPARTMENT, *et al.,* | **JURY TRIAL DEMANDED** |
| Defendants | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... iv

INTRODUCTION ..................................................................................................................1

FACTS ...................................................................................................................................1

   I.     The Shooting...............................................................................................................1

   II.    Plaintiffs Have Absolutely Nothing to do with the Murder ............................................2

   III.   The Wooden Homicide Investigation Is Assigned to Defendants..................................3

   IV.   Early Leads in the Wooden Homicide Investigation ....................................................4

         A.  Shooting Erupted at Federal and Washington ...........................................................4

         B.  There is Only One Shooter .......................................................................................5

         C.  Descriptions and Identity of the Shooter ..................................................................6

         D.  Information from On-Scene Witnesses Was Withheld ................................................6

   V.    Defendants Get Their Big Break with Diane Bailey .....................................................6

         A.  Bailey's Prior Cooperation and Witness Protection Benefits ...................................6

         B.  Bailey's False Story .................................................................................................8

         C.  Police Know That Bailey's Account Is Unreliable .................................................11

   VI.   Defendants Deviate From Practice to Bolster Bailey's Unreliable Story with Fake Corroboration From Thompson ...................................................................................15

   VII.  Thompson's and Bailey's False Identifications ..........................................................17

   VIII. Plaintiffs Are Falsely Arrested ................................................................................18

   IX.   Defendants Coerce Marcus King Into Giving a Fabricated Statement.......................19

         A.  Defendants Coerce Marcus King...........................................................................19

         B.  Defendants Feed King Information About the Crime from Diane Bailey .............20

         C.  King's False and Fabricated Tape-Recorded Statement ........................................21

   X.    King Recants His False and Fabricated Police Statement ..........................................22

i

XI.    Plaintiffs Are Wrongfully Convicted of Conspiracy to Commit Murder ...................22

XII.    The CIU Reinvestigation  ...........................................................................................23

LEGAL ARGUMENT ...............................................................................................................25

I.    Summary Judgment Standard ...................................................................................25

II.    Genuine Disputes of Fact Require a Trial on Plaintiff's Fabrication Claims .............26

    A.  Marcus King's Fabricated Statement ............................................................26

        1.  A Jury Could Find That King's Statement Was False.......................27

        2.  A Jury Could Find That Defendants Authored The Key Parts of King's Statement.........................................................................27

        3.  A Jury Could Find That Defendants Knew They Were Forcing King To Adopt A Statement That Was Materially False.........................................................32

        4.  King's Fabricated Statement Proximately Caused Plaintiffs' Convictions......36

    B.  Keisha Thompson's Fabricated Identification ........................................37

        1.  Plaintiffs' Fabrication Claim is Not Speculative.................................38

        2.  A Jury Could Find that the Fabrication of Keisha Thompson's Statement Caused Plaintiffs' Wrongful Conviction ........................................41

III.    A Trial Is Required On Plaintiffs' Evidence Suppression Claims ...............................45

    A.  Keisha Thompson ..........................................................................................45

    B.  Witness Accounts From James Martin and Barbara Jean Anderson.....................47

IV.    A Trial Is Required On Plaintiffs' Malicious Prosecution and Unlawful Detention Claims ........................................................................................................49

    A.  Neither Bailey Nor Thompson Establish Probable Cause .....................................49

    B.  There are Material Disputes About Whether Defendants Acted With Malice.......53

V.    Summary Judgment Is Not Appropriate On Plaintiffs' Failure to Intervene Claim.....54

VI.   Summary Judgment Is Not Appropriate On Plaintiffs' Claim Of Intentional Infliction of Emotional Distress ................................................................................................... 54

VII.  Qualified Immunity Is Unavailable Because A Jury Could Find That Plaintiffs' Constitutional Rights Were Violated .......................................................................... 55

CONCLUSION ....................................................................................................................... 55

## TABLE OF AUTHORITIES

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)........................................................33

*Andersen v. City of Chicago,* 454 F. Supp. 3d 808 (N.D. Ill. 2020)............................39

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................................25

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017).............................................31

*B.N. v. K.K.*, 538 A.2d 1175 (Md. Ct. App. 1988)..........................................................54

*Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991) ........................................................43

*Bies v. Sheldon*, 775 F.3d 386 (6th Cir. 2014) ...............................................................48

*Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007) ............................. 43

*Bost v. Wexford Health Sources, Inc.*, No. CV ELH-15-3278, 2022 WL 4290528 (D. Md. Sept. 16, 2022) ................................................................................................................ 29, 38

*Boyette v. Lefevre*, 246 F.3d 76 (2d Cir.2001) ..............................................................48

*Brady v. Maryland*, 373 U.S. 83 (1963)..................................................................45, 48

*Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) ....................................................... 29

*Burgess v. Baltimore Police Dep't*, No. RDB-15-0834, 2017 WL 4947004 (D. Md. Oct. 31, 2017) ..........................................................................................................................42, 55

*Burgess v. Goldstein*, 997 F.3d 541 (4th Cir. 2021) ....................................... 31, 39, 40

*Carrillo v. City of Los Angeles*, 798 F.3d 1210 (9th Cir. 2015)...................................48

*Carter v. Bigelow*, 787 F.3d 1269 (10th Cir. 2015)......................................................47

*Clark v. Alexander*, 85 F.3d 146 (4th Cir. 1996) ..........................................................27

*Clipper v. Takoma Park, Md.*, 876 F.2d 17 (4th Cir. 1989) ......................................... 51

*Cole v. Cole*, 633 F.2d 1083 (4th Cir. 1980)..................................................................25

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).........................................................36

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc) ................................... 32

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992)........................25, 41

*Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012) ........................................................48

*Exxon Corp v. Kelly*, 381 A.2d 1146 (Md. 1978) .........................................................49

*Farmer v. Brennan*, 511 U.S. 825 (1994)..................................................................36

*Ferrera v. Hunt*, No. CA 0:09-02112-RMG, 2012 WL 1044503
    (D.S.C. Mar. 19, 2012) ....................................................................52

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ......................................................31

*Gell v. Town of Aulander*, No. 2:05-CV-00021-FL, 2008 WL 11381403 (E.D.N.C. Sept. 24,
    2008) ...........................................................................29, 31, 35

*Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019).........................................26, 31, 34, 37

*Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022)................ 36

*Gray v. Spillman*, 925 F.2d 90 (4th Cir. 1991) ......................................................... 28

*Gregory v. City of Louisville,* 444 F.3d 725 (6th Cir. 2006)..........................................43

*Harris v. Jones*, 380 A.2d 611 (Md. 1977)................................................................54

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015)...........................................................40

*Hayes v. City of Seat Pleasant,* No. 10–2172, 2012 WL 836258
    (4th Cir. Mar.14, 2012)....................................................................53

*Hope v. Pelzer*, 122 S.Ct. 2508 (2002) ...................................................................55

*Howard v. City of Durham*, 487 F. Supp. 3d 377 (M.D.N.C. 2020) ....................................*passim*

*Howard v. Dowdy*, No. 1:17CV477, 2022 WL 1720156 (M.D.N.C. May 27, 2022)........31, 35, 46

*Iacopelli v. Town of Port Royal*, No. 9:16-CV-287-PMD-BM, 2018 WL 3867803
    (D.S.C. Aug. 15, 2018) ....................................................................52

*Jackson v. Carin*, No. 8:19-CV-00564-PWG, 2020 WL 998736
    (D. Md. Mar. 2, 2020)..................................................................... 51

*Jimenez v. City of Chicago*, 732 F.3d 710, 721-22 (7th Cir. 2013) ...................................39, 40, 46

*Johnson v. Balt. Police Dep't.,* Civil No. ELH-19-00698, 2020 WL 1169739
    (D. Md. Mar. 10, 2020) ..................................................................................................48

*Juniper v. Zook*, 876 F.3d 551 (4th Cir. 2017) ............................................................................40

*Kadia v. Gonzales*, 501 F.3d 817 (7th Cir. 2007) .......................................................................29

*Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353 (W.D. Va. 2020) ...........................37

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................................................. 45, 47

*Lambert v. Williams*, 223 F.3d 257 (4th Cir. 2000).....................................................................48

*Magill v. Gulf & W. Indus., Inc*, 736 F.2d 976 (4th Cir, 1984) ...................................................25

*Massey v. Ojaniit*, 759 F.3d 343 (4th Cir. 2014) ...............................................26, 31, 32, 34, 43

*Miller v. Prince George's County, Md.*, 475 F3d. 621 (4th Cir. 2007) ..................................31, 52

*Moldowan v. City of Warren*, 578 F.3d 351, 388-89 (6th Cir. 2009).............................................48

*Monroe v. Pape*, 365 U.S. 167 (1961) ........................................................................................42

*Moultrie v. Harris Lake Inc.*, 813 F.2d 1228 (4th Cir. 1987) ..................................................... 29

*Osborne v. Georgiades*, CV RDB-14-182, 2015 WL 6447503 (D. Md. Oct. 23, 2015), aff'd, 679
    Fed. App'x. 234 (4th Cir. 2017) ...........................................................................................33

*Pac. Shores Properties, LLC v. City of Newport Beach,*
    730 F.3d 1142 (9th Cir. 2013) ..............................................................................................36

*Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017).....................................................................40

*Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1046 (N.D. Ill. 2018), *opinion clarified*, No. 12-CV-
    04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018)...................................................46

*Sales v. Grant*, 158 F.3d 768 (4th Cir. 1998) .......................................................................29, 36

*Savage v. Cnty. of Stafford, Va.*, 754 F. Supp. 2d 809 (E.D. Va. 2010) ......................................51

*Shipley v. Disney,* No. CV SAG-21-3173, 2022 WL 2789076 (D. Md. July 15, 2022)................48

*Smith v. Cain*, 565 U.S. 73 (2012) .............................................................................................46

*Smith v. Ray*, 781 F.3d 95, 103 (4th Cir. 2015) ..........................................................................25

*Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793 (D. Md. 2001) ............................................53

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009) ...................................................43

*Tarlton for McCollum v. Sealey*, No. 5:15-CV-451-BO, 2018 WL 1129976 (E.D.N.C. Mar. 1, 2018), *aff'd sub nom.* ..........................................................37

*Tolan v. Cotton, 572 U.S. 650, 656 (2014)* ............................................................55

*United States v. Ayesh*, 702 F.3d 162 (4th Cir. 2012) ....................................................34

*United States v. Smith*, No. 5:15-CR-51-BO, 2015 WL 3618705 (E.D.N.C. June 9, 2015), *aff'd,* 692 F. App'x 112 (4th Cir. 2017) .....................................42

*United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990) .....................................................47

*Washington v. Boudreau*, No 16-cv-01893, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022) (N.D. Ill. Sept. 30, 2022) .......................................................43

*Washington v. Buraker*, 322 F. Supp. 2d 702 (W.D. Va. 2004) ...................................37

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005) ..................................................26

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) .........................................................45, 47

*White v. Roper*, 901 F.2d 1501 (9th Cir. 1990) ...........................................................36

*White v. Smith,* 696 F.3d 740 (8th Cir. 2012) ...............................................................26

*Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) ...........................................................48

*Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249 (4th Cir. 1987) .............................36

*Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000) ...............................................................52

*Youngblood v. W. Virginia*, 126 S. Ct. 2188 (2006) ......................................................45

*Yousefi v. INS*, 260 F.3d 318 (4th Cir. 2001) ..............................................................55

**INTRODUCTION**

Plaintiffs Kenneth McPherson and Eric Simmons allege they were wrongfully convicted of conspiracy to commit murder, spending decades behind bars for a crime they did not commit. The State, after a lengthy investigation, determined that the Plaintiffs were factually innocent; jointly petitioned for Writs of Actual Innocence; and dismissed all charges against them. In short, and particularly at summary judgment, this is the story of two innocent men.

How Plaintiffs came to be wrongfully arrested, prosecuted, and convicted is hotly contested. Defendants disclaim any responsibility, arguing in their motion that Plaintiffs' convictions resulted an uncorrupted investigation, and any missteps they may exist were immaterial and not the cause of Plaintiffs' combined five decades behind bars. But these are arguments for trial, because there are numerous disputed facts which require a jury to resolve.

Viewing the record in the light most favorable to Plaintiffs, there is ample evidence that Defendants fabricated and withheld evidence to frame Plaintiffs. In particular, there are genuine factual disputes about whether Defendants fabricated inculpatory statements by 13-year-old Marcus King and Keisha Thompson; withheld evidence that would have enabled Plaintiffs to rebut the bogus case against them at trial; deprived Plaintiffs of their liberty without probable cause; and failed to intervene to prevent this misconduct from happening. As a result, Defendants' motion for summary judgment must be denied.

**FACTS**

**I.     The Shooting**

At approximately 12:30 a.m. on August 31, 1994, Anthony Wooden was shot and killed in the 1600 block of N. Washington. Ex. 1 (Brown Dep.) at 14:21-15:10; Ex. 2 (G. Brown Report) at Legal Images Scan Homicide File ("Homicide File") at 52-53. Patrol officer Garry Brown was in the area; when he heard the gunshots, he drove southbound toward the 1600 block.

1

Ex. 1 (Brown Dep.) at 41:6-42:15, 43:19-44:5; Ex. 2 (Brown Report) at Homicide File 52-53.

Wooden's body was found near 1629 N. Washington. Ex. 3 (Office Report) at Homicide File 35.

Officers located the victim's gun—a .32 caliber revolver—near the victim, along with six fired

.32 cartridge casings. *Id*. at Homicide File 35, 39.

## II.     Plaintiffs Had Absolutely Nothing to do with the Murder

Plaintiffs had absolutely nothing to do with the murder of Anthony Wooden. Ex. 4

(McPherson Dep.) at 354:9-11; Ex. 5 (Simmons Dep.) at 379:3-10; Ex. 6 (Sentencing Transcript

7.5.95) at 38:10-17, 41:8-42:14. At the time of the shooting, Plaintiff Kenneth McPherson was

outside on the 1500 block of Chapel Street with a number of his friends, including Marcus King,

Shanna Marshall (née Thomas), Joanne Crandall, Deborah Carter and Alfreda Costley. Ex. 4

(McPherson Dep.) at 188:5-192:14; Ex. 7 (McPherson Statement 9/6/94) at 5:9-7:3. When

McPherson heard the shots, he ran into Crandall's home with Crandall and King, and then ran

out the back door to go to his friend Alfred Costley's home. Ex. 4 (McPherson Dep.) at 193:21-

194:3, 195:3-197:16; Ex. 7 (McPherson Statement 9/6/94) at 6:3-7:22; Ex. 8 (Crandall Test.

5/16/95) at 89:12-90:9. Numerous witnesses confirmed McPherson's and King's whereabouts at

the time of the shooting. Ex. 9 (Alfreda Costley Dep.) at 34:2-35:4, 63:17-64:10; Ex. 10

(Marshall Dep.) at 12:18-14:9, 14:18-16:1, 21:11-21, 22:9-25:5, 26:1-26:10; Ex. 11 (Thomas

Test. 5/16/95) at 36:7-19, 37:20-40:18; Ex. 8 (Crandall Test. 5/16/95) at 87:12-94:3; Ex. 12

(Carter Test. 5/16/95) at 61:14-66:5.

For his part, during the shooting, Plaintiff Eric Simmons was at home asleep at 1816 E.

Federal with his then-girlfriend, Ebony Paige. Ex. 5 (Simmons Dep.) at 208:6-18; Ex. 13 (Paige

Dep.) at 43:4-15. After the gunshots, Paige woke Simmons because Simmons' mother wanted

him to go to Chapel Street to check on his brother McPherson. Ex. 5 (Simmons Dep.) at 209:19-

210:10, 211:1-22; Ex. 13 (Paige Dep.) at 44:7-18. On his way out, Simmons ran into his

neighbor, Michelle Christian (née Coleman), who asked where Simmons was going; Simmons told her he was going to check on his brother. Ex. 5 (Simmons Dep.) at 216:20-217:8; Ex. 14 (Christian Dep.) at 59:16-22, 60:8-16; Ex. 15 (Coleman Test. 5/16/95) at 112:8-115:7.

Simmons found McPherson on Washington Street and confirmed that his brother was okay. Ex. 5 (Simmons Dep.) at 221:1-222:17. They both went to the crime scene to see if they knew the victim, and then left. Ex. 4 (McPherson Dep.) at 214:4-7, 217:22-219:10; Ex. 5 (Simmons Dep.) at 227:21-228:13; Ex. 16 (Simmons Statement 9/6/94) at 6:15-25; Ex. 13 (Paige Dep.) at 46:4-48:7, 48:15-22, 49:14-17, 54:1-3.

### III.   The Wooden Homicide Investigation Is Assigned to Defendants

Patton and Barlow were the primary and secondary detectives assigned to investigate the Wooden murder, respectively. Ex. 17 (Patton Test. 5.12.95) at 4:23-5:3; Ex. 18 (Barlow Dep.) at 26:12-15, 99:6-18. The Defendants were in charge of investigating the homicide, including speaking with suspects and witnesses and authoring reports, and they shared information with each other about the case as they learned it. Ex. 17 (Patton Test. 5.12.95) at 4:23-5:3; Ex. 18 (Barlow Dep.) at 26:12-15, 29:4-13, 82:12-83:19, 99:6-18. In addition, as the primary detective, Patton was responsible for maintaining the homicide file and disclosing evidence to the prosecutor Ex. 18 (Barlow Dep.) at 29:4-13, 82:12-83:19. At the time, those disclosures typically consisted of the Prosecution Report and its attachments—the "medical examiner report, witness statements, suspect statements" and "Office Reports." *Id*; Ex. 19 (Prosecution Report) at Homicide File 18-21. Assistant State's Attorneys ("ASAs") might also get copies of detective notes, but Patton does not recall if he turned over his notes in this case. Ex. 20 (Patton Dep.) at 79:3-10. Moreover, while detectives would make homicide files available for the ASA to view,

3

the prosecutor in this case, Sharon Holback, does not know if she actually viewed the file, or just relied on the documents that Patton pulled for her. Ex. 21 (Holback Dep.) at 41:15-42:16.[1]

IV.     **Early Leads in the Wooden Homicide Investigation**

The night of the shooting Defendants learned three key pieces of information from witnesses located on the scene.

A.  **Shooting Erupted at Federal and Washington**

First, the Defendants learned that the shooting erupted at Federal and Washington, near where the victim's body was found. Barlow interviewed Crystal White at approximately 1:20 a.m. on August 31, 1994. Ex. 18 (Barlow Dep.) at 106:23-25; Ex. 22 (White Information Sheet) at Homicide File 427; Ex. 23 (White Notes) at 428-30. White told Barlow that right before the shooting she saw two men facing each other on the corner of Federal and Washington—the victim and the suspect. Ex. 18 (Barlow Dep.) at 108:2-109:10; Ex. 23 (White Notes) at Homicide File 429. The victim ran north on Washington, the shooter had his arm out pointed toward the victim, and then multiple shots were fired. *Id.*

At around 1:50 a.m. on August 31, 1994, Sandra Jackson similarly told Barlow that the shooting started at the intersection of Federal and Washington. Ex. 18 (Barlow Dep.) at 114:23-115:3; Ex. 27 (Jackson Information Sheet) at Homicide File 418; Ex. 28 (Jackson Notes) at Homicide File 419. Patton followed up and re-interviewed Jackson, which he memorialized in a "Follow-Up Note." Ex. 20 (Patton Dep.) at 86:19-88:1; Ex. 29 (Jackson Follow-Up Note) at Homicide File 424.

---

[1] During this litigation, the Baltimore Police Department ("BPD") scanned and produced a copy of the Homicide File for the Wooden shooting. Ex. 24 (Wooden Homicide File) at Homicide File 1-866. Neither Patton nor Barlow are aware of any documents that are missing or lost from this Homicide File. Ex. 25 (Patton Resp. to Pltfs. First Interrog) at No. 13; Ex. 26 (Barlow Resp. to Pltfs. First Interrog.) at No. 13.

Jackson told Barlow that from the corner of Federal and Wolfe she saw three black men walk past her on Federal Street. Ex. 18 (Barlow Dep.) at 115:8-116:25; Ex. 28 (Jackson Notes) at Homicide File 419. She saw the men exchange a black gun, and heard one express an intent to use the gun Ex. 18 (Barlow Dep.) at 115:8-116:25; Ex. 28 (Jackson Notes) at Homicide File 421. She then saw the three men meet up with two others. Of the five, two men started running north on Washington; once they crossed Federal, one started firing a gun. Ex. 18 (Barlow Dep.) at 115:8-116:25; Ex. 28 (Jackson Notes) at Homicide File 420. After Jackson heard four gunshots, she started running on Federal toward Washington where she saw the shooter with a black gun in his hand. Ex. 18 (Barlow Dep.) at 115:8-116:25; Ex. 28 (Jackson Notes) at Homicide File 421.

Another witness, James Martin, was sitting on the steps to 1640 N. Washington at the time of the shooting, and told Patton he saw the shooting start at Federal and Washington. Ex. 30 (Martin Note) at Homicide File 800; Ex. 20 (Patton Dep.) at 80:1-83:2 (note is accurate); *id*. at 61:17-64:5 (his handwriting on note); Ex. 31 (Scully Report) at 3 (map showing witnesses' locations). Martin told Patton he saw the victim running up the street with a bag on his shoulder, saw a second person at the northeast corner of Federal and Washington, and then saw the victim and the second person start shooting at each other. Ex. 30 (Martin Note) at Homicide File 800; Ex. 20 (Patton Dep.) at 61:17-64:5, 80:1-83:2.

### B. There is Only One Shooter

Second, the Defendants also learned that there was only one person shooting at the victim—Jackson, White and Martin each identified only a single suspect shooter. *See* Section IV(B), above; Ex. 20 (Patton Dep.) at 235:17-236:18, 238:8-20 (White and Jackson identify one suspect shooter); *id*. at 242:14-243:6 (Martin identifies one suspect shooter).

### C.  Descriptions and Identity of the Shooter

Third, Defendants learned that one of the witnesses could identify the shooter. Jackson was able to give "fairly detailed descriptions" of the shooter and the other people involved. Ex. 18 (Barlow Dep.) at 111:11-112:2. Most importantly, Jackson told Patton that she could identify the shooter as the same person who had recently robbed her niece, Barbara Jean Anderson; and gave the location the shooter frequented. Ex. 29 (Jackson Follow-Up Note) at Homicide File 424; Ex. 20 (Patton Dep.) at 86:19-88:1. Jackson also gave Patton Anderson's home address. *Id*. This information was memorialized in Patton's "Follow-Up Note." *Id*. Patton has no recollection of ever trying to locate Anderson or pulling the reports on Anderson's robbery, and there is no indication in the file that he did. Ex. 20 (Patton Dep.) at 88:7-17, 105:9-112:6; *see generally* Ex. 24 (Homicide File) (no documents related to Anderson robbery).

### D.  Information from On-Scene Witnesses Was Withheld

The interviews of Jackson, White and Martin were all memorialized in police notes, yet not all of those notes were disclosed to the prosecutor or the defense. In particular, Patton's "Follow-Up" note about Barbara Jean Anderson and his note regarding James Martin were never disclosed. Ex. 32 (Writ of Actual Innocence ("WAI") Hrg. Tr.) at 11:3-12:1, 17:2-4, 17:25-18:2, 18:11-19:23); Ex. 33 (CIU Memo) at 11-12 ( ███████████████████████████ ███████████████████████ Ex. 34 (Lipscomb Dep.) at 111:11-112:2 (what is in the CIU memo is correct).

## V.    Defendants Get Their Big Break with Diane Bailey

### A.  Bailey's Prior Cooperation and Witness Protection Benefits

Instead of following-up on the information from Jackson, Defendants decided to rely on Diane Bailey—a woman with a criminal history, including for crimes of dishonesty—who called the Baltimore Police Department ("BPD") claiming to have information about the Wooden

6

homicide. Ex. 35 (Bailey Test. 5/15/95) at 232:2-9, 232:24-233:3; 233:4-11 (admitting to

stealing "[a]ll [her] life", and having two outstanding warrants). Bailey was familiar to the BPD

homicide section, as she was a witness to a murder on Hollander Ridge from August 1993—the

prosecution of which was ongoing and for which Bailey was unsatisfied with the lack of

assistance she was receiving in exchange for her cooperation.[2] Ex. 35 (Bailey Test. 5/15/95) at

210:14-212:2, 221:21-222:12, 224:16-226:19; 226:18-19; 231:14-17; Ex. 36 (Amended State's

Disclosures) at MS 9134-35. In particular, Bailey complained that, notwithstanding their

agreement to assist her,  the State "did nothing," to help her, so she had gone to City Hall and

"had herself moved" from Hollander Ridge to 1421 N. Washington, although the State's records

reflect that the prosecutor's office assisted her with this move. Ex. 35 (Bailey Test. 5/15/95) at

224:16-226:19; *see also id*. at 226:18-19 ("They did nothing so I did it on my own."); Ex. 36

(Amended State Disclosure) at MS 9135 (listing "Moved to Relocation House 1" on August 20,

1993 as one of the "services . . . provided for Diane Bailey by the State's Attorney's Office").

Indeed, it was only after Bailey provided information about the Wooden homicide, and

with Patton's help, that she received benefits which she (largely) found satisfactory. Ex. 35

(Bailey Test. 5/15/95) at 225:8-9 ("The protective custody that I ever got really happened with

[the Wooden] murder."). Patton was essential to getting Bailey benefits she sought. Ex. 20

(Patton Dep.) at 271:3-272:21 (prosecutor's decision about witness protection was made after

consulting with investigating officer—which, in this case, was him). After Bailey's statement to

police claiming to have information about the Wooden shooting, and in the months that followed

leading up to Plaintiffs' criminal trial, the State paid to move Bailey twice to a new home, paid

---

[2] Although that homicide occurred in August 1993, at the time of Plaintiffs' criminal trial in May
1995, the trial of the 1993 homicide had not yet occurred. Ex. 37 (Transcript of Proceedings
5/15/95) at 213:5-15.

$600 every month for her rent, gave her money for phone calls and food, and paid $850 to buy

her a refrigerator and bunk beds for the 11 children and four grandchildren who lived with her.

Ex. 36 (Amended State Disclosure) at MS 9135; Ex. 35 (Bailey Test.) at 155:24-156:7. Despite

Bailey's claim that she needed protective custody due to fear and the need for anonymity, Bailey

had no problem drawing attention to herself: She went on Fox News to complain about her

treatment by the State. Ex. 35 (Bailey Test.) at 258:7-259:8.

**B.  Bailey's False Story**

By the time of the Wooden homicide, Bailey lived at 1421 N. Washington with her

children and grandchildren. Ex. 35 (Bailey Test. 5/15/95) at 155:24-156:7. The morning after the

shooting, Bailey was in Lynn's Carryout, the store across from her house, when she overheard

that someone had been killed during a shooting "on Federal and Washington." Ex. 35 (Bailey

Test. 5/15/95) at 234:20-236:7; Ex. 39 (Bailey Interview) at Homicide File 476. Bailey

overheard Alfred Costley saying that the shooting happened after "Whitey and Country and them

was chasing them guys so that they could rob them." Ex. 38 (Bailey Grand Jury Test. 10/12/94)

at 8:22-25.

Bailey knew "Whitey" (legal name: Daniel Ellison) and "Country" (legal name: Nicholas

Richards), both of whom lived in the neighborhood. Ex. 35 (Bailey Test. 5/15/95) at 161:1-

162:6; Ex. 39 (Bailey Interview) at Homicide File 447-48. Ellison frequently hung out with

McPherson (who Bailey knew as "JR") and a 13-year-old boy named Marcus King. Ex. 4

(McPherson Dep.) at 126:14-127:11. McPherson and Simmons (who Bailey knew as "Black")

are brothers. Ex. 3 (Office Report) at Homicide File 44. On September 1, 1994—the day that

Bailey overheard in the grocery store that "Whitey" and "Country" were involved in the Wooden

shooting—Bailey contacted Baltimore police and implicated "Whitey" and "Country," along

with Plaintiffs and Marcus King, as the perpetrators. Ex. 39 (Bailey Interview) at Homicide File 474-477. Bailey's first call was to try to speak with Detective Steinheice, who was the detective Bailey had been working with on the Hollander Ridge shooting. Ex. 35 (Bailey Test. 5/15/95) at 209:23-212:8, 252:2-8. Bailey went to the police station with her daughter, Keisha Thompson, where she saw Steinheice. Steinheice told Patton that Bailey was working with him on another homicide case. Ex. 3 (Office Report) at 9; Ex. 35 (Bailey Test. 5/15/95) at 253:14-254:10. Bailey and Thompson were interviewed by Patton and Barlow. Ex. 3 (Office Report) at 9; Ex. 20 (Patton Dep.) at 143:8-15 ( "Investigators" in the Office Report refers to Patton and Barlow).

According to the police summary of Bailey's story (which she largely parroted at trial), Bailey told Patton and Barlow that in the early morning hours of August 31, 1994, she and Thompson were in Thompson's bedroom on the third floor watching television. Ex. 35 (Bailey Test. 5/15/95) at 156:14-157:17, 189:20-22. Bailey claimed that she heard "somebody telling Marcus 'Go get the guns.'" *Id*. at 157:23-158:5. After she heard this, Bailey claimed that she and Thompson put their heads out the window, and that then she could see that the person who had said "Go get the guns" was "JR"—*i.e.*, Kenneth McPherson. *Id*. at 190:2-3; *id.* at 158:3-4.

Bailey told police that she had seen McPherson, King, Ellison, Richards and Simmons standing at the corner of Federal and Oliver, in front of Lynn's Carryout, and that after McPherson told King to "Go get the guns," King walked diagonally across the street toward Alfred Costley's home. Ex. 39 (Bailey Interview) at Homicide File 474. Bailey claimed that she saw King come back with a bag and that Ellison, Richards and McPherson took guns out of it. Bailey claimed that she could see Simmons with a gun already in his hand, held behind his back. *Id*. at Homicide File 475; Ex. 35 (Bailey Test. 5/15/95) at 163:23-164:13.

9

According to Bailey, she saw three unknown men (one in front of the other two) turn onto the 1500 block of Washington from Oliver Street, and then begin walking north. Ex. 39 (Bailey Interview) at Homicide File 475. Bailey claimed she heard Richards say "hey," and then saw McPherson, Simmons, King, Ellison, and Richards start to run north on the other side of the street. *Id*. Bailey admitted that there were no street lights on that block and that it was "dark out." Ex. 35 (Bailey Test. 5/15/95) at 186:4-17; *see also* Ex. 31 (Scully Report) at 3 (showing no streetlights on 1500 block of Washington).

Bailey told Patton and Barlow that she saw McPherson, Simmons, Ellison and Richards running with guns in their hands, and then saw each of them shooting. Ex. 39 (Bailey Interview) at Homicide File 446. Once the gunshots started, she claimed to have seen the three unknown men begin running north on Washington; she lost sight of them about four houses past Lynn's Carryout, and she could not see all the way to the intersection of Federal and Washington. *Id*.; Ex. 35 (Bailey Test. 5/15/95) at 169:2-171:18, 172:17-173:10, 197:7-8. According to Bailey, she stayed in the window until she saw McPherson, Simmons, King, Ellison and Richards run back down Washington Street, and the next thing she saw after that was a police car driving down Washington in the wrong direction (i.e., Southbound on the one-way Northbound street). Ex. 39 (Bailey Interview) at Homicide  476; Ex. 35 (Bailey Test. 5/15/95) at 173:24-174:4

Bailey claimed Thompson was in the window with her the entire time she witnessed this incident. Ex. 35 (Bailey Test. 5/15/95) at 189:8-190:8. Bailey also told police about what she overheard at Lynn's Carryout the morning after the shooting. *Id*. at 234:20-236:7; Ex. 39 (Bailey Interview) at Homicide File 476; Ex. 38 (Bailey Grand Jury Test. 10/12/94) at 8:22-25.

Rather than obtain a tape-recorded or written statement from Bailey, which would have been best practice at the time, Patton typed notes of his interview of Bailey, which he did not

have Bailey sign. Ex. 20 (Patton Dep.) at 156:1-157:18; Ex. 39 (Bailey Interview) at Homicide

File 474-477. Patton offered no reason why he did not take a tape-recorded or signed written

statement from Bailey. Ex. 20 (Patton Dep.) at 156:1-157:18.

### C.  Police Know That Bailey's Account Is Unreliable

Bailey's account is demonstrably false, since she implicated both Plaintiffs, who had

absolutely nothing to do with the Wooden murder. *See supra* §II. The problems with Bailey's

account are not only apparent in hindsight— it would have been apparent to the Defendants,

based on the information they knew at the time of their initial investigation, that Bailey's account

was wholly unreliable.

First, Defendants knew that Bailey had supposedly overheard at Lynn's Carryout

information about the crime—that the shooting was committed by "Whitey and Country and

them" and that it occurred "on Federal and Washington"—the morning after the shooting, before

Bailey went to police, posing the risk that her account was contaminated or influenced by what

she had heard. Ex. 31 (Scully Report) at 29.

Second, Defendants knew it would not have been possible for Bailey to have seen what

she claimed. It is about 153 feet from the corner of Lynn's Carryout to Bailey's building at 1421

N. Washington. Ex. 31 (Scully Report) at 29. Given that distance, the darkness, and the absence

of street lighting, "it is unlikely that a person in the position of Ms. Bailey would have been able

to recognize the faces of the individuals standing near Lynn's Carryout." *Id*. Similarly, this long

distance makes it highly doubtful that Bailey could have seen the detailed hand movements of

the perpetrators that she claimed to have seen, like taking guns out of a bag or holding a gun

behind the back with hand at hip level. *Id*.; Ex. 35 (Bailey Test. 5/15/95) at 163:23-164:13; Ex.

39 (Bailey Interview) at Homicide File 475. Patton went to Bailey's home to evaluate what she

could have seen from the third floor window, and it would have been obvious to him that Bailey's account of what she saw was farfetched, if not impossible. Ex. 40 (Patton Test. 5.15.95) at 23:9-18; *id*. at 55:6-14.

Third, Bailey's account of the police car's movement was demonstrably false. Bailey told Defendants she saw the patrol officer's car driving the wrong way down Washington Street, but Defendants would have known that this was impossible. The responding patrol officer parked near 1629 N. Washington, which was documented in the police file. Ex. 1 (Brown Dep.) at 42:21-43:7; Ex. 3 (Office Report) at Homicide File 35. 1629 N. Washington is well north of the intersection of Federal and Washington. Ex. 31 (Scully Report) at 3 (diagram). And Defendants knew it was impossible to see the intersection of Federal and Washington from Bailey's window, let alone the scene farther north where the victim's body was found and where the responding officer parked. Ex. 40 (Patton Test. 5/15/95) at 23:9-12 ("you can't see this scene from Ms. Bailey's house"); *id*. at 24:2-13 (cannot see intersection). Indeed, both Plaintiffs' and Defendants' experts agree that Bailey could not have seen the patrol car driving the wrong way down the street. Ex. 31 (Scully Report) at 31; Ex. 41 (Terpstra Dep.) at 243-3-11.

Fourth, Defendants knew it would have been very difficult, if not impossible, for Bailey to have heard McPherson tell King to "Go get the guns." During their reinvestigation of this case, the Baltimore City State's Attorney's Office Conviction Integrity Unit ("CIU") tested this proposition: someone stood at Lynn's Carryout and screamed "Go get the guns," while another person stood in front of Bailey's home, listening. Ex. 33 (CIU Memo) at 8; Ex. 48 (Ellis Dep.) at 135:1-136:2, 137:4-138:6; Ex. 34 (Lipscomb Dep.) at 150:6-153:6. The CIU concluded that even at this maximum volume, "you could not decipher the words that were being used." *Id.* at 153:2-6; Ex. 33 (CIU Memo) at 8; *see also* Ex. 31 (Scully Report) at 34 (Bailey's ability to hear further

12

compromised by television and ambient city noise). While Patton and Barlow did not have the advantage of the CIU findings (although they could easily have repeated its rudimentary experiment), it would have been obvious to them based on their knowledge of the distances involved and their familiarity with Baltimore nighttime ambient noise that Bailey's story—of watching TV and hearing this phrase uttered from over 150 feet away—was deeply suspect. Ex. 40 (Patton Test. 5.15.95) at 23:9-18, 55:6-14; Ex. 31 (Scully Report) at 29.

Fifth, critical details of Bailey's story contradicted the information police had already learned from the other witnesses. For example, unlike Jackson, White and Martin—each of whom identified a single suspect shooter—Bailey's story claimed that McPherson, Simmons, Ellison and Richards were all shooting. *See* Section V, above. Similarly, Bailey claimed that the shooting began before the perpetrators reached Federal and Washington, while Jackson, White and Martin each told the Defendants that it began either at the corner of Federal and Washington or slightly north of that—areas that Bailey admits she could not see. *See* Section V, above. Moreover, there was no forensic evidence that corroborated Bailey's account of where the shooting occurred. Ex. 17 (Patton Test. 5/12/95) at 136:5-20 (no ballistic evidence that the shooting started south of Federal Street).

Sixth, Defendants knew that Bailey had an incentive to want to be helpful to police— even if that meant making up an eyewitness account based on information about a murder she overheard at Lynn's Carryout. Ex. 35 (Bailey Test.) at 253:14-254:10; (Steinheice told Patton about Bailey's role in Hollander Ridge and by inference, fact that she was receiving assistance). Bailey knew from her role as a witness in the Hollander Ridge case that helping police solve a homicide could help her get benefits—but Bailey was frustrated about the assistance she had received so far, and may have believed that helping police out on another case would finally get

her the benefits she was seeking. *See* Ex. 36 (Amended State Disclosure) at MS 9135 (Bailey

gets relocation help as benefit of her Hollander Ridge cooperation); Ex. 35 (Bailey Test. 5/15/95)

at 224:16-226:19 (Bailey complains that she isn't getting more help). Bailey was right—as

detailed above, after helping Patton and Barlow "solve" the Wooden homicide, she received a

slew of additional valuable benefits. *See* Ex. 36 (Amended State Disclosure) at MS 9135.

Additionally, Defendants would have known that Bailey had two outstanding warrants, and that

her criminal background included crimes of dishonesty—warning them both that she might be

motivated to help police for personal gain, and that she might not be scrupulously honest while

doing so. Ex. 35 (Bailey Test. 5/15/95) at 232:2-9, 232:24-233:11.

Seventh, while Bailey claimed that both she and Thompson witnessed the Wooden

shooting together, as described below, Patton and Barlow learned that Thompson was not

claiming to be a witness to the shooting. *See infra* Facts Section VI. This would have been a

huge red flag casting doubt on Bailey's entire story.

Indeed, Defendants knew they could not corroborate Bailey's story: They never

reconciled what Bailey said with what Jackson, White and Martin had told the Defendants. Ex.

40 (Patton Test. 5/15/95) at 55:18-21; Ex. 18 (Barlow Dep.) at 194:8-12. Nor did Defendants

ever try to show Jackson a photo array with the suspects that Bailey identified, despite Jackson

telling Patton that she could identify the shooter. Ex. 40 (Patton Test. 5/15/95) at 86:16-87:6; Ex.

29 (Jackson Follow-Up Note) at Homicide File 424. According to Patton, he could not find

Jackson and simply needed to "move on." Ex. 40 (Patton Test. 5/15/95) at 86:16-87:6. Instead,

Patton admitted that the only corroboration of Bailey's story was connecting the nicknames of

the people she identified with their given names. Ex. 17 (Patton Test. 5/12/95) at 133:23-137:3.

**VI.    Defendants Deviate From Practice to Bolster Bailey's Unreliable Story with Fake Corroboration From Thompson**

As noted above, when Bailey went to the police station on September 1, 1994, to tell Defendants what she allegedly saw, she went with Thompson and the two were interviewed together. Ex. 40 (Patton Test. 5/15/95) at 40:5-16. Construed in Plaintiff's favor, the record reveals that Thompson has never claimed to be a witness to the Wooden homicide, but that Patton and Barlow fabricated a narrative that Thompson corroborated Bailey in order to bolster Bailey's unconvincing and unreliable claims.

To that end, Patton and Barlow admit that interviewing two witnesses together is not the best practice; indeed, it violated BPD policy. Ex. 40 (Patton Test. 5/15/95) at 40:19-23; Ex. 18 (Barlow Dep.) at 165:20-165:11; Ex. 20 (Patton Dep.) at 124:8-126:10; Ex. 42 (Harvey Report) at 8. Nor was there any reason why the two needed to be interviewed together: Thompson was an adult at the time and although Patton speculated that she may have been "afraid to be in the police station," there is absolutely no documentation (contemporaneous or otherwise) of that. Ex. 43 (Thompson Dep.) at 15:1-20 (Thompson was 18); Ex. 44 (Thompson Information Sheet) at Homicide File 473; Ex 42 (Harvey Report) at 8. "If for some reason the investigator determined that it was best for witnesses to be interviewed together, generally accepted police practices in 1994 would require the investigator to contemporaneously document the reason for it." Id. at 8.

Despite the fact that Patton was a "meticulous notetaker," there are no notes of his alleged interview with Thompson. Ex. 45 (Garvey Dep.) at 37:12-38:18; Ex. 40 (Patton Test. 5/15/95) at 40:11-13. Nor is there a separate statement of Thompson. Ex. 3 (Office Report) at 9-13. That too was contrary to practice: Barlow testified that for each witness who is questioned during a criminal investigation, there should either be notes or a formal statement done. Ex. 18 (Barlow Dep.) at 196:13-197:15. No witness statement from Thompson exists. *See* generally Ex.

24 (Homicide File).  There is only one notation in Patton's "Interview" of Diane Bailey that

expressly attributes information to "[t]he witness *and her daughter*" and that is when the two

were presumably giving approximate street addresses and minimal descriptors for "Country,"

"Whitey,", "Marcus," "JR" and Alfred Costley. Ex. 39 (Bailey Interview) at Homicide File 476

(emphasis added); *see also* Ex. 33 (CIU Memo) at 11 (███████████████████████████

██████████████   The remainder of Bailey's "Interview," including the portion discussing the

shooting itself, refers only to information provided by "the witness" –*i.e.*, Diane Bailey. *Id*. at

Homicide File 474-77. Nevertheless, Patton deceptively portrayed that he had two separate,

corroborating witnesses (Bailey and Thompson) in his statement of probable cause, and later, at

trial. Ex. 46 (Simmons Probable Cause Statement) at Homicide File 238-40; Ex. 47 (McPherson

Probable Cause Statement) at Homicide File 358-60; Ex. 40 (Patton Test. 5/15/95) at 42:17-18.

        That Thompson could only provide the Defendants with information about the identities

of "Country," "Whitey,", "Marcus," "JR" and Alfred Costley is hardly surprising. ████████████

██████████████████████████████████████████████████   Ex. 33 (CIU

Memo) at 11; Ex. 48 (Ellis Dep.) at 177:2-17, 181:19-182:12. Nonetheless, Thompson knew the

men her mother had identified because she was friends with Alfreda Costley (Alfred's twin

sister), who McPherson was dating at the time. Ex. 4 (McPherson Dep.) at 120:6-122:20.

Additionally, Bailey and Thompson would throw house parties that McPherson, King, Ellison

and Richards attended at least once. *Id*. at 117:14-118:17; Ex. 49 (Watson Dep.) at 35:7-15, 41:6-

19, 108:20-109:19.

        While Patton claimed during the criminal investigation and prosecution that Thompson

and Bailey were "totally consistent" with each other, he does not deny attributing statements to

Thompson that she never said. Ex. 20 (Patton Dep.) at 325:17-326:2; Ex. 40 (Patton Test.

5/15/95) at 42:17-18. For her part, ASA Holback testified that she was not sure she ever interviewed Thompson, and may have relied on whatever the Defendants represented to her in the file; and that if she had known that Thompson had not witnessed the shooting, she would have disclosed that to the defense because it would undermine Bailey's account. Ex. 21 (Holback Dep.) at 171:12-173:11.

**VII.    Thompson's and Bailey's False Identifications**

In addition to doing an "Interview," Defendants apparently separately showed Bailey and Thompson photo arrays on September 2, 1994, and again on September 7, 1994. Ex. 18 (Barlow Dep.) at 131:9-132:7; 134:11-17; Ex. 17 (Patton Test. 5/12/95) at 109:2-121:11; Ex. 50 (9/2/94 Photo Arrays) at Homicide File 450-51, 455-56, 480-81, 490-91; Ex. 51 (9/7/94 Photo Arrays) at Homicide File 459-62, 488-89, 492-9.

When a witness views a photo array, a detective memorializes the "who-what-when-where" of the array on the back of the array, as well as any comments made by the witness; and writes a supplement. Ex. 18 (Barlow Dep.) at 127:17-128:8; 137:14-141:14. In this case, for each of the arrays viewed by Thompson, the comments section indicate that she merely identified the person in the picture; that is, for King, she stated "That's Marcus; for Richards, she stated "That's Country [*sic*] that's him right there;" for McPherson, she merely indicated "JR;" and for Simmons, Thompson stated "That's Black." Ex. 50 (9/2/94 Photo Arrays) at Homicide File 481, 491,; Ex. 51 (9/7/94 Photo Arrays) at Homicide File 489, 492,. Nonetheless, Patton falsely reported that Thompson "positively identified" these individuals. Ex. 52 (Supplement 9/2/94) at Homicide File 92 (witness "positively identified" number five, who is King); Ex. 50 (9/2/94 Photo Arrays) at Homicide File 480-81; Ex. 53 (Supplement 9/7/94) at Homicide File 66 (witness "positively identified" photo five, who is McPherson); Ex. 51 (9/7/94 Photo Arrays) at Homicide File 492-93 (Thompson identifying number five as "JR"); Ex. 3 (Office Report) at 13

17

(witnesses "positively identified" Country). A "positive identification" is a term of art in the BPD, which means that the witness identified the suspect. Ex. 18 (Barlow Dep.) at 221:23-223:21; Ex. 42 (Harvey Report) at 11-12. It is different than merely identifying someone that the witness may recognize or know. Ex. 18 (Barlow Dep.) at 221:23-223:21.

## VIII.   Plaintiffs Are Falsely Arrested

On September 6, 1994, the Defendants arrested Plaintiffs for murder and conspiracy to commit murder. Ex. 46 (Simmons Probable Cause Statement) at Homicide File 238-40; Ex. 47 (McPherson Probable Cause Statement) at Homicide File 358-60. The Statements of Probable Cause for both Plaintiffs are nearly identical in all material respects. *Id*.

Patton's Statements of Probable Cause sets forth the basis for Plaintiffs' arrests. *Id*. Those statements falsely rely specifically on "two witnesses" whose names are not revealed "for reasons of safety," but whose information tracks the information memorialized in Patton's typewritten notes of Bailey's story—notes that reflect an account made by Bailey and not Thompson. *Id.*; *cf.* Ex. 39 (Bailey Interview) at 445-47; Ex. 20 (Patton Dep.) at 162:14-163:3. Indeed, Patton does not deny that he lied in the affidavits for probable cause. *Id*. at 343:6-19; 346:9-19; 347:10-21.

Plaintiffs both told police that they had nothing to do with the Wooden shooting and gave alibis for where they were at the time, including the names of the people they were with who could corroborate their accounts. Ex. 16 (Simmons Statement 9/6/94) at 5-11; Ex. 7 (McPherson Statement 9/6/94) at 5-9. King, Ellison and Richards were also arrested on the morning of September 6, 1994. Ex. 17 (Patton Test. 5/12/95) at 12:19-13:8.

**IX.     Defendants Coerce Marcus King Into Giving a Fabricated Statement**

**A. Defendants Coerce Marcus King**

At the time of his arrest, King was only 13 years old, in the sixth grade and had learning disabilities. Ex. 54 (King Test. 5/11/95) at 174:21-175:5, 186:22-23; Ex. 55 (Smith Dep.) at 16:4-20:5.[3] Notwithstanding his young age, when King was brought into Homicide after his arrest, the Defendants both handcuffed him and chained him with leg irons to a chair. Ex. 17 (Patton Test. 5/12/95) at 21:16-22:3. King sat like this waiting to be interrogated for four-and-a-half hours. *Id.* at 15:13-16 (King arrived at 7:20 am); *id.* at 23:23-24:7 (King interview began at 11:50 am). This was by design. As Patton testified, he saw King as the "weak link" and he and Barlow "had planned to break Marcus King upon his arrest." *Id.* at 131:14-15.

King was interrogated by Patton and Barlow. When Defendants first interviewed King, King denied being involved in the murder. Ex. 17 (Patton Test. 5/12/95) at 28:18-21, 129:10-130:9; Ex. 54 (King Test. 5/11/95) at 221:1-24. King told the Defendants that McPherson and Simmons also did not have anything to do the murder: McPherson was with King on Chapel Street when the shots were fired and Simmons came looking for McPherson right after to make sure he was okay. *Id.* at 182:4-16, 199:1-14, 205:7-15, 221:14-222:9. The Defendants were not happy with that answer, and told King to "[s]top lying." *Id.* at 199:1-14, 205:7-15, 222:6-9; Ex. 17 (Patton Test. 5/12/95) at 131:19-23.

By his own admission, Patton began yelling at King, banging on the table, and stood on the desk to intimidate the small 13-year-old child. Ex. 40 (Patton Test. 5/15/95 at 30:22-24, 32:5-6, 101:24-102:9; Ex. 56 (King Arrest Report) (King was 4'5" and 105 lbs). According to King,

---

[3] Notwithstanding the coercion described below, and contrary to the Defendants' representation, King does not dispute that he signed his initials to the *Miranda* waiver. Ex. 54 (King Test. 5/11/95) at 187:6-23, 188:10-15.

Barlow, the white detective, was also yelling at him. Ex. 54 (King Test. 5/11/95) at 240:6-19.

King started crying. Ex. 17 (Patton Test. 5/12/95) at 41:23-42:1.

### B.   Defendants Feed King Information About the Crime from Diane Bailey

Not only did the Defendants intimidate the young boy, but they also admit that they fed

King information about the crime. Patton testified he told King he "knew that [King] was there. I

knew he went to the house and got those guns and we're not going to complete this interview

until you tell us what happened." Ex. 17 (Patton Test. 5/12/95) at 32:1-4; *see also id*. at 29:17-

20; Ex. 40 (Patton Test. 5/15/95) at 92:20-93:7. According to Patton, notwithstanding the fact

that he had not been able to corroborate Bailey's story, and despite the many reasons (described

above) that would have caused him to doubt its veracity, Patton decided to accept Bailey's

claims as true; "what happened" was what Bailey had told him. Ex. 40 (Patton Test. 5/15/95) at

133:5-10. This interrogation approach of pre-determining what was "true" and then requiring

witnesses or suspects to match this narrative was a part of Patton's practice. Ex. 59 (Patton Test.

in *Maryland v. Griffin*) at 77:12-78:13, 95:2-13 (describing his "template of truth" in

interrogations); Ex. 20 (Patton Dep.) at 415:10-416:11. In order to further get King's statement

to match Bailey's, Patton also admitted that he may have told King that King put the guns in a

bag, and the bag was black. *Id*. at 92:24-93:1. Indeed, Patton does not deny that King's statement

was based on what Bailey told him. Ex. 20 (Patton Dep.) at 428:7-14, 440:2-6, 442:4-17. Finally,

Barlow told King that McPherson and Simmons were involved. Ex. 54 (King Test. 5/11/95) at

195:18-196:13, 199:4-23; *see also id*. at 183:15-184:8 (white detective forced him to implicate

Simmons and McPherson).

### C.  King's False and Fabricated Tape-Recorded Statement

Unable to withstand the coercion, King gave an untrue taped statement. Ex. 54 (King Test. 5/11/95) at 203:1-4. King testified that while he had learned "some of the stuff" about the murder from Ellison, it was"[t]he policeman" who told him what to say on the taped statement, and in particular, insisted that King say that Simmons and McPherson committed the crime. *Id*. at 195:18-196:13, 199:4-23, 203:5-9; *see also id*. at 183:15-184:8. Indeed, when directly asked by the Court whether Ellison "told you what to say when you lied to the police," King answered "No," and explained that it was the police officer who was "making me say stuff out of my mouth . . . ." *Id*. at 204:2-5, 204:21-23.

Notably, what Ellison had told King about the murder differed markedly from what is on King's tape-recorded statement. Ellison claimed that the murder was committed by Richards, "Rome" and their other friend whose name he did not know, which Ellison told to the Defendants. Ex. 57 (Ellison Dep.) at 111:1-112:17; Ex. 58 (Ellison Taped Statement) at 3. Ellison also told Defendants that neither King nor Plaintiffs were involved in any way. Id. at 5-6; Ex 57 (Ellison Dep.) at 52:19-25; 59:7-13; 70:25-71:19, 108:10-112:17.

By contrast, in his tape-recorded police statement, King stated that McPherson told him to go get guns and he went to Alfred Costley's house to retrieve them. Ex. 17 (Patton Test. 5/12/95) at 49:12-50:1. King could not describe what guns he supposedly got, or even whether the guns were semi-automatic—he alternatively stated that the guns were .22, .38 or .380. *Id*. at 50:8-51:9. After prompting by Barlow, King stated that he took the guns in a black bag. *Id*. at 51:10-18. King claimed he left two guns in the house but could not remember where those two guns were or what kind of guns they allegedly were. *Id*. at 51:23-52:9. King stated that "Whitey" and "Country" took guns out of the bag, but then later claimed that Country had a .44 caliber

21

weapon, which was not one of the guns he took from Costley's house. *Id*. at 52:13-16, 56:22-24.

King alternatively claimed that the victim started shooting first, and that "Whitey," "Country,"

"JR" and "Black" shot first. *Id*. at 53:23-24, 54:6-16, 58:5-59:5. According to King's taped

statement, the victim was shot in the back (wrong) and was hit twice (wrong again). *Id*. at 56:15-

21, 59:12-16.

## X.     King Recants His False and Fabricated Police Statement

Shortly after he gave his coerced and fabricated statement, King began recanting it. For

example, on November 3, 1994, during an evaluation at the Waxter Juvenile Detention Center,

King told the psychiatrist that "two other boys were locked up with him, Kenneth and Eric, but

they did not do it." Ex. 60 (King Waxter Coto Eval. 11/3/95) at MAIP McPherson 54. Likewise,

during another evaluation, King told two different psychologists the same thing. Ex. 61 (King

Waxter Villasana Eval. 11/3/95) at MAIP McPherson 59.

At trial, King (at that time 14-years-old) again recanted his taped police statement,

explaining that what he said on the tape "was lies." Ex. 54 (King Test. 5/11/95) at 174:7-22,

203:4. King explained that he was coerced into making those lies, which "[t]he man"—*i.e.*,

"[t]he white detective"—made him say. *Id*. at 183:15-184:8, 203:4; *see also id*. at 240:6-19

(white detective is Barlow). Nonetheless, Patton not only testified about King's statements, but

also King's taped statement was played at trial. Ex. 17  (Patton Test. 5/12/95) at 44:23-63:11.

## XI.    Plaintiffs Are Wrongfully Convicted of Conspiracy to Commit Murder

Plaintiffs' criminal trial began in May 1995 following an indictment based on Patton's

and Bailey's false grand jury testimony. Ex. 62 (Patton Grand Jury Test.); Ex. 38 (Bailey Grand

Jury Test.). There was no physical evidence connecting either McPherson or Simmons to the

crime, and no physical evidence that corroborated Bailey's story or King's fabricated narrative.

Ex. 42 (Harvey Report) at 12-13; Ex. 63 (Defense Closing Argument 5/16/95) at 179:8-22; Ex.

64 (Patton's Resp. to Pltfs RFA) at Nos. 3, 7, 10 (admitting murder weapon not recovered); Ex.

17 (Patton Test. 5/12/95) at 136:5-20. Instead, the prosecution's case rested almost exclusively

on Bailey's testimony (which Patton claimed was corroborated by Thompson) and King's taped

statement (along with Patton's testimony about that statement). Ex. 63 (State Closing Argument)

at 165:24-166:14 ("both witnesses, who have nothing in common, no reason to want to be

consistent with each other"); *id*. at 167:14-15 ("How do we know this? Because Diane Bailey

saw it and Marcus King participated in it"); *id*. at 168:5-8 (King and Bailey no reason to lie); *id*.

at 210:13-213:9 (King's "version is remarkably consistent with Diane Bailey's version").

Thompson was not called as a witness at the trial. ASA Holback could not explain why she was

not, and was not even sure she spoke with Thompson during the criminal proceedings. Ex. 21

(Holback Dep.) at 171:7-18, 172:12-19.

After two days of deliberations, and based on Bailey's false testimony and King's

fabricated taped statement, Plaintiffs were convicted of conspiring to murder Anthony Wooden.

Ex. 65 (Transcript of Proceedings 5/18/95) at 3:21-4:7. Plaintiffs were sentenced to natural life.

Ex. 6 (Sentencing Transcript 7/5/95) at 51:2-7. At their sentencing hearing, Plaintiffs maintained

their innocence. *Id*. at 38:13-14, 41:16-18.

## XII.  The CIU Reinvestigation

Having never given up on proving their innocence, McPherson wrote to the CIU and

asked them to reinvestigate his and his brother's case. Ex. 66 (McPherson Letter to Lipscomb);

Ex 4 (McPherson Dep.) at 302:20-304:2. The CIU re-investigates cases where there is

"substantial indicia of factual innocence." Ex. 34 (Lipscomb Dep.) at 44:11-15.

The CIU reinvestigation was thorough and lengthy, involving numerous interviews, site

visits and reviewing all relevant documents. Ex. 33 (CIU Memo) at 10-11, 13-19, 22-23; Ex. 34

(Lipscomb Dep.) at 52:5-13, 61:5-15, 76:4-7, 95:11-97:4, 115:16-18, 139:5-140:5, 176:17-19,

207:7-20, 240:20-241:18, 245:8-21; Ex. 32 (Writ of Actual Innocence ("WAI") Hrg. Tr. 5/3/19) at 11:3-16. Following that review, the CIU determined that the evidence demonstrated that the shooting erupted at Federal and Washington, on the 1600 block of Washington, which was outside Bailey's view. Ex. 33 (CIU Memo) at 3, 8, 12-13; Ex. 32 (WAI Hrg Tr. 5/3/19) at 16:22-17:4, 17:17-24. As noted above, the CIU also determined that while Bailey may have been able to hear someone yelling, she would not have been able to make out words. Ex. 33 (CIU Memo) at 8; Ex. 34 (Lipscomb Dep.) at 150:6-153:6. Plaintiffs' acoustical expert reached a similar conclusion. Ex. 31 (Scully Report) at 31-34. Further, the CIU determined that there was substantial evidence that both Plaintiffs were "factually innocent"—including that credible alibi witnesses placed them on Chapel Street (McPherson) or at home (Simmons) when the shooting occurred. Ex. 33 (CIU Memo) at 3, 13-18, 22-24; *see generally* Ex. 32 (WAI Hrg. Tr. 5/3/19). The Plaintiffs and the State filed a Joint Petition for a Writ of Actual Innocence, which was granted by the Court on May 3, 2019. Ex. 67 (Joint Petition); Ex. 32 (WAI Hrg. Tr. 5/3/19) at 21:8-22:12. On the same day, the Court granted the Plaintiffs a new trial; and the State *nolle prosequied* all charges against the Plaintiffs. Ex. 32 (WAI Hrg. Tr. 5/3/19) at 22:10-23:4.

All told, Plaintiffs spent nearly 25 years each in prison for a murder that they did not commit. Their time in prison was enormously damaging.[4] Plaintiffs were finally released from custody on May 3, 2019.

---

[4] So difficult were the conditions at the prisons that McPherson was desperate to get into the much safer Eligible Person (EP) program at Patuxent institution— a prison placement the judge recommended as part of his original sentence. Ex. 6 (Sentencing Transcript 7/5/95) at 51:24-52:15, 53:9-14. Patuxent was a "lot easier environment . . . You don't have to fear for your life in there." Ex. 4 (McPherson Dep.) at 345:6-8. And if an inmate goes through the EP program, he or she can be eligible for parole. *Id*. at 9-11. To be admitted to that program, McPherson had to go through an evaluation process, where he was asked about the Wooden homicide by Dr. Abumere. Any statement attributed to McPherson suggesting he was involved in the Wooden homicide is not true; McPherson said it "to get in the program because I did not want to go back

**LEGAL ARGUMENT**

**I.      Summary Judgment Standard**

At summary judgment, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. Conflicting inferences are always resolved in the non-movant's favor, *Cole v. Cole*, 633 F.2d 1083, 1089 (4th Cir. 1980), and the Court draws inferences from "not only depositions but also documentary materials in the light most favorable to the party opposing the motion." *Magill v. Gulf & W. Indus., Inc*, 736 F.2d 976, 979 (4th Cir. 1984). "Even if there is no dispute as to the evidentiary facts, summary judgment is inappropriate if there is a dispute as to the conclusions to be drawn from such facts." *Id*. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. Plaintiff's "version of any disputed issue of fact thus is presumed correct[.]" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992).

In a case like this one, where virtually every material fact is hotly disputed, a jury is needed to decide the claims. *See Smith v. Ray*, 781 F.3d 95, 103 (4th Cir. 2015) (where officers' testimony is at odds with testimony from other witnesses, summary judgment is inappropriate).

---

North Branch, and I feared for my life, and I was trying to go for – get parole. And I was already told . . . the only way to get in this program is – I ain't going to say admit, but take responsibility for the crime." *Id*. at 356:2-9.

## II.      Genuine Disputes of Fact Require a Trial on Plaintiff's Fabrication Claims

Fabricated evidence has no place in a criminal proceeding, particularly where liberty interests are at stake. *See Washington v. Wilmore*, 407 F.3d 274, 283–84 (4th Cir. 2005). The due process clause forbids a police officer from using manufactured false evidence to deprive a criminal suspect of their liberty, whether through fabricated witness statements or otherwise. *See Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) ("We have recognized a due process 'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'") (quoting *Washington*, 407 F.3d at 282); *Washington*, 407 F.3d at 282 (Section 1983 fabrication claim involves "the creation of false evidence").

Pressuring a witness to adopt a detective's theory of the case has long been actionable. *See, e.g, Gilliam v. Sealey,* 932 F.3d 216 (4th Cir. 2019) (fabrication claim proceeded to trial where officers met with a 16-year-old witness multiple times and made him take a polygraph test in which he declared that he did not know anything about the crime, marked him "as a suspect" and ordered his fingerprint analysis, causing witness to change his story and testify at plaintiffs' trial that one of the plaintiffs had confessed to committing the crime); *White v. Smith,* 696 F.3d 740, 757 (8th Cir. 2012) (allowing a § 1983 fabrication claim to proceed when evidence demonstrated "that Defendants coached and manipulated" witnesses "into adopting Defendants' theory of the case"). An investigator is liable for fabrication where the "false evidence [was] fabricated 'deliberately or with reckless disregard for the truth.'" *Howard v. City of Durham*, 487 F. Supp. 3d 377, 404–05 (M.D.N.C. 2020) (quoting *Massey*, 759 F.3d at 357).

### A.  Marcus King's Fabricated Statement

The record presents an unmistakable and genuine dispute about whether Patton and Barlow fabricated Marcus King's statement, violating Plaintiffs' due process rights.

### 1.   A Jury Could Find That King's Statement Was False

For starters, King's recorded statement was false. Shortly before the murder occurred, King was on Chapel Street, and at the time the shots were fired, King ran into Joanne Crandall's house, making it impossible for him to have participated in the murder. At summary judgment, these facts must be credited. *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996). If King were on Chapel Street and not running to grab a bag of guns or otherwise participating in a homicide, his police statement saying the opposite is obviously false. Additionally, Plaintiffs' testimony about their whereabouts, as well as their alibi evidence, further establish the falsity of King's police statement. A reasonable jury could certainly credit Plaintiffs' testimony that they did not participate in the murder and credit the alibi testimony that McPherson and Simmons were elsewhere when the murder occurred.

Further underscoring the falsity of King's statement, King disavowed his coerced police statement and testified that this statement was false. For these reasons, there is a genuine dispute about whether King's statement was, in fact, false.

### 2.   A Jury Could Find That Defendants Authored The Key Parts of King's Statement.

If, as must be assumed at summary judgment, King's statement is false, the question becomes: how did he come to implicate not only himself, but also the two Plaintiffs, in Wooden's murder? Either he provided this false information of his own volition, or Defendants forced him to adopt it. The record evidence, properly construed, reveals that Defendants deliberately fabricated King's statement, knowing it to be false—or at a minimum, with reckless disregard for whether or not it was true. *Howard*, 487 F. Supp. 3d at 404–05.

To start, there is King's own sworn testimony. King testified that "[t]he policeman" told him what to say. King made clear to Patton and Barlow that he was not involved in the shooting,

27

and that he could not truthfully implicate either Plaintiff—unsurprisingly given that he did not witness the shooting and was with McPherson on Chapel Street when shots were fired. King's own testimony revealed the moving force behind the false police statement: the investigating detectives literally told him what to say, "making [him] say stuff out of [his] mouth . . . ." Ex. 54 (King Test. 5/11/95) at 204:2-5, 204:21-23. Indeed, Patton admits to feeding King critical information about his supposed role in the shooting: *e.g.*, that King provided the Plaintiffs (and the other perpetrators) with guns, where the guns came from, and how they were transported.

Defendants' strategy to gloss over this testimony fails at summary judgment. King's attribution of his false statement to Patton and Barlow was direct and unequivocal; his testimony on this score would essentially have to be disregarded to conclude as a matter of law that King's statement was not fabricated. But there is no legally defensible way to scrub out the parts of King's testimony that are unfavorable to Defendants. *See Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) ("It is not [the Court's] job to weigh the evidence, to count how many affidavits favor the plaintiff and how many oppose him, or to disregard stories that seem hard to believe. Those tasks are for the jury.") (citations omitted). King testified that the Defendants told him to implicate the Plaintiffs, so after much pressure, he did.

It is true that King's testimony at points may be subject to competing interpretations. At times, he testified unequivocally that he gave an inculpatory statement because of pressure from the police, while at other points he attributed some of the facts in his police statement (but importantly, never his identification of Plaintiffs nor his own involvement) to Daniel Ellison. But this does not undermine Plaintiffs' fabrication claim at the summary judgment stage.

First, to the extent King gave inconsistent testimony at trial, at most this creates a fact dispute for the jury to resolve about who scripted King's statement. It is axiomatic that, where

there are inconsistencies in testimony in the record, the version of the facts most favorable to the plaintiff must be accepted as true at the summary judgment stage. *See Gell v. Town of Aulander*, No. 2:05-CV-00021-FL, 2008 WL 11381403, at *12 (E.D.N.C. Sept. 24, 2008) ("To the extent that the inconsistencies in the numerous witness statements in the record create an issue of witness credibility, this cannot be assessed on summary judgment."); *Bost v. Wexford Health Sources, Inc.*, No. CV ELH-15-3278, 2022 WL 4290528, at *25 (D. Md. Sept. 16, 2022) (where there is "conflicting evidence . . . summary judgment is not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.").

This is equally true when the inconsistencies are not between testimony given by separate witnesses, but within the testimony of a single witness. *See, e.g., Bost*, 2022 WL 4290528, at *48 (noting that healthcare administrator's deposition testimony that jail nurses required doctor approval before sending a detainee to the emergency room created genuine factual issue precluding summary judgment, even though her testimony was "contradictory or inconsistent," in that she also testified that nurses could "just on their own send someone out"—since ultimately "it is the role of the factfinder to resolve any discrepancies in the testimony and to decide what testimony to credit"); *see also Branion v. Gramly*, 855 F.2d 1256, 1263 (7th Cir. 1988) ("Selective disbelief, however, is an ordinary incident of trial"); *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) (noting that the judicial system could not function if it adopted the discredited doctrine that a witness who testifies incorrectly about one thing must be disbelieved on all things); *cf. Sales v. Grant*, 158 F.3d 768, 779 (4th Cir. 1998) (finding that the court erred by crediting witness trial testimony where that witness's own inconsistent testimony served to create a genuine issue of fact); *Moultrie v. Harris Lake Inc.*, 813 F.2d 1228 (4th Cir. 1987)

29

("[A]s the trial court quite properly instructed the jury, they were free to believe all, part or none of what any witness . . . had to say.").

Second, these seeming inconsistencies in King's testimony are in fact reconcilable as to the most salient inculpatory facts—such that King's testimony as a whole, properly construed and considered in context, supports Plaintiffs' fabrication claims. King did overhear some information about the crime from Ellison, who he knew from the neighborhood. Ex. 54 (King Test. 5/11/95) at 203:5-9, 203:22-204:5. As King testified, Ellison told him "some of the stuff" about "what happened." *Id*. But King was clear that Ellison did not tell him what to say on the taped statement. *Id.* ("Q. And he told you what to say when you lied to the police? A. No, he told me what they did – what happened."). Nor would Ellison have implicated McPherson and Simmons in the murder, as Ellison consistently maintained that McPherson and Simmons had no connection to the Wooden homicide. Ellison pointed the finger at Richards and other individuals, but never the Plaintiffs or himself. It is, thus, implausible that King implicated Plaintiffs because of Ellison, given that Ellison's consistent account of the murder does not mention the Plaintiffs.

Put another way, it is entirely consistent that King truthfully testified at trial that he learned some information about the crime from Ellison, and truthfully testified that the information in his statement, which implicated himself and Plaintiffs in the crime, was supplied by the Defendants. As such, Defendants sweep far too broadly by attempting to lay all of the blame for King's false account on Ellison. Indeed, King's direct testimony on this point is consistent: it was Detective Barlow, not Ellison or anyone else, who insisted that King implicate McPherson and Simmons.

Taken together with King's own testimony on this score, the fair inference from these facts is that Patton and Barlow knew King's statement was false as to its central and most

inculpatory claim—that King saw Plaintiffs involved in the murder. Defendants deceptively presented this "fact" as King's own, falsifying the idea that King saw something they knew he did not see. *See Howard*, 487 F. Supp. 3d at 412 (denying summary judgment on fabrication claim where witness statement contained non-public information about the crime, since if the witness was not present at the crime this would support inference that their statement was fabricated by the police). *See also Burgess v. Goldstein*, 997 F.3d 541, 552–54 (4th Cir. 2021). Even if King may have learned some facts about the murder from Ellison, that does not absolve Defendants of responsibility for their hand in fabricating King's inculpatory statements implicating himself and Plaintiffs.

At a minimum, Patton and Barlow acted with reckless disregard for the truth and misrepresented that the source of these identifications was King. *See Massey*, 759 F.3d at 357 (fabrication claim were false evidence fabricated "deliberately or with reckless disregard for the truth), citing *Miller v. Prince George's Cty.*, 475 F.3d 621, 627 (4th Cir. 2007). This is sufficient to create a triable issue on fabrication. "Fabricated testimony is testimony that is made up; it is invariably false." *Fields v. Wharrie* (*Fields II*), 740 F.3d 1107, 1110 (7th Cir. 2014). Plaintiffs agree that a fabrication claim requires a finding that the defendants knew the falsity of the evidence in question, but as *Fields* makes plain, "made up" testimony is invariably false. *See Howard v. Dowdy*, 2022 WL 1720156, at *4 (M.D.N.C. July 8, 2022) (fabrication of evidence where police provided fed information to witness who knew nothing about the crime); *Gell*, 2008 WL 11381403, at *12 (fabrication of evidence where police intentionally mis-recorded what witnesses said in their police reports). Moreover, introduction of fabricated witness statements always violates due process. *Avery v. City of Milwaukee*, 847 F.3d 433, 441-42 (7th Cir. 2017). *See also Gilliam*, 932 F.3d at 241 (due process protects against "depriv[ation] of liberty as a

result of the fabrication of evidence by an investigating officer"); *Massey*, 759 F.3d at 354 (same).

In a similar vein, Defendants argue that the symmetry between King's and Diane Bailey's statements underscores King's accuracy, but the Defendants have it backwards. Given the significant record evidence of Plaintiffs' innocence, and the assumption at summary judgment that King's identification of Plaintiffs is objectively false, the only plausible explanation for why he wrongly identified the same people that Bailey also identified is that Defendants fabricated his statement to match hers. On that point, Patton concedes that when he interviewed King, he was not going to stop until he got the "truth," and the "truth" was what Bailey told him. So long as King's statement matched Bailey's, it did not matter to Patton or Barlow that King's statement was made up.

### 3. A Jury Could Find That Defendants Knew They Were Forcing King To Adopt A Statement That Was Materially False.

Likewise, whether Patton and Barlow knew King's identification of Plaintiffs was false is hotly disputed. King told Patton and Barlow repeatedly that Plaintiffs were not involved in the shooting. For the first half hour of his one-and-a-half hour interrogation, King, a 13 year-old boy in sixth grade, denied any knowledge of the crime, and provided an alibi for McPherson. Defendants would not accept that, however, and started yelling at King, banging and standing on the table (techniques designed to "break" King) and told King they were not going to leave until he parroted back their version of the crime, consistent with Patton's interrogation style of only relenting once witness or suspect statements comported with his "template of truth." That resort to coercion alone provides circumstantial evidence of fabrication. *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) (fabrication can be proven circumstantially, including by evidence showing that "[d]efendants used investigative techniques that were so coercive and

abusive that they knew or should have known that those techniques would yield false information"); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 156-57 (1970) (error to grant summary judgment where the plaintiff's evidence permits inference that certain interactions between defendants and third parties occurred, even when the plaintiff had no direct knowledge).

In spite of King's own account and total lack of knowledge about the crime, Barlow and Patton forced him to say Plaintiffs were involved. Whether or not they subjectively believed in Plaintiffs' guilt, Patton and Barlow knew that *this witness* (King) could not truthfully make such an identification based on his personal knowledge. But Patton and Barlow were undeterred. Determined to corroborate Bailey's account, they strong-armed King into adding McPherson and Simmons to the story. This is what King testified to, and that testimony must be credited at this juncture.

Defendants misapprehend the significance of their extreme coercion on King. King's mistreatment matters not because Plaintiffs have an independent due process claim for witness coercion but because it supports the inference that they knew King's taped statement was false— one he would not adopt absent relentless pressure and physical intimidation. *See Devereaux,* 263 F.3d at 1074-75; *Osborne v. Georgiades*, CV RDB-14-182, 2015 WL 6447503, at *4 (D. Md. Oct. 23, 2015), aff'd, 679 Fed. App'x. 234 (4th Cir. 2017) (finding that allegations that the defendant exerted pressure on victim that resulted in the fabrication of evidence against plaintiff set forth a fabrication claim particularly where the "contents of the conversations . . . are not disclosed" contrary to what one would expect). Evidence that Defendants shackled King, yelled at him, banged their fists on the table, stood up on the table, and verbally and physically intimidated King provides essential context for how they got King to adopt their view of the truth. King's age and learning disabilities must also be considered—a thirteen-year-old boy,

King was visibly distraught during the interrogation and was crying throughout. *Gilliam*, 932 F.3d at 236 (noting that young age and mental state of witness are highly relevant factors when assessing coercive effect of interrogation); *United States v. Ayesh*, 702 F.3d 162, 168 (4th Cir. 2012) ("[P]ersonal attributes," such as "age, education, intelligence, and mental state" are relevant considerations). *See also* Ex. 42 (Harvey Report) at 14 (experienced detectives know juveniles especially vulnerable to pressure and threats). King's vulnerabilities made him an easy target for Patton and Barlow, who were looking to develop support for Bailey. Patton went after the "weak link," with a stated desire to "break" King, which is circumstantial evidence of his intent to fabricate. *Gilliam*, 932 F.3d at 240 (triable fabrication claim where sixteen-year-old witness was allegedly coerced to make false statement). [5]

Defendants rely on *Howard v. City of Durham*, but *Howard* advances Plaintiffs' position, not theirs. *See* Def. Br. at 19. Unlike the witness in *Howard*, here there *is* "evidence of influence or coercion" by law enforcement on King. King testified to Patton's improper influence and directly linked it to his false implication of Plaintiffs. This is not merely a recantation decades later for reasons unrelated to the detectives' interrogation, but a nearly contemporaneous recantation, under oath, that describes how the initial false statement was caused solely by the detectives' abusive interrogation. As *Howard* instructs, it would be improper at summary judgment to tease out and discredit King's testimony of coercion in favor of other, potentially inconsistent testimony. *See also Gilliam*, 932 F.3d at 240; *Massey*, 759 F.3d at 357.

---

[5] The coercive techniques (particularly when used against a child ) coupled with feeding King non-public allegations about the murder, represented a deviation from generally accepted police practices at the time – practices that were designed to reduce the risk of eliciting untruthful statements from witnesses. Ex. 42 (Harvey Report) at 13-15 (Section II).

Indeed, even once the Defendants broke King by resort to this coercion, King still could not provide the Defendants with a coherent narrative. King's tape-recorded statement largely included facts that Patton admits he fed to him, that were contradicted by King, or were simply wrong. There is no dispute that Patton fed King facts about the crime: He testified to the same at trial and admitted at his deposition that he did so.

Additionally, within his brief tape-recorded statement, King either could not remember or directly contradicted himself on salient facts. For example, King could not describe the types of guns used (by caliber or whether they were semi-automatic); King also attributed the murder weapon to Ellison but then contradicted that allegation; King was unable to track the number of guns that were retrieved and/or from where; and King offered contradicting facts about how the murder took place (*i.e.* who was shooting and when)

Third, King's statement includes facts that are simply flat out wrong. According to King, the victim was shot in the back and hit by two bullets, but both statements are incorrect.

At bottom, what this evidence demonstrates is that King could not get his fabricated story straight. That was because King had no knowledge of the crime—and any reasonable officer, speaking with him, would have understood the same. *Howard v. Dowdy*, No. 1:17CV477, 2022 WL 1720156, at *4 (M.D.N.C. May 27, 2022) (sufficient evidence for jury to find officer fabricated witness statement where witness denied being at crime scene or having any knowledge of crime, permitting inference that her inculpatory statement was fed to her by police, despite fact that witness testimony was "combative, evasive, and fraught with inconsistencies").

Finally, whether Defendants believed King's manufactured statement was false is itself a jury question that can be answered through circumstantial evidence alone. *See Gell*, 2008 WL 11381403, at *13 (summary judgment denied where record contained evidence to support two

competing inferences: that defendant competitively sought plaintiff's conviction, and that defendant was a "competent professional whose poor performance in this instance does not rise to the level of deliberate fabrication of evidence"); *see also Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022) (a plaintiff "need not have a smoking gun or an admission to prove knowledge."); *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") (citations omitted); *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (A defendant's intent is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."). Indeed, it is the rare case where a defendant would admit his bad faith, and the law does not set such a high evidentiary bar. *Sales v. Grant*, 158 F.3d 768, 780 (4th Cir. 1998) (recognizing that the requisite culpable "state of mind[] can be proved by circumstantial evidence as commonly the only kind available for this purpose"); *cf. Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir. 1987) (intent to defraud rarely admitted).).

### 4. King's Fabricated Statement Proximately Caused Plaintiffs' Convictions.

King's fabricated statement deprived Plaintiffs of their liberty and caused their combined 50-year imprisonment. King's police statement was introduced at the criminal trial and repeatedly presented to the jury as part of the State's guilt evidence. The jury listened to King's audio-recorded statement, powerful evidence that surely swayed the jury. Although King tried to disavow it, he was cross-examined extensively. There is simply no dispute that his fabricated statement deprived Plaintiffs of liberty, and Defendants do not even make the argument.

The question of causation is intensely factual and generally one for the jury, rather than the Court at summary judgment. *See Pac. Shores Properties, LLC v. City of Newport Beach,* 730 F.3d 1142, 1168 (9th Cir. 2013) (explaining that causation "is an intensely factual question that

36

should typically be resolved by a jury." (citing *White v. Roper*, 901 F.2d 1501, 1505-06 (9th Cir. 1990)). Here, a jury could conclude that King's testimony, standing alone even without Bailey's testimony, proximately caused Plaintiffs' conviction. King's police statement was portrayed as a voluntary, truthful confession from an accomplice. This highly damning evidence was paraded throughout the trial and emphasized repeatedly in the State's closing argument. A jury could readily conclude on these facts that King's fabricated statement was a proximate cause of Plaintiff's conviction. *See Howard*, 487 F. Supp. 3d at 416 (M.D.N.C. 2020) (causation issue on effect of fabricated witness testimony was jury question where police fabricated testimony of "key" witness even where there was other evidence of guilt submitted at trial). *See also Kovari v. Brevard Extraditions, LLC*, 461 F. Supp. 3d 353, 372 (W.D. Va. 2020) ("the question of causation is an ultimate issue for the fact finder to resolve and so, the jury can find the existence of causation if the totality of evidence proffered at trial supports it"); *Tarlton for McCollum v. Sealey*, No. 5:15-CV-451-BO, 2018 WL 1129976, at *12 (E.D.N.C. Mar. 1, 2018), *aff'd sub nom. Gilliam*, 932 F.3d 216; *Washington v. Buraker*, 322 F. Supp. 2d 702, 712 (W.D. Va. 2004) (finding causation where fabricated evidence "could have affected the judgment of the jury"), *aff'd sub nom. Washington*, 407 F.3d 274.

### B. Keisha Thompson's Fabricated Identification

Keisha Thompson was presented to the prosecution as a second, independent eyewitness to the murder. But that presentation was entirely false. Patton and Barlow never obtained a suspect identification from Thompson, nor any inculpatory information that would have corroborated Bailey's statement. Nevertheless, they lied to the prosecutor and court about Thompson to secure an arrest warrant and initiate felony charges against Plaintiffs.

Defendants make two challenges to this evidence: first, that it is "entirely speculative" that her statements were false; and second, that Thompson did not cause Plaintiffs' deprivation of liberty because she did not testify at trial. Neither challenge has merit.

### 1. Plaintiffs' Fabrication Claim is Not Speculative

As to the first, the record permits two competing inferences regarding the falsity of Thompson's statement, neither of which are remotely speculative. On one hand, a jury could easily find that the police report documenting Thompson's supposed statement was false—and that in fact Thompson made no such statement at all to police, but simply accompanied her mother to the police station. For starters, the statement is provably false in light of Plaintiffs' testimony and several alibi witnesses' testimony, credited at summary judgment as it must be. So, too, could a jury credit Daniel Ellison, who admitted to being involved, identified the perpetrators and repeatedly excluded Plaintiffs. A jury could also credit ██████████ ████████████████████████████████████████████████████████ ████████ Ex. 33 (CIU Memo) at 11. Indeed, as Plaintiffs' sight and sound expert has confirmed, neither Bailey nor Thompson could have identified anyone from their third story window nor heard McPherson allegedly yell to King to "Go get the guns." Ex. 31 (Scully Report) at 29-34.[6]

The glaring lack of documentation for Thompson's supposed incriminating statements also supports the inference that she never incriminated Plaintiffs. Patton and Barlow admitted that if Thompson had in fact provided them with a statement, their practice would have been to create a separate report documenting that statement. BPD practices at the time, as well as

---

[6] Defendants construe Thompson's earlier statement to Ellis as inconsistent with her later one but they need not be interpreted that way -- it is for a jury to decide, in any case, and at summary judgment the inferences must be drawn in Plaintiffs' favor. *See Bost,* 2022 WL 4290528, at *48.

generally accepted police practices, confirm that a reasonably trained homicide detective would have recorded Thompson's statement independent of her mother's—if such a statement existed. Yet there is no such report or note, nor any contemporaneous explanation of why no such report exists. In fact, the only report of Thompson's alleged statement is her mother's. And the synopsis of Bailey's interview only refers to "her daughter" in the portion of the interview in which "the witness and her daughter" provided identifying information about McPherson, Simmons, Ellison and Richards. There is no corollary mention of Thompson or Bailey's "daughter" in the portion of Patton's typed summary of Bailey's interview that discusses what Bailey—"the witness"— allegedly saw. Patton and Barlow's failure to record Thompson's statement supports the inference that no such statement was made. *See Burgess*, 997 F.3d at 553 (jury could have been persuaded to reject police officer's testimony since officer "failed to document parts of the investigation he claimed to have conducted and [] his investigation failed to comply with police best practices"); *Andersen v. City of Chicago,* 454 F. Supp. 3d 808, 816 (N.D. Ill. 2020) (officers' failure to document Andersen's alleged spontaneous confession was relevant to proving plaintiff's theory that Andersen did not spontaneously confess, but rather the officers "developed and fed him a story to confess to"); *see also Jones v. City of Chicago*, 856 F.2d 985, 991 (7th Cir. 1988) (denying summary judgment on fabrication claim where serologist's report allegedly omitted that the plaintiff was excluded as source of forensic evidence); *Jimenez v. City of Chicago,* 732 F.3d 710, 721-22 (7th Cir. 2013) (deviations from professional norms can "give a jury a baseline to help evaluate whether a defendant's deviations from those standards were merely negligent" or could "support an inference of intentional" conduct); Howard, 487 F. Supp. 3d at 412 (reasonable inference of police misconduct where "inconsistent explanations for stopping the tape in violation of his own practice and DPD training").

Thompson's photo identification – which Defendants then and now attempt to pass off as a suspect identification – merely documented individuals whom Thompson recognized, as well as their nicknames. The natural meaning of her words, as documented on the photo array forms, makes clear she was not identifying the person(s) responsible for the Wooden homicide. This, too, supports the inferences that not only did she not see the shooting, but also Defendants *knew* she did not see the shooting or else they would have asked her to make suspect identifications, not just confirm nicknames for their investigation. Barlow and Patton went a step further, however, and misrepresented what was merely a naming of familiar faces by fabricating a "positive identification" of suspects by Thompson. Barlow testified that this term meant the witness was identifying the suspect who committed the crime. This police fabrication took a fact that was actually exculpatory—the failure of Thompson, a purported eyewitness to the crime, to identify Plaintiffs as perpetrators of the shooting—and converted it into false inculpatory evidence used against Plaintiffs at trial. *See Juniper v. Zook*, 876 F.3d 551, 565 (4th Cir. 2017) (noting that failure of witness to identify a suspect from a photo array is exculpatory if anyone in that array is later prosecuted) (citing *Hart v. Mannina*, 798 F.3d 578, 588 n.1 (7th Cir. 2015)).

Finally, Patton and Barlow took the highly improper step of interviewing two claimed eyewitnesses to a murder together, taking no precautions to avoid tainting or influencing their stories. Doing so allowed Thompson to hear exactly what her mother described, word for word, before having to give her own statement. It is undisputed that generally accepted police practices required them to interview Bailey and Thompson separately. Thompson was an adult and did not require another adult present. It is likewise undisputed that neither Patton nor Barlow documented any basis for violating police practice, but that the standard practice would have been to create such documentation given the importance of the evidence in question. These

deviations support an inference of intentional conduct – in this case, that Patton and Barlow knew that Thompson was not a witness in her own right and at most would be copying her mother's statement. *See Burgess*, 997 F.3d at 553; *Restivo v. Hessemann*, 846 F.3d 547, 579-80 (2d Cir. 2017); *Jimenez*, 732 F.3d at 721-22; *Howard*, 487 F. Supp. at 412. More realistically, their "joint" interview suggests that there was no interview of Thompson at all – instead, Thompson quietly accompanied her mother, who did all the talking. Patton's *post hoc* explanation for violating BPD practice was that Thompson was afraid to be alone, but at summary judgment the Court may not weigh evidence or credit that self-serving justification over conflicting inferences. Moreover, that explanation makes little sense given that their claim that they apparently separated Bailey and Thompson days later to conduct photo arrays. All of this evidence, when viewed in its totality and construed in Plaintiffs' favor as it must be, creates a more than fair inference that Thompson never made a witness statement, and Defendants' claim otherwise was a total fabrication. Indeed, Patton does not deny that he misattributed information to Thompson that was actually given to him by Bailey. Ex. 20 (Patton Dep.) at 325:7-20.

While a jury could credit the Defendants' evidence instead and believe that Thompson gave the statement attributed to her, summary judgment cannot be used to resolve these diametrically opposed inferences; a trial is required. *Anderson*, 477 U.S. at 255; *Eastman Kodak Co.*, 504 U.S. at 456.

## 2. A Jury Could Find that the Fabrication of Keisha Thompson's Statement Caused Plaintiffs' Wrongful Conviction

Defendants' causation argument is not supported by the relevant caselaw. Patton and Barlow relied on two witnesses to initiate Plaintiffs' prosecution, and one of them was Thompson. Her statement was used to deprive Plaintiffs of liberty, as Plaintiffs were detained on

the murder without release until after their Writs of Actual Innocence were granted and all charges against them were dismissed on May 3, 2019.

First, Thompson's fabricated statement implicating Plaintiffs *was* used at Plaintiffs' criminal trial. Patton injected Thompson's supposed corroboration into the trial when he testified that he was not concerned that Bailey's account would have influenced Thompson, because the two were "totally consistent throughout the investigation with what they had to say to us." Ex. 40 (Patton Test. 5/15/95) at 42:5-18. Patton introduced this manufactured corroboration to give the jury confidence in Bailey's statement. As noted above, causation in the fabrication context is an intensely factual question for the jury. And here, the factfinder in this case could readily conclude this fabricated corroboration of Bailey—alone or in concert with Marcus's fabricated statement—was used to deprive Plaintiffs of liberty.

Second, even if Thompson's fabricated inculpatory statement had not been introduced at trial, her statement was used to corroborate Bailey's account and provide the prosecution with greater confidence in Bailey – after all, not one but two people apparently saw the same five people commit the crime. *See United States v. Smith*, No. 5:15-CR-51-BO, 2015 WL 3618705, at *3 (E.D.N.C. June 9, 2015), *aff'd*, 692 F. App'x 112 (4th Cir. 2017) (single uncorroborated statement by witness of unknown reliability calls into question the sufficiency of probable cause). Indeed, for that reason, Patton also used Thompson's fabricated statement to assert that "two" witnesses saw the shooting in his Statements of Probable Cause for Plaintiffs' arrests.

Given the foregoing, Thompson's fabricated statement gives rise to a triable fabrication claim. The Fourth Circuit has explained that in evaluating whether a fabrication resulted in the deprivation of liberty, "[t]he proper inquiry . . . is whether [the plaintiff's] conviction was a reasonably foreseeable result of [the defendant's] initial act of fabrication . . . ." *Washington*, 407

F.3d at 283; *see also Monroe v. Pape*, 365 U.S. 167, 187 (1961) (recognizing the applicability to § 1983 claims of the rule of tort liability "that makes a man responsible for the natural consequences of his actions"); *Burgess v*, 2017 WL 4947004, at *16 (fabricating a police report that hid the existence of an eyewitness foreseeably caused plaintiff's wrongful conviction even though report was not introduced at trial); *Jones* , 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."). *See also Massey*, 759 F.3d at 355 (analyzing "but for" causation by assessing whether the deprivation of liberty "was foreseeable"); *Washington v. Boudreau*, No 16-cv-01893, 2022 WL 4599708, at *21 (N.D. Ill. Sept. 30, 2022) (denying summary judgment on fabrication claim from West's statement even though West died before Hood's trial and thus did not testify); *Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009) (finding causation with regard to statements submitted in a criminal prosecution because police officers "are generally responsible for the 'natural' or 'reasonably foreseeable' consequence of their actions"); *Gregory v. City of Louisville,* 444 F.3d 725, 741 (6th Cir. 2006) (holding that officer's investigatory notes "were the result of pretrial fabrication efforts by [the officers]," and "comprise[d] part of the documentary record before the prosecution and defense and affected the course of the criminal proceedings independent of any testimony to the notes' contents. . . . Their very existence, even if not introduced as evidence at trial, affected Plaintiff's criminal prosecution."). Thus, officers who submit false reports "to the prosecutor may be held liable for damages incurred as a proximate result of those reports," *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007) (citing *Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991)).

Thompson's fabrication matters because it was reasonably foreseeable that her "identification" of Plaintiffs would lead to their arrest and prosecution. Before Defendants' separate subsequent fabrication of King's false statement, Thompson's account was the *only* evidence that corroborated Diane Bailey, leading to their pursuit of Plaintiffs. Bailey's statement badly needed corroboration, as she described something different than what every other witness to the crime saw. Bailey had obvious credibility concerns as well, given that she was looking to relocate, knew that being a material witness to a homicide would get her family moved (plus additional benefits), and had a history of committing crimes of dishonesty. Without Thompson, Bailey's statement was entirely unsupported and even less reliable.

On the flip side, Thompson's true accounting of what she saw directly impeached Bailey's story. Bailey came into the police station claiming that she was in Thompson's bedroom and that *together* they heard and saw aspects of the shooting. Once it become apparent that Thompson could not provide an account of the murder, Bailey's statement would be exposed as false – either she lied about her daughter being with her when she saw the crime, which would make little sense if she actually saw the murder, or she lied altogether about seeing the crime. An indication from Thompson that Bailey did not see the murder, or even just contradicting Bailey about who she was with and what she was doing when she supposedly observed the crime, had undeniable significance to the prosecution. As prosecutor Sharon Holback testified,

> I mean, that's basic impeachment, basic exculpatory, basic [*sic*] a problem for my case that I need to understand. If somebody had told me that [*sic*] was with my eyewitness that my eyewitness didn't see what she said she saw, that's a big problem and I need to – I need to ask her straight up, I need to investigate it, I need to assess whether my case lacks vitality, and I need to of course to disclose – all those things would have needed to be done, but I don't recall that happening.

Ex. 21 (Holback Dep.) at 173:1-11.

The record reveals that it is certainly a reasonable inference that, if Defendants had provided prosecutors with the truth about Thompson's non-identification, instead of the fabricated false corroboration of Bailey they attributed to Thompson, the prosecution of Plaintiffs would have collapsed well before trial. The Thompson fabrication thus was a proximate cause, albeit not the only proximate cause, of Plaintiffs' deprivation of liberty. Plaintiffs fabrication claim on this basis must be resolved by a jury.

### III.    A Trial Is Required On Plaintiffs' Evidence Suppression Claims.

Evidence is material in the context of *Brady* claims if it "undermines confidence in the verdict." *Youngblood v. W. Virginia*, 126 S. Ct. 2188, 2190 (2006). Plaintiff need not show that the suppressed evidence "would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). *Brady* claims need only satisfy a lower standard: evidence is material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.' " *Id.* Materiality must be evaluated based on the cumulative effect of all suppressed evidence and not in isolation piece by piece. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016); *Kyles*, 514 U.S. at 421. Ultimately, materiality is a jury question. *See Wearry*, 136 S.Ct. at 1006-07.

Here, Defendants withheld two material pieces of evidence: the fact that Thompson did not actually give a statement; and the information provided by crime-scene witnesses James Martin and Sandra Jackson. Each is addressed in turn.

### A.  Keisha Thompson

As explained in Section II.B, *supra*, the record permits the inference that Thompson never gave a statement to Defendants (other than to identify names of familiar faces) and merely accompanied her mother at the police station. When properly credited at summary judgment, that fact logically means that Defendants' police report omitted crucial evidence: Thompson did not give a statement, meaning she could neither serve as a witness nor corroborate Bailey. Evidence

that impeaches a supposed eyewitness – one of the State's star witnesses – is unquestionably

material impeachment evidence that should have been disclosed. *See*, *e.g.*, *Wearry*, 136 S. Ct. at

1004-05 (holding that suppression of police and other records that could have been used to

impeach a state's witness were material in a case that depended on the jury crediting "[the

witness]'s account rather than [the defendant]'s alibi"); *Smith v. Cain*, 565 U.S. 73, 74-75 (2012)

(deciding that police records of statements by eyewitness that he could not see a perpetrator's

face that contradicted that eyewitness's later identification of the defendant at trial were

material). The trial prosecutor testified that this impeachment evidence would have been a "big

problem" with her case and would have caused her to reassess that evidence altogether. Ex. 21

(Holback Dep.) at 173:1-11.

      Nor is it plausible that due diligence would have teased out the truth about Thompson's

account. Defendants cite nothing to support that Thompson would have revealed the truth if

questioned prior to trial. Indeed, Thompson did not testify at the criminal trial, has been

uncooperative since then, and there is no reason to believe she would have voluntarily exposed

her mother's false account, thereby opening her mother to perjury charges. *See Jimenez v. City of

Chicago*, 830 F.Supp.2d 432, 444-45 (N.D. Ill. 2011) ("A legal rule that assumes that such a

witness will readily describe the circumstances of the coercion or persuasion simply because the

other side's lawyer asks the witness the right question would defy common sense."); *Rivera v.

Guevara*, 319 F. Supp. 3d 1004, 1046 (N.D. Ill. 2018), *opinion clarified*, No. 12-CV-04428,

2018 WL 11469072 (N.D. Ill. May 17, 2018) ("[W]here a witness has fabricated an

identification with police, the witness might well view the consequences of revealing the truth to

be dire"); *Howard*, 2022 WL 1720156, at *4 (noting that it took "years of attempting to locate"

critical witness whose inculpatory statement was fabricated by police, and when plaintiff "finally

located and deposed her" her testimony "was combative, evasive, and fraught with inconsistencies").

By affirmatively misrepresenting that Thompson corroborated Bailey's account in their police report, moreover, Plaintiffs' defense attorneys had no reason to suspect that she would have impeached her mother's statement. For that reason, the Defendants' citation to *United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990), is unavailing. Unlike the present case, *Wilson* considered the situation where "the defendant was 'aware[] of [the witness's] closeness to [an alternative perpetrator] and given Wilson's belief that he was framed, it would have been natural for Wilson to have interviewed [the witness] in preparation for trial[.]'" *See Wilson*, 901 F.2d at 380-81. Here, in contrast, Plaintiffs had no reason to know that Thompson was going to contradict her mother. *See Strickler*, 527 U.S. at 284-85 (mere fact that witness apparently had multiple interviews with the police does not tip lawyer off that records of to those interviews had been suppressed); *Carter v. Bigelow*, 787 F.3d 1269, 1282 (10th Cir. 2015).

### B.  Witness Accounts From James Martin and Barbara Jean Anderson

Defendants also withheld material information provided by witnesses James Martin and Sandra Jackson. Martin told Patton that the shooting started at Federal and Washington—so his testimony would have impeached Bailey, who claimed the shooting started much farther south and closer to her apartment. Martin saw only one shooter, which also undercut Bailey's account. Martin's observations materially impeached Bailey and should have been disclosed but were not. *See Kyles*, 514 U.S. at 441-42 (failure to disclose contemporaneous eyewitness statement describing shooter as several inches shorter than defendant was material and exculpatory). *See also Wearry*, 136 S. Ct. at 1006 (materiality must be evaluated based on the cumulative effect of all suppressed evidence and not in isolation).

47

Defendants also learned that Sandra Jackson could identify the shooter as the same person who had recently robbed her niece, Barbara Jean Anderson; and that the shooter "frequents area of Montford and Federal Streets." Ex. 29 (Jackson Follow-Up Note) at Homicide File 424; Ex. 20 (Patton Dep.) at 86:19-88:1. If the court credits Plaintiffs' testimony of innocence, which it must at this stage, it follows that Anderson's identification of the shooter would exculpate Plaintiffs. As such, Anderson's and Jackson's ability to identify the actual perpetrator is evidence of an alternate perpetrator that should have been disclosed but was not. "[E]vidence suggesting an alternate perpetrator is 'classic *Brady* material.'" *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010) (quoting *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir.2001)). *See also Brady v. Maryland*, 373 U.S. 83, 87-88 (1963) (discussing an undisclosed confession of a co-defendant); *Carrillo v. City of Los Angeles*, 798 F.3d 1210, 1224 (9th Cir. 2015) (alternative suspect evidence falls within *Brady*); *Bies v. Sheldon*, 775 F.3d 386, 400 (6th Cir. 2014) (same).

Finally, bad faith can be inferred from the failure to disclose that evidence given its exculpatory value. *Shipley v. Disney,* No. CV SAG-21-3173, 2022 WL 2789076, at *6 (D. Md. July 15, 2022); *Johnson v. Balt. Police Dep't.,* Civil No. ELH-19-00698, 2020 WL 1169739, at *24 (D. Md. Mar. 10, 2020) ("A plaintiff need not demonstrate bad faith directly; it can be inferred through gross deviations from routine police conduct...Moreover, bad faith can be inferred when police officers fabricate evidence and fail to disclose especially pertinent exculpatory evidence."). Where evidence can be expected to be used in a suspect's defense, it can never been withheld in good faith. *Moldowan v. City of Warren*, 578 F.3d 351, 388-89 (6th Cir. 2009).

IV.   **A Trial Is Required On Plaintiffs' Malicious Prosecution and Unlawful Detention Claims.**

A Section 1983 malicious prosecution claim is "properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000)). Plaintiffs must show that Defendants caused their seizure pursuant to legal process unsupported by probable cause, and criminal proceedings terminated in their favor. *Howard,* 487 F. Supp. 3d at 422–23. The state law claim is similar: Plaintiffs must show that Defendants caused criminal proceedings to be initiated against them, favorable termination of those proceedings, the absence of probable cause, and malice. *Exxon Corp v. Kelly*, 381 A.2d 1146, 1149 (Md. 1978).

A.   **Neither Bailey Nor Thompson Provided Probable Cause to Prosecute Plaintiffs**

Defendants attack Plaintiffs' malicious prosecution claim as to two elements: the absence of probable cause, and malice. On probable cause, the crux of their argument is that Bailey alone established probable cause, and that neither she nor her daughter have ever recanted (which Plaintiffs dispute) so nothing undermines Bailey's initial account. This argument flouts the summary judgment standard. Defendants' characterization of Bailey as unimpeached, pristine evidence works only if the Court ignores *all the other evidence* Patton and Barlow collected during the investigation: evidence that contradicted what Bailey could have seen and heard, what she said about where the shooting began, and about whether there was more than one shooter. As described in detail above, *infra* Facts V.C, Defendants knew of major red flags that made it unreasonable for them to treat Bailey's statement as gospel. Given the fact that Bailey allegedly witnessed the events from a third-floor bedroom, at 12:30 a.m. from approximately 153 feet away, it would have been extremely difficult for her to have seen any of McPherson, Simmons,

49

Ellison or Richards' faces and virtually impossible for Bailey to have identified these individuals without seeing their faces. Ex. 31 (Scully Report) at 29, 34, 153. Nor could Bailey have been able to make out whatever words were allegedly spoken by McPherson, which according to Bailey was the first thing she perceived, and what caused her to go look out the window. Patton would have known as much: He visited Bailey's home and looked out the window. Given the distance, common sense would have immediately cast doubt on Bailey's claims. A simple test—such as that conducted by the CIU—would have confirmed that she could not have intelligibly heard McPherson yell to King to "Go get the guns." A similar, simple test could have confirmed the near impossibility of seeing facial features in the dark at such a distance.

Additionally, the information police had already developed about the crime from other witnesses contradicted, not corroborated, Bailey's account. Sandra Jackson, Crystal White, and James Martin each provided information to Defendants that cast significant doubt on Bailey's claims—namely, that she saw specific individuals firing shots, and that multiple people shot at the victim. If the shooting began at the intersection of Federal and Washington, as Jackson, White, and Martin all consistently described, then there was no way for Bailey to see who fired shots, nor how many people were shooting, because Bailey could not see Federal and Washington from her third-floor apartment window. Bailey and Patton both admit that her line of sight did not reach to Federal Street. Bailey claimed that McPherson, Simmons, and Richards were all "firing guns" south of Federal Street while running toward the victims, but nobody else placed the shooting, or any part of it, south of Federal Street, and the other eyewitnesses all described only a single shooter.

Indeed, Patton conceded that he was never able to corroborate Bailey's statement about the location of the shooting, and that no physical evidence corroborated any part of Bailey's

story. The only thing that Patton could corroborate is that the nicknames Bailey provided matched up to individuals' given names and identities. This is hardly surprising as both Bailey and Thompson knew people in the neighborhood, including the men Bailey identified. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

Moreover, Patton would have had reason to doubt Bailey given her motivations for coming forward. As cited above, Patton was well aware that Bailey was a witness to a prior homicide and was supposed to be in witness relocation. However, Bailey was deeply dissatisfied with the assistance she was receiving from the State, and by her own admission, only got substantial benefits from the witness relocation program by participating in the Wooden homicide investigation: ultimately, receiving a new place to live rent-free for herself and her many children, bunk beds and a new refrigerator and money for food and phone calls.

Other aspects of Bailey's account were known by Defendants to be false—that she saw a police car driving the wrong way down Washington, and that she witnessed the crime together with Thompson—or provided significant reason to doubt Bailey's reliability—her criminal history for crimes of dishonesty, and the potential that her account was contaminated by what she overheard at Lynn's Carryout. Moreover, after McPherson, Simmons and King were first detained, McPherson and Simmons gave alibis to Defendants, which were corroborated by King and which named additional individuals who would confirm their whereabouts during the shooting—if only Defendants were to investigate the alibis, which they did not. This further tilted the scales away from probable cause. *See Clipper v. Takoma Park, Md.*, 876 F.2d 17, 19 (4th Cir. 1989) (affirming jury verdict on false arrest claim, holding that while officer's failure to investigate plaintiff's alibi might not be "in itself, sufficient to negate probable cause," "the evidence of that omission" combined with the weakness of other information known to police

provided a sufficient basis for a reasonable jury to conclude that police lacked probable cause to arrest plaintiff); *Jackson v. Carin*, No. 8:19-CV-00564-PWG, 2020 WL 998736, at *5 (D. Md. Mar. 2, 2020) (officer's lack of investigation into suspect's alibi was relevant fact that reasonable factfinder could consider in determining whether officer lacked probable cause); *Savage v. Cnty. of Stafford, Va.*, 754 F. Supp. 2d 809, 816 (E.D. Va. 2010) (denying summary judgment on probable cause because of disputed facts about whether suspect gave alibi to officer).

While a single witness may be sufficient for probable cause, the necessary corollary is reliability, in light of the totality of the information available to police. Defendants, too, concede that eyewitness testimony must be believable to constitute probable cause. *See* Def. Br. at 27. The dispute lies in whether Bailey was believable. But that is classically a jury question, *see Moultrie v. Harris Lake Inc.*, 813 F.2d 1228 (4th Cir. 1987) ("[A]s the trial court quite properly instructed the jury, they were free to believe all, part or none of what any witness . . . had to say."), and with Plaintiffs' evidence properly construed at summary judgment, the fair inference is that it was not reasonable for Patton and Barlow to rely on Bailey's statement, for all of the reasons described above. On that score, officers may not bury their heads in the sand and ignore "evidence creating uncertainty and calling for further investigation." *Iacopelli v. Town of Port Royal*, No. 9:16-CV-287-PMD-BM, 2018 WL 3867803, at *3 (D.S.C. Aug. 15, 2018). Given the other, contradictory evidence, Bailey's statement "would lead a reasonable officer to be suspicious" such that he "has a duty to investigate further." *Ferrera v. Hunt*, No. CA 0:09-02112-RMG, 2012 WL 1044503, at *6 (D.S.C. Mar. 19, 2012).

To create a triable issue on probable cause, Plaintiffs must show that Defendants "made material false statements" in order to secure arrest warrants, and that they made these false statements "deliberately or with a reckless disregard for the truth…" *Miller*, 475 F3d. at 627.

Reckless disregard may be easily established where, as here, Defendants "must have entertained serious doubts as to the truth of his statements or had obvious reason to doubt the accuracy of the information he reported." *Id.*, citing *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000). That standard is easily met at summary judgment. Patton and Barlow made "material false statements" in their affidavit supporting the warrant application, deceiving the issuing court into thinking two separate witnesses observed the Plaintiffs engaged in a homicide. As explained above, there is strong circumstantial evidence that Thompson saw nothing and thus told the Defendants nothing – a very different occurrence than had she affirmatively gave a statement implicating Plaintiffs in the murder. A jury could readily conclude from this evidence that Patton's and Barlow's statement of charges was false.

Defendants treat the probable cause analysis the same for Plaintiffs' malicious prosecution and unlawful detention claims, so the above discussion applies with equal force against their Fourth Amendment detention claim.

### B.  There are Material Disputes About Whether Defendants Acted with Malice

As to malice (an element only for malicious prosecution), it may be shown by demonstrating the absence of probable cause. "The Maryland Court of Appeals has long held that the "malice" element of malicious prosecution may be inferred from a lack of probable cause." *Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793, 804 (D. Md. 2001) (internal citations omitted). Where, as here, genuine issues of material fact exist as to whether Defendants had probable cause to arrest Plaintiffs, there is enough for a triable malicious prosecution claim. *Hayes v. City of Seat Pleasant,* No. 10–2172, 2012 WL 836258, at *5 (4th Cir. Mar.14, 2012). Indeed, if the jury concluded that Patton and Barlow knew Bailey's story did not fit with all the other evidence they had gathered, nor could Thompson corroborate her

mother, the jury could also conclude that the detectives pursued Plaintiffs for a purpose other than bringing the true offenders to justice.

For the foregoing reasons, material factual disputes preclude summary judgment on Plaintiffs' malicious prosecution and unlawful detention claims.

## V.       Summary Judgment Is Not Appropriate On Plaintiffs' Failure to Intervene Claim[7]

Defendants argue that Plaintiffs failed to demonstrate an underlying constitutional violation, and thus there was nothing against which to intervene. Because summary judgment as to the above-discussed constitutional violations is not appropriate, Defendants' entirely derivative argument fails, too. Nor can either Patton or Barlow make the straight-faced argument that they did not know about the other's misconduct: the two worked hand in hand during the investigation, were both active during Marcus's interrogation, knew what Bailey and Thompson did and did not say, and shared information with each other. Accordingly, this claim must survive summary judgment.

## VI.      Summary Judgment Is Not Appropriate On Plaintiffs' Claim Of Intentional Infliction of Emotional Distress.

To defeat this claims, Defendants argue that their conduct was in good-faith and not in fact extreme or outrageous, citing their earlier discussion of the facts. But Defendants' factual characterization is hotly contested, and if Plaintiffs' facts are credited, Defendants acted in an extreme and outrageous manner by manufacturing false evidence and pursuing criminal charges despite the lack of probable cause.  "[T]he extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests." *Harris v. Jones*, 380 A.2d 611, 616 (Md. 1977); *see also B.N. v. K.K.*, 538 A.2d 1175, 1182 (Md. Ct. App. 1988). As

---

[7] Plaintiffs are no longer pursuing their conspiracy count against any Defendant.

described above, there is sufficient evidence in the record for a reasonable jury to decide that the

Defendants suppressed and fabricated material evidence in order to arrest, charge, prosecute,

convict and imprison Plaintiffs for decades for a murder they did not commit. *See* Sections II-III,

*supra*. If proven, that is indisputably extreme and outrageous conduct. *See Burgess v. Baltimore*

*Police Dep't*, No. RDB-15-0834, 2017 WL 4947004, at *22 (D. Md. Oct. 31, 2017).

## VII.   Qualified Immunity Is Unavailable Because A Jury Could Find That Plaintiffs' Constitutional Rights Were Violated.

Defendants make only one argument on qualified immunity: that Plaintiffs' constitutional

rights were not violated. Any additional arguments have been waived. *See Yousefi v. INS*, 260

F.3d 318, 326 (4th Cir. 2001). But qualified immunity must be considered in light of *Plaintiffs'*

facts, properly construed and with all inferences drawn in their favor – not, as Defendants have

done, by crediting their own (contested) facts. *See Hope v. Pelzer*, 122 S.Ct. 2508, 2513 (2002);

*see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[U]nder either prong, courts may not

resolve genuine disputes of fact in favor of the party seeking summary judgment."). The

Supreme Court in *Tolan* recently emphasized the need to draw inferences in favor of the

nonmovant specifically in qualified-immunity cases. *Tolan*, 572 U.S. at 657. Here, Plaintiff has

presented ample evidence of facts that, if proven, demonstrate that Defendants' *did* violate

Plaintiffs' constitutional rights, rendering qualified immunity unavailable on the only basis for

which Defendants assert it.

## Conclusion

For all of the reasons stated above, the Defendants' motion should be denied.

Respectfully submitted,

**KENNETH MCPHERSON**
**ERIC SIMMONS**

By:      /s/ Jon Loevy
*One of Plaintiffs' Attorneys*

Attorneys for Plaintiffs
Jon Loevy*
Gayle Horn
Roshna Bala Keen*
Renee Spence*
LOEVY & LOEVY
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
jon@loevy.com
*Admitted *pro hac vice*

56