**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **KENNETH MCPHERSON, _et al._,** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-20-0795** |
| | * | |
| **BALTIMORE POLICE DEPARTMENT,** | * | |
| _et al._, | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

This case arises out of the arrest, prosecution, and conviction of Plaintiffs Kenneth McPherson and Eric Simmons (collectively, "Plaintiffs") for conspiracy to murder Anthony Wooden in 1984. Plaintiffs' convictions were vacated in 2019, after their attorneys and the Conviction Integrity Unit ("CIU") of the Baltimore City State's Attorney's Office filed a Joint Petition for Writ of Actual Innocence. On March 26, 2020, Plaintiffs filed a Complaint against the Baltimore Police Department ("BPD") and five individual defendants who served as BPD detectives during the investigation of Wooden's murder. This Court dismissed the claims against all but two of those individual detectives: Robert Patton and Frank Barlow (collectively the "Officer Defendants"). ECF 34. Presently, the Officer Defendants have filed a Motion for Summary Judgment,[1] ECF 92, Plaintiffs opposed, ECF 105, the Officer Defendants replied, ECF 112, and Plaintiffs filed a surreply with leave of court, ECF 116. After reviewing the motion and related briefing, this Court held a hearing on the motion on May 8, 2023. At the hearing, this Court

---

[1] This Court granted Plaintiffs and BPD's joint motion to stay discovery on Plaintiffs' _Monell_ claims against BPD, which will be addressed separately. ECF 42.

raised an evidentiary issue, to which the parties have provided supplemental, post-argument briefing. ECF 122 (Plaintiffs' Memorandum); ECF 123 (Officer Defendants' Response). Upon request by this Court, ECF 128, the parties then provided briefing on some additional evidentiary issues. ECF 129 (Plaintiffs' Supplemental Briefing); ECF 134 (Defendants' Supplemental Briefing); ECF 135 (Plaintiffs' Reply). After consideration of all of the above briefing, associated exhibits, and arguments, for the reasons that follow, the Officer Defendants' Motion for Summary Judgment, ECF 92, will be GRANTED.

## I.   BACKGROUND

*The Night of the Murder*

On August 31, 1994 at approximately 12:30 a.m., Anthony Wooden was shot in the head and murdered during an exchange of gunfire near the intersection of North Washington Street and Federal Street in Baltimore City.[2] ECF 93-2 at 3. A Baltimore Police Officer on patrol in the area heard the gunshots and responded, locating the victim lying face down on the sidewalk near the northern end of a vacant food warehouse building. *Id.* at 3, 5. The officer observed a red baseball hat with a bullet hole through it and a blue duffle bag near the victim's body. *Id.* The officer called for emergency transport and assistance from the homicide unit. *Id.* at 4. Shortly thereafter, Defendant Patton—the lead investigator on the case—and another homicide unit officer arrived and began to investigate. *Id.* at 28; ECF 93-4 at 452–53; ECF 105-20 at 6, 16:5–8.[3] The detectives'

---

[2] North Washington Street is a one-way street that runs northbound through northeast Baltimore City. It is intersected by Federal Street, which runs east-west, and Oliver Street, also running east-west, one block south of Federal Street. Police found Mr. Wooden's body approximately one-half block north of the intersection of Federal and Washington Streets on the east side of Washington Street. *See* ECF 93-3 at 2.

[3] Unless otherwise noted, initial citation numbers refer to the ECF number and any additional citation numbers refers to the transcript's pagination.

notes reflect that they spoke at the scene with at least three eyewitnesses who saw bits and pieces of the night's events: Crystal White (located two blocks north of the murder), Sandra Jackson (around the corner from the murder), and James Martin (across the street from the murder). ECF 93-2 at 60, 69, 117; *see also* 93-3 at 2. BPD then transported four potential witnesses—White, Jackson, and two relatives of the victim—to the homicide office of the BPD's Criminal Investigations Division ("CID") for formal interviews. ECF 93-4 at 453; ECF 93-2 at 29.

At the CID at approximately 1:20 a.m. that morning, Defendant Barlow interviewed Crystal White, who had been sitting outside of her residence at the time of the homicide, roughly two blocks north of where the shooting occurred. ECF 93-2 at 68. According to the detective's handwritten notes, White saw two men facing each other on the northeast corner of Federal and Washington Street just before the victim began to run north on Washington Street. *Id.* at 69. She reported that "the shooter had his arms out and was holding something pointed in the direction of the [victim]." *Id.* She reports hearing "four gunshots, a pause and then four or five more gunshots . . . while [victim] was on the ground the shooter fired 3–4 more shots." *Id.* at 68. She witnessed the victim fall after the fifth gunshot. *Id.* She reported witnessing the shooter flee east on Federal Street, but she was unable to determine the shooter's identity. *Id.* at 69.

Defendant Barlow interviewed Sandra Jackson at approximately 1:50 a.m. ECF 93-2 at 60–61. According to the handwritten notes of her interview, Jackson was standing with two friends near the intersection of North Wolfe Street and Federal Street (around the corner southwest from where the murder would take place). *Id.* at 61. Around fifteen minutes before the shooting, she reported witnessing three men walk past her heading east on Federal Street and noted that a gun was passed from one man to another. *Id.* at 61, 63. She watched the three men join up with two men already at the intersection of Federal Street and Washington Street. *Id.* at 62. At some point,

two of the five men departed, heading south on Washington, and one man headed east on Federal Street. *Id.* The remaining two men began to run north on Washington Street and one of them began firing a firearm. *Id.* After multiple gunshots, one of the men ran back past her on Federal Street, holding a "large black handgun." *Id.* at 63. She provided detailed descriptions of the three men who walked past her, and also noted that she recognized one of the men as the individual who had robbed her niece a few weeks prior. *Id.* at 64–66.

Aside from these two witnesses, the detectives at the CID interviewed the victim's sister and the victim's girlfriend. *Id.* at 53. Neither had been present during the shooting. *Id.* at 9. This concluded the interviews on the night of the murder.

*Interview with Diane Bailey and Her Daughter*

The homicide file reflects that, approximately twenty-four hours later, in the early morning hours of September 1, 1994, Diane Bailey and her daughter, Keisha Thompson, contacted the homicide office to report that they witnessed Mr. Wooden's murder. *Id.* at 10. Bailey lived at 1421 Washington Street, located on the third floor of her building diagonally opposite to Lin's[4] Carryout. ECF 93-3 at 2; ECF 93-4 at 603. The typed police notes of her interview are as follows:

> Witness stated that she was sitting in her daughter's third floor bedroom by the window when she and her daughter heard a subject known to her as "JR" [Plaintiff McPherson] yell out, "Marcus, go get the guns, go get the guns."
>
> Witness stated by the time the subject "JR" said go get the guns the second time the witness and her daughter were both in the window looking out.
>
> Witness stated that when she looked out the window she saw "Country" [Nicholas Richards], "Whitey" [Daniel Ellison], "JR,"

---

[4] The precise spelling of the carryout shop located at the northwest corner of the intersection of Washington Street and Oliver Street is unknown. Certain witnesses referred to it as "Len's," *e.g.*, ECF 105-57 at 46:8 – 9, or "Lin's," *e.g.*, ECF 93-2 at 90, and some exhibits refer to the shop as "Lynn's," *e.g.*, ECF 93-3 at 2.

and another guy who she did not know his name, but has seen him before and knows that he is "JR's" brother and believes his nickname is "Black" [Plaintiff Simmons].

The witness stated that they were all standing in front of Lin's Carryout, which is located at the intersection of Oliver and Washington Street on the even side, northwest corner.

Witness stated that Marcus was walking across the street and away from the area where the subject "JR" and the others were standing. . . . The witness stated about two to three minutes later she and her daughter saw Marcus crossing back over to the even side of the street and walking back to the area where "JR," "Country," and "Whitey" and "JR's" brother were all standing.

Witness stated that Marcus was carrying a brown paper bag when she saw him crossing the street.

The witness stated at that point Marcus approached the other subjects with the bag. The witness indicated that Marcus held the bag while "JR" reached into the bag and removed a handgun. And then "Country" reached into the bag and pulled out a gun. And then "Whitey" reached in [and] pulled out a gun.

The witness indicated that "JR's" brother kept reaching into his rear waist area as if he already had a gun.

Witness stated that after everyone reached into the bag and retrieved [their] guns Marcus held onto the bag and "Country" walked to the Oliver Street side of Lin's Carryout and "JR" and his brother, "Whitey" and Marcus stood in front of Lin's Carryout on the Washington Street side.

Witness stated the next thing she and her daughter saw was three guys come around the corner onto Washington Street from Oliver Street. The witness stated that it did not appear that the three guys were together. She stated that one of the three guys who was wearing a red hat and carrying a bag on this shoulder was several feet in front of the other two subjects who appeared to be walking together.

The witness stated that the three guys turned up Washington and were walking in the direction of Federal Street.

The witness indicated it was at this time "Country" walked from the side of Lin's Carryout to the front where "JR," "Whitey," Marcus, and "JR's" brother were all standing. The witness stated that when "Country" walked to the front of Lin's Carry Out he yelled out and said "Hey" to the three guys that had just turned onto Washington

Street. . . . [Next,] the two guys who were in the back of the one guy who was wearing the red hat started running and "Country," "Whitey," "JR" and "JR's" brother and Marcus all started running after the two guys.

The witness stated it was during this same time "Country," "Whitey", and "JR" and "JR's" brother all pulled out [their] guns and started shooting as they chased the two guys down the street.

The witness stated that the guy in the red hat who was carrying the shoulder bag did not start to run until the shooting started. The witness stated that the three guys all ran up Washington Street towards Federal with "Country," "JR," "Whitey," "JR's" brother, and Marcus behind them shooting.

The witness stated that next thing she saw was "Country," "Whitey", Marcus, "JR" and "JR's" brother running back down Washington Street towards Oliver Street.

[She] stated that Country ran down to Gay Street and went into his house. The other suspects turned up Oliver Street towards Chapel Street.

The witness stated the next thing she saw was the Police coming down Washington Street the wrong way.

Witness stated that after the Police arrived at Federal and Washington, the witness saw "Country" exit his house and walk back up to the corner of Oliver and Washington. The witness stated that "Country" had changed clothes and was now riding a bike. The witness stated that "Country" was now wearing a green Fila hat to cover his dreadlocks.

Witness stated that after the Police were there several minutes "JR," Marcus, "Whitey," and "JR's" brother all came back and went up to Federal and Washington Street [and] watched the Police.

The witness stated that she did not know that anyone was killed until the next day when she was in Lin's Carryout and someone [said] that "Country" had shot and killed a boy down on Federal and Washington Street last night.

ECF 93-2 at 89–91. Thus, according to the homicide file, Bailey and her daughter provided eyewitness accounts implicating: Nicholas Richards ("Country"); Daniel Ellison ("Whitey"); Marcus King; Plaintiff McPherson ("JR"); and Plaintiff Simmons ("Black"). The following day,

Bailey and her daughter identified Richards and Marcus King in a photographic lineup. *Id.* at 55; ECF 105-50.

*Initial Arrests and Suspect Interviews*

On September 4, 1994, officers obtained arrest warrants for Ellison and Richards, as well as search warrants for suspects' homes. ECF 93-2 at 19, 55–56. In the early morning of September 6, 1994,[5] BPD arrested Ellison and Richards. *Id.* at 47. King was also arrested. *Id.* at 17. At that time, King was thirteen years old. *Id.* at 25. During these searches, officers learned Plaintiffs' whereabouts. *Id.* at 20. During a consent search of their homes, police arrested Plaintiffs McPherson and Simmons "on view" and charged them in connection with illegal drugs, money, and a gun recovered in their houses. *Id.* At the time of the arrest, Plaintiff McPherson was twenty years old. ECF 93-2 at 17–18. Plaintiff Simmons was twenty-four years old. *Id.* at 18.

According to the typed police custody log, Police brought King to the station at 7:20 a.m., placed him in handcuffs and leg irons, and sat him next to Plaintiff Simmons. *Id.* at 47–48. Officers informed King's mother, Phyllis Smith, about her son's arrest and brought her to the homicide office to wait with her son. *Id.* at 48.

---

[5] The record is slightly unclear on the date of Plaintiffs' (and others') arrests and interviews. The handwritten summary of the investigation, ECF 93-2 at 57, the date of Plaintiff McPherson's interview, *id.* at 45, the custody log for King, ECF 93-2 at 47, and the statement of probable cause for Plaintiff Simmons, ECF 105-46 at 3, all report their arrest occurred in the early morning hours of Tuesday, September 6, 1994. In contrast, the date and transcript of Plaintiff Simmons's interview, ECF 93-6 at 3:2–4, 8:6 ("Today's date is September the 7th, 1994. The time is now approximately 0847 hours. . . . [t]he police came to your house *today*[.]") (emphasis added), and the typed police summary of the investigation, ECF 9-32 at 19, all suggest police executed the search warrants and arrested Plaintiffs on Wednesday, September 7, 1994. *See also* ECF 105-6 (transcript of sentencing hearing) at 50:17–51:1 (court and defense counsel unsure whether police arrested Plaintiffs on the 6th or 7th, but noting that police arrested all suspects on the same day).

At 8:47 a.m., the Officer Defendants interviewed and took a recorded statement from the older brother, Plaintiff Simmons. ECF 93-6 at 4, 3:3. He reported: "My mother woke me up and told me she heard shots. She told me to run around on the block where we be hanging out at and make sure my brother was okay. I ran around and wasn't nobody on the block. It was some people standing in the doorway at this lady Joann house. I asked her where my little bro was at, she said in her house. . . . And so lady Joann told me that my brother went in her house. So they looked around in the house and they say he went out the back door across the street to his girlfriend's house. So I went around to his girlfriend's house and asked where he was at. They told me up the street. So I went up the street where everybody was at and all the confusion was going on and all that junk. The man was laying out there and all that stuff." *Id.* at 4–5, 5:19–6:25. Plaintiff Simmons denied knowing "Country," and reported that people had said someone "was trying to rob somebody or something and there was some shooting." *Id.* at 6, 10:1–25.

At 9:20 a.m., Officer Richard Garvey interviewed the younger brother, Plaintiff McPherson. *Id.* at 42. Although Officer Garvey presently does not recall any relevant facts about the interview, he took contemporaneous handwritten notes. *See* ECF 105-45 at 11–15. According to these notes, Plaintiff McPherson admitted the drugs and money were his but provided no comment about the gun. *Id.* at 44. Regarding the murder, Plaintiff McPherson stated that "on the night of murder he was in the 1500 blk of Chapel St. (bet. Oliver + Federal) with about 30 other people. Marcus, Whitey were also in block. 'Black' [Plaintiff Simmons] was in the house. [Unsure] where 'Country' was. Heard one shot, then several more. Ran into Miss JoAnn's house till the shots stopped. Then ran out the back door to Alfreda's house. [Unsure] what time. [He] never saw [victim]. [He] saw 'Country' earlier in the evening and saw him after the shooting in the crowd." *Id.* at 44.

At 10:17 a.m., Defendant Patton interviewed Ellison ("Whitey"). ECF 105-58 (Tape Recorded Statement of Daniel Ellison, Jr.). Ellison admitted to witnessing the murder and identified other persons involved, but affirmatively stated that Plaintiffs and King were not involved:

> Patton: Mr. Ellison, could you tell me what you know about the murder of Anthony Bernard Wooden . . .
>
> Ellison: All right. Um. Country, Rome, and this other boy, all right, they was coming round the corner. I seen them. I'm like, yo, what y'all about to do? And he's like, we about to rob somebody. I was like, what? They like, we about to rob somebody. So they walk down to Washington and Federal. I followed behind them to see what they was going to do.
>
> Patton: Where did you initially see Country and Rome and this other gentleman?
>
> Ellison: On the corner of Washington and Federal, by the liquor store. Country was on the other side of the street.
>
> Patton: Okay.
>
> Ellison: Rome told him – put his jacket over his head – told the boy to come here. The boy just came out the bag with the gun, shooting at Rome. I ran around the corner, and Country and Rome and their friend just started shooting at em.
>
> Patton: Now describe how this boy looked that they were trying to rob. What was he wearing?
>
> Ellison: He had on a blue tank top and he had a bag. Two gold chains on, a hat, some sweatpants, I think.
>
> Patton: What color hat was he wearing?
>
> Ellison: Either red or blue.
>
> . . .
>
> Patton: Now was Marcus out there that night?
>
> Ellison: No.
>
> Patton: Was JR [Plaintiff McPherson] out there?
>
> Ellison: No.
>
> Patton: Was Black [Plaintiff Simmons] there?
>
> Ellison: No.

ECF 105-58 at 3–6.[6]

At 11:50 a.m., Defendants Patton and Barlow interviewed King with his mother present. ECF 93-2 at 49. The initial hour and a half of King's interview was unrecorded. Consequently, the parties present different versions about King's unrecorded interview, although it appears parties agree that at least one detective yelled at King. Although Defendant Patton does not presently recall the interview, he testified about it during Plaintiffs' criminal trial in 1995. ECF 105-17 at

---

[6] In his 2021 deposition, Ellison retells a similar account of events but presents greater detail. *See* ECF 105-57 at 46–75. In his deposition, he describes that he was on the corner of Oliver and Washington Streets in front of Lin's Carryout with two girls and a male friend. *Id.* at 46. Country, Rome, and Bird walked up Washington Street towards them from Gay Street, holding guns. *Id.* at 47–51. Country, Rome, and Bird informed Ellison that they planned to rob someone for "weed money," and Ellison responded, "All right, that's cool. Take that [* * *] down the street," concerned that the guns would scare off the girls. *Id.* at 52–54. At this point, the victim walked through their group, heading north on Washington Street. *Id.* at 55. Ellison suggested to Country that they could rob him, not believing they would actually do it. *Id.* at 56–57. At the point, the victim was approximately a half block up from the group. *Id.* at 58. Country, Rome, and Bird began following the victim north on Washington. *Id.* at 58–59. The victim crossed the street, perhaps aware that he was being followed. *Id.* at 59. Rome and Bird likewise crossed the street, and Country remained on the west side of Washington, continuing to keep pace with the victim. *Id.* at 60. At the intersection of Washington and Federal, the victim made a right turn east on Federal Street. *Id.* at 63. However, the victim returned and headed back to the northeast corner of the intersection of Federal Street and Washington Street. *Id.* at 65. At this point, Country was on the diagonal (southwest corner of the intersection) and Rome and Bird were on the southeast corner. *Id.* at 66. The victim put his hand in his duffel bag, Rome covered his face with his shirt, and "that's when they pulled out their guns and tried to walk towards him, telling him, 'Yo, come here. Come here.' And when he knew that they were talking to him, he didn't have to – I'm saying 'he' as in the victim. He doesn't hesitate. He comes straight out of the bag with .357 and starts shooting at them first." *Id.* at 67:1–13. Ellison continues: "He shot at Rome and Bird first. I don't think he knew that Country was with them. So when he shot at them first, they scrambled back. Because they wasn't prepared for that. So Country started shooting at him and he must – the victim looked like, 'Whoa, [] I don't know it was another guy.' He started running. And when he started running, that's when Rome and Bird got up and started shooting at him. And they was just taking – they were like, one was shooting at him rapid fire. One was shooting at him, taking his time, aiming at him, trying to hit him. And that's when you just see him fall. You see him running halfway up Washington Street and you see him fall and roll towards the wall. That's when everybody ran." *Id.* at 68:7–22.

25, 25:19–20. During his 1995 testimony, Defendant Patton acknowledged that King initially denied involvement in Wooden's murder, and he acknowledged that he yelled at King to tell the truth. *Id.* at 28, 28:19–21; *id.* at 30 30: 22–24. Defendant Patton described:

> I told Marcus that I knew that he was there. I knew he went to the house and got those guns and we're not going to complete this interview until you tell us the truth about what had happened. I knew you was there. I stood up on the desk, Marcus sit in the chair and I said, "Marcus, tell me the truth. You were out there. I know you were." Just like that. His mother is sitting right there. Detective Barlow sitting across the other desk.

*Id.* at 32, 32:1–8. Defendant Patton stated that he took the lead on the interview and yelled at King, while Defendant Barlow did not yell at King.[7] *See id.* at 26, 26:13–15; *id.* at 30–31, 30:22–31:2.

At 1:28 p.m., the detectives turned on a recorder and taped a statement by King that largely corroborated Bailey's statement:

| | |
|---|---|
| Barlow: | … Marcus, were you outside when this shooting occurred? |
| King: | Yes. |
| Barlow: | What can you tell us about this incident? What happened that night, Marcus? |
| King: | That night – Country, Whitey, J.R., and Black [Plaintiff Simmons] and me, we – |
| Barlow: | And who? |
| King: | And Marcus. |
| Barlow: | You. You're talking about you? Okay. |
| King: | Yeah, and we – we were on our street and then – and then – Whitey – Whitey said there was somebody trying to stick somebody up around so I went – and J.R. turned around and told me to get the gun so I went into the house and got the gun. |
| Barlow: | What house did you go in to get the guns? |

---

[7] In contrast, in King's trial testimony, King asserted that Defendant Barlow (the "white detective") and not Defendant Patton (the "black detective") was the one yelling at him. ECF 93-4 at 184–85, 183:24–184:8.

| | |
|---|---|
| King: | Uh, uh – Alfred's house. |
| Barlow: | Alfred's house? |
| King: | Yeah. |
| Barlow: | Do you know Alfred's address? |
| King: | It's 1511. |
| Barlow: | What street? |
| King: | Washington. |
| Barlow: | What street? |
| King: | Washington. |
| Barlow: | Washington. You have to speak up and speak clearly, Marcus. Was Alfred home when you got the guns? |
| King: | No. |
| Barlow: | Where did you get the guns – where did you have to do [sic] in the house to get the guns? |
| King: | In the closet. |
| Barlow: | Whose bedroom? |
| King: | Alfred's. |
| Barlow: | How many guns were in there? |
| King: | Four. |
| Barlow: | How many guns did you take outside? |
| King: | Two. |
| Barlow: | What kind of guns did you take outside? |
| King: | The – uh, uh – 380. |
| Barlow: | You took a 380 outside? Is that a semi-automatic gun? |
| King: | Uh? |
| Barlow: | A semi-automatic gun, where the clip goes in the handle? |
| King: | No, that was – that was the 22. |
| Barlow: | That's a 22. |
| King [sic]: | Was it a 380 or a 38? |
| King: | I don't – I don't really know nothing about no guns. |
| Barlow: | Okay, but one of them was the 22? |
| King: | Yeah. |
| Barlow: | Okay. And what did you do with the guns you took outside? |

King:       I gave them to ---

Barlow:     What did you put them in?

King:       A bag.

Barlow:     A what?

King:       A bag.

Barlow:     What color was the bag?

King:       Black.

Barlow:     So you had two guns that you took out of the house?

King:       Yeah.

Barlow:     And put them in a bag, okay? How many other guns were left in the house?

King:       Two.

Barlow:     What kind were they, do you know?

King:       No.

Barlow:     You don't know? Were they in the closet, too?

King:       No.

Barlow:     Where were those guns kept, the two that you didn't take out of the house?

King:       I don't know.

Barlow:     You just saw the two that you took?

King:       Yeah.

Barlow:     All right, you went outside with these guns in a bag, what happened then?

King:       Then I took them up the street to – I gave one to Whitey and gave one to Country.

Barlow:     Okay, then what happened?

King:       Then um, then um, then um, then J.R. had a gun.

Barlow:     J.R. had a gun already on him?

King:       Yeah.

Barlow:     Okay.

King:       And then Eric came up the street. He had a gun.

Barlow:     Eric?

King:       Yeah, that's J.R.'s brother. That's his real name.

Barlow:     Okay, what's his nickname?

13

| | |
|---|---|
| King: | Uh? |
| Barlow: | What's his nickname? |
| King: | Black Child. |
| Barlow: | Black Child? |
| King: | Yeah. |
| Barlow: | Okay, so now you gave a gun to Whitey or Whitey took the gun out of the bag, is that right? |
| King: | - - |
| Barlow: | Yes? Speak up. |
| King: | Whitey took a gun out of the bag. |
| Barlow: | And who else took a gun out of the bag? |
| King: | Country. |
| Barlow: | And J.R. had his own gun and Black had his own gun? |
| King: | Yeah. |
| Barlow: | All right. What happened now. They have guns? |
| King: | Then we see the three men coming up the street, right? |
| Barlow: | Were they all together or was one walking in front of the other? |
| King: | Well, one was walking in front and two was in the back. |
| Barlow: | Okay. |
| King: | I don't know if they was trying to rob a man in the front or not. What, ah – what, ah – what – when we went up to the corner – |
| Barlow: | What corner? |
| King: | Washington – Washington and 5th, then we saw – we saw a man – the man pulled a gun out of this bag – he had a bag, he pulled a gun out of his bag and he started shooting, and then he [sic] the mailbox there. He – then Whitey yelled and he started shooting and then Country started shooting, and then J.R. and his brother started shooting, or J.R. and his brother shoot. |
| Barlow: | So all four of the people, Country, J.R., Whitey, and Black were shooting up the street, towards the three men, is that correct? |
| King: | No. |
| Barlow: | Were they shooting at three men? |

| | |
|---|---|
| King: | White – Whitey – Whitey and Country was shooting at the man who got shot in his head. |
| Barlow: | Uh-huh and – |
| King: | And J.R. and – was shooting – |
| Barlow: | J.R. and Black? |
| King: | Yeah. J.R. and them was shooting at the other two people. |
| Barlow: | All right, now you said earlier that Country, Whitey, J.R. and Black thought that somebody was going to hold people up. Was it the man that got shot that they thought was going to do the robberies or was it the two men walking behind him? |
| King: | Uh, I thought the men in the back was going to be the robberies but the man in the front wasn't robbing nobody. |
| Barlow: | The man that got shot didn't rob anybody? |
| King: | No. |
| Barlow: | But Whitey had said that the other two men had done robberies? |
| King: | Yeah. |
| Barlow: | Were sticking people up? |
| King: | Uh-huh. |
| Barlow: | So the man that got shot really hadn't done anything to anybody? |
| King: | No. |
| Barlow: | And they shot him anyway, correct? |
| King: | Yes. |
| Barlow: | Okay. After the shooting what happened? |
| King: | We ran. |
| Barlow: | Where did you go? |
| King: | I ran my way. |
| Barlow: | What was your way? Where did you run to? |
| King: | -- shooting, I just started running so I started running. So then – |
| Barlow: | Where did you run? |
| King: | I ran with them. |
| Barlow: | To where? |

15

| | |
|---|---|
| King: | -- When that man got shot up there by like this – it was right up on Old Marbury, and he got shot in front of that – he – he – he got shot, but he was still running. He was still running while he was shot 'cause Whitey shot him and he was still running through. Then Country shot again and he hit him – hit him in his head. And -- |
| Barlow: | What kind of gun did Country have, do you know? |
| King: | A 44. |
| Barlow: | A 44? |
| King: | Yeah. |
| | . . . |
| Patton: | Who was shooting – who started shooting first? |
| King: | Whitey. |
| Patton: | And who started shooting after Whitey? |
| King: | Country? |
| Patton: | And who started shooing after Country? |
| King: | Black. |
| Patton: | Black? |
| King: | Yeah. |
| Patton: | Did J.R. shoot, too? |
| King: | Yeah. |
| Barlow: | He did? Did – |
| King: | Well, he shot – J.R. and Black only shot two times. |
| Barlow: | Okay. But they started shooting first and then the other people started shooting back, is that correct? |
| King: | Yes, sir. |
| Barlow: | So that man, the man that got shot, didn't start shooting first? |
| King: | No. |
| Barlow: | No. |
| King: | No. |
| Barlow: | It was J.R. and Country and the rest of the people that you've talked about, started shooting at the three men, before any gunshots were fired back, is that correct? |
| King: | No. That ain't correct. |
| Barlow: | What is correct? |

| King: | It is correct, but it's not correct from – this is correct right here. Whitey shot – hit – shot first and hit the man in his back, he was still running so Country shot him again. He – then he – then I just saw him fall and hit the ground. |
| Barlow: | The man that got shot, did he ever shoot back at Country and Black and Whitey and J.R.? |
| King: | Yeah. |
| Barlow: | Okay. But Whitey or one of Whitey's friends started shooting at him first or him and the other two guys that were behind him, is that right? |
| King: | Well, yeah, that's right, but what made my attention though, I saw the two – the two – the two men walking down the street and I saw the other man had his hand in a bag. That's what made my attention. |
| Barlow: | Okay, but still Whitey and Country and that group started shooting up the street at the other men first? |
| King: | Yeah. |
| Barlow: | Pardon me? |
| King: | Yes, sir. |

ECF 93-4 at 320–31.[8]

The following morning, Bailey and her daughter identified Plaintiffs as suspects in a photographic array. ECF 93-2 at 15. Defendant Patton did not compare Bailey's statement to that of other eyewitnesses and only planned to follow up with Sandra Jackson. ECF 93-4 at 502–04, 55:18–21, 56:24–57:1. Defendant Patton explained that he believed the other eyewitnesses were not able to provide details of the people involved, but in contrast, Jackson could identify a man with a gun, and so "she was the most likely person to do a follow-up[.]" *Id.* at 504–05. However, despite trying her number and address, Defendant Patton was unable to contact Jackson. *Id.* at 503, 56:14–15.

---

[8] Although the tape recording is no longer available, the Assistant State's Attorney for Baltimore City played it during Plaintiffs' criminal trial in 1995, memorializing it in the trial transcript. *See* ECF 93-4 at 316–33.

Following King's arrest and prior to Plaintiffs' criminal trial, King was detained at the Thomas J.S. Waxter Children Center and underwent multiple medical evaluations during his juvenile proceedings. *See* ECF 105-60; ECF 105-61. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

*Indictment and Trial*

Officer Defendants submitted their evidence to the Baltimore City State's Attorney's Office, which presented the evidence to a grand jury and secured Plaintiffs' indictments along with indictments of Nicholas Richards ("Country") and Daniel Ellison ("Whitey"). ECF 93-11. Plaintiffs' trial began on May 11, 1995, with King as the State's first witness. ECF 93-4 at 142, 174. However, to the surprise of the Assistant State's Attorney ("ASA") for Baltimore City, Sharon Holback, *see* ECF 105-21 at 31, 119:13–120:3 (Holback Testimony, March 22, 2022), King recanted on the stand and testified that neither he nor Plaintiffs had any involvement in the murder. ECF 93-4 at 176–77. When ASA Holback asked King about his previously recorded statement, King answered:

> A:    Yeah, but he made me say what I was supposed to say.
>
> Q:    He made you say it?
>
> A:    Yeah, because he was forcing me.
>
> Q:    Was your mother there?
>
> A:    Yeah, my mother was there.
>
> Q:    And he was forcing you while your mother was there?

A:      No.

Q:      Ok.

        …

A:      They were in – Country had something to do with it.

        …

Q:      Country had something to do with what?

A:      With the shooting – and then they, they got us mixed up – Country and his friends.

Q:      I'm confused. You said Country had something to do with the shooting?

A:      And Whitey.

Q:      And Whitey?

A:      Yep.

        …

Q:      Why did you tell the police that you were with Country, J.R., Whitey and Black when the murder occurred?

A:      I – because he was making me say stuff out of my mouth.

        …

Q:      All right. And when he made you tell your story, was your mother there?

A:      Yeah.

Q:      So he made you tell your story. He made you tell a lie in front of your mother?

A:      Yeah.

        …

Q:      Yeah, the day that they took your taped statement. Did they question you without your mother's presence?

A:      No.

Q:      So everything they said to you they said in front of your mother?

A:      Yeah.

        …

Q:      Okay. A white police officer, and what did that white
        police officer say to you?

A:      When I was – when I was saying – they ain't have
        nothing – Whitey and J.R., they ain't have nothing to
        do with it, he say yes, they did, yes, they did, and then
        I was getting upset because I didn't want to lie and
        he kept on making me –

Q:      Making you do what, Marcus?

A:      Say what – say what ain't happen.

        …

Court:  Well, you say then somebody told you what to say?

A:      Yes.

Q:      And this was after you got your rights?

A:      Yes.

Q:      And your mother and you, and one of the policeman
        told you what to say?

A:      No, my mother ain't tell me what to say.

Q:      Well, who did and what did he tell you?

A:      He – the po – when I was – when I was saying this
        stuff, but he was – when I was saying the stuff was
        true, he said that – he said, well, it weren't true and
        he was trying to make me say stuff out of my mouth
        weren't true.

        …

        *By Holback:*

Q:      And the detective wasn't pleased with what you said,
        right?

A:      Yep. He kept on saying that ain't true –

Q:      Okay.

A:      – and then he started screaming at me.

Q:      Okay. And he screamed at you?

A:      Yeah.

Q:      And then what happened?

A:      Then he kept – he kept on saying stuff – what – kept
        on making me say stuff out of my mouth and then he
        said it ain't true and then he try – and then try – pep
        me up and try and go get me some food and stuff.

Q:     Okay. What exactly did the white detective tell you that you had to say?

A:     Tell me – say the truth.

Q:     So the white –

A:     – truth – I was – what I just told you.

Q:     Okay. So when he was screaming at you he was screaming at you about telling the truth?

A:     Yeah.

       …

Q:     So you told the police originally that J.R. and Black had nothing to do with it and there came a point when you changed that story, correct?

A:     Yeah.

Q:     Now, did the police give you a script and tell you exactly what they wanted you to say?

       [Objection]

Q:     Where did the information come from that you gave the detectives on the tape?

A:     From the – it came from – what Whitey told me – when he came around there he said –

       [Objection]

       …

Court:  Okay. Well, where did you get the story you told on the tape?

A:     Somebody was – well, Whitey – well, Whitey told – when I was – when I was –

       …

A:     Nobody told me to put on the tape, but Whitey was telling me what happened – what happened –

       [Objection]

Q:     The story that you told on the tape, the things you said on the tape, you say they were lies, right?

A:     Yeah, they was lies.

Q:     Well, did you just make them up yourself or did somebody else tell you or what?

> A:   No, I'm – I'm saying – well, Whitey told me – it was some of the stuff what – what I was saying on the tape –
>
> [Objection].
>
> …
>
> *By Holback:*
>
> Q:   So, did you tell – you said before that the police officer, the white police officer, made you say something different on the tape. Is that true?
>
> A:   Yeah.
>
> Q:   Well, did he tell you what he wanted you to say?
>
> A:   No.
>
> …
>
> Q:   Okay. What did the white detective do to make you say things out of your mouth?
>
> A:   He – he kept on saying – he kept on saying, like, "No, that ain't true," what I was – I said J.R. and Eric had nothing to do with it and he said, "Yes, they did. They had something to do with it. They had something to do with it," and I kept on saying, "No, they ain't have nothing to do with it. If you don't believe me you can bring my mother in here."

ECF 93-4 at 178–206. King repeated these allegations of coercion on cross-examination. *Id.* at 212.

In the remainder of the trial, the State presented testimony from Defendant Patton, Bailey, a relative of the victim, and another officer, along with the tape-recorded statement from King. ECF 93-4 at 273, 449, 727. Plaintiffs presented testimony from Shanna Thomas, JoAnn Crandall, Deborah Carter, Michelle Coleman, and Janet McPherson as friends, relatives, and alibis of Plaintiffs. *Id.* at 727. Ultimately, the jury convicted Plaintiffs of conspiracy to murder Wooden, but acquitted them of the murder charges. ECF 105-65 at 2–3, 3:21–4:7. Plaintiffs received life sentences. ECF 105-6 at 51, 51:3–7. Richards ("Country"), who was tried at the same time and

was likewise convicted of conspiracy to murder, received a sentence of thirty years. *Id.* at 51, 51:8–11.

### Writ of Actual Innocence and the Present Case

Over twenty-three years later, Plaintiffs wrote to Lauren Lipscomb, an Assistant State's Attorney for Baltimore City in the CIU. *See* ECF 105-66; ECF 105-34 at 6, 17:22; ECF 105-33 at 1. ASA Lipscomb brought in the Mid-Atlantic Innocence Project and the University of Baltimore School of Law's Innocence Project. ECF 105-33 at 1–2. On April 8, 2019, ASA Lipscomb submitted a memorandum to Marilyn Mosby, the State's Attorney for Baltimore City, detailing the case, summarizing the modern-day investigation, and recommending that the State's Attorney's Office move the court to grant a petition for writ of actual innocence. *Id.* at 3 (hereafter "CIU Memorandum").

On May 1, 2019, Plaintiffs and the State's Attorney's Office filed a joint petition for writ of actual innocence. ECF 93-15. Two days later, the Circuit Court for Baltimore City held a twenty-seven-minute hearing on the joint petition. ECF 93-16. The court expressed skepticism that the parties had presented newly discovered evidence, as required by the governing statute. *See, e.g.*, *id.* at 7–8, 6:22–7:12 ("I don't see how that's possibly under the statute . . . with due diligence, that no one could somehow locate the Defendant's girlfriend, whose mother testified that she was there and could provide corroborative alibi. . . . Well, maybe that's -- . . . ineffective assistance of counsel. But I don't think that's newly discovered evidence."). Ultimately, however, the court accepted that "the State [was] in agreement that there is newly discovered evidence as required under 8-301" and granted the petition and ordered a new trial. *Id.* at 22, 21:8–13; *id.* at 23, 22:10–12. The State of Maryland entered a *nolle prosequi* as to all charges. *Id.* at 23, 22:22–25.

This action followed. Plaintiffs contend that the Officer Defendants engaged in misconduct and actively pursued their wrongful convictions. Plaintiffs seek recovery of compensatory damages, punitive damages, and reasonable attorneys' fees based on eleven specific claims for relief. Count I alleges that the Officer Defendants deprived Plaintiffs of their Fourteenth Amendment right to due process through fabrication of evidence and the deliberate withholding of exculpatory evidence, in violation of 42 U.S.C. § 1983. ECF 1 ¶¶ 118–25. Count II asserts a federal claim for malicious prosecution against the Officer Defendants, also under § 1983. *Id.* ¶¶ 126–32. Count III alleges that the Officer Defendants violated Plaintiffs' Fourth Amendment rights by detaining them without probable cause, in violation of § 1983. *Id.* ¶¶ 133–38. Count IV asserts that the Officer Defendants failed to intervene, in violation of § 1983. *Id.* ¶¶ 139–42. Count V again cites § 1983, and charges a conspiracy to deprive constitutional rights against the Officer Defendants. *Id.* ¶¶ 143–49. Count VI asserts a claim against BPD, alleging its liability for the various constitutional violations described above, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* ¶¶ 150–54. Count VII, VIII, IX, and X assert state law claims against the Officer Defendants for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, and violation of due process rights conferred by Article 24 of the Maryland Constitution, respectively. *Id.* ¶¶ 155–72. Finally, Count XI seeks to compel the BPD to indemnify the Officer Defendants upon a finding of their liability to Plaintiffs. *Id.* ¶¶ 173–75.

## II.   LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best*

*Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### III.  DISCUSSION

To begin, another court has already reviewed Plaintiffs' claims of innocence, and in the present case, Plaintiffs provide ample evidence, alibies, and argument regarding their innocence. However, the question before this Court today is not Plaintiffs' guilt or innocence. Thus, this Court focuses its analysis on the potential evidence demonstrating alleged misconduct by Defendants.

### A.  Admissibility of Evidence

Given the events occurred nearly thirty years ago, many of the appropriate witnesses are no longer available or have no pertinent recollection. Thus, Plaintiffs primarily rely on transcripts of police interviews and previous trial testimony to substantiate their claims. During the motions hearing, this Court questioned the admissibility of Marcus King's trial transcript—a piece of evidence heavily cited by Plaintiffs because it provides King's account of coercion by the detectives.[9] After subsequent briefing by the parties on King's trial transcript, this Court also raised the issue of the admissibility of other hearsay evidence from unavailable witnesses, and this Court invited the parties to provide additional briefing. ECF 128.

"While a party may support its position on summary judgment by citing to almost any material in the record, the party's reliance on that material may be defeated if 'the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" *Whittaker v. Morgan State Univ.*, 524 F. App'x 58, 60 (4th Cir. 2013) (quoting FED. R. CIV. P. 56(c)(2)). Thus, before addressing substantive issues regarding Plaintiffs' claims, this Court first

---

[9] Pursuant to Rule 56(f), this Court may grant the motion for summary judgment on grounds not raised by a party so long as there has been notice and a reasonable time to respond. FED. R. CIV. PROC. 56(f)(2). Given the Court has provided the parties with an opportunity to brief the issue following oral argument, there has been proper notice and sufficient opportunity to respond.

addresses the admissibility of certain statements relied on by Plaintiffs for the truth of the matters asserted.

### i.    Trial Witness Testimony of Marcus King

Plaintiffs assert that the trial transcript of King's testimony as a witness in Plaintiffs' criminal trial is admissible under Federal Rules of Evidence 804(b)(1), 804(b)(3), and 807. *See* ECF 120-1.

Beginning with the first rule—804(b)(1)—if the declarant of otherwise inadmissible hearsay testimony is unavailable as a witness, Rule 804(b)(1) permits the introduction of that declarant's former trial testimony so long as it "is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination." King is clearly unavailable to serve as a witness because he was murdered in the years following Plaintiffs' criminal trial. *See* ECF 105-21 at 28, 105:1–13. Thus, the only issue is whether his former trial testimony was offered against a predecessor in interest of the Officer Defendants who had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

During Plaintiffs' criminal trial, King served as the State's first witness; however, he recanted on the stand and suddenly became an adverse witness to the State's case. ECF 93-4 at 174; ECF 105-21 at 31, 119:13–120:3; ECF 93-4 at 176–77. ASA Holback questioned King to some degree, challenging his recanted story and attempting to rehabilitate her witness, but she eventually dropped her line of questioning in light of King's changed position. *See* "Indictment and Trial" *supra*, Section I.

The Fourth Circuit has explained that "the party against whom the testimony was admitted in the prior proceeding need only have a 'similar motive,' not an 'identical motive,' to the party in the second proceeding." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d

119, 127 (4th Cir. 1995). The party against whom the testimony is offered must point to "distinctions in [their] case not evident in the earlier litigation that would preclude similar motives of witness examination." *Id.* at 128.

Plaintiffs assert that ASA Holback had a similar motive because, like the Officer Defendants, she sought to discredit King's recantation. They note that she questioned King about the circumstances surrounding his police interview and attempted to clarify who "was making [him] say stuff out of [his] mouth." In contrast, Defendants highlight the distinctions between the two cases, noting that ASA Holback was concerned with introducing King's taped statement into evidence and proving the truth of his taped story. She was not concerned, however, with whether the Officer Defendants knew King's taped statement was false.

Similar lawsuits have arisen around the country and courts have reached conflicting conclusions. In *Hill v. City of Chicago*, No. 06-CV-6772, 2011 WL 3876915 (N.D. Ill. Sept. 1, 2011), Hill was convicted for murder and sexual assault and served over ten years of his sentence. *Id.* at *1. Hill and a co-defendant, Young, originally both confessed to the police. *Id.* However, at trial, they maintained their innocence and asserted that law enforcement coerced them into confessing. *Id.* Over a decade later, the results of DNA testing led to the trial court vacating their convictions and the State dropping the charges. *Id.* Young was later killed in a driving accident, and Hill subsequently sought to use Young's trial testimony as evidence of their coercion. *Id.* The trial court found the trial testimony to be inadmissible under Rule 804(b), concluding that the state's attorney was not the present defendants' predecessor in interest because the state prosecutor did not have the same requisite stake in the criminal proceeding. *Id.* at *2. The court emphasized that "[i]t is well-settled that strategies for civil and criminal trials may differ greatly," and that "a prosecutor's motive in securing just result differs from a civil attorney's motive when representing

a defendant in a civil rights lawsuit." *Id.* at *3; *see also Bellamy v. City of New York*, No. 12-CIV-1025, 2017 WL 2189528, at *32 (E.D.N.Y. May 17, 2017), *aff'd in part, vacated in part on different grounds*, 914 F.3d 727 (2d Cir. 2019) ("The detectives did not have their own lawyers at the trial. And, the assistant district attorneys, charged with prosecuting cases on behalf of the People of the State of New York, did not represent either detective, and did not cross-examine Carter with the detectives' interests in mind.").

In contrast, in *Fields v. City of Chicago*, No. 10-CV-1168, 2014 WL 477394 (N.D. Ill. Feb. 6, 2014), Fields was convicted of two murders by a judge he attempted to (almost successfully) bribe. His conviction was later overturned given the judge's corrupt conduct, and a re-trial fifteen years later resulted in his acquittal. *Id.* at *3. In a subsequent civil case against his investigating officers, Fields relied on the original trial testimony of a witness to the murders, who claimed that he had been induced by the officers to falsely implicate Fields. *Id.* at *8. The officers challenged the admissibility of this evidence. *Id.* The modern-day trial court anticipated that the witness would be able to testify, thus mooting any potential hearsay objection. *Id.* However, the court hypothesized that even if the witness were unavailable to testify, his former testimony would be admissible under Rule 804(b)(1), concluding that the prosecutors at Fields's trial were "every bit as motivated to cross-examine [the witness] vigorously regarding his claims about [the officer] as the defendants are here." *Id.*

On the whole, this Court finds the reasoning of *Hill* more persuasive. Prosecutors in criminal trials have different motives and priorities than defendants in a subsequent civil trial. ASA Holback did not have to rehabilitate the Defendant Officers' credibility to, in her mind, protect the public and secure a just result in Plaintiffs' criminal trial. It was not her focus or goal to prove that Defendant Officers did not know that King's story was false; she only needed to prove that the

story was true. Moreover, today, now-former ASA Holback acknowledges that King's unexpected recantation caught her off guard, and so she was not able to prepare any questioning regarding his fabrication allegations. A reasonable litigation strategy could have been to minimize the extent of King's direct examination and instead focus on introducing his taped statement. In short, ASA Holback's motives and strategies were distinct from Defendants' present motives and strategies. Nobody at the criminal trial was looking out for the Officer Defendants' interests and trying to prove they acted in accordance with the law. King's trial testimony is thus not admissible under Rule 804(b)(1).

Plaintiffs' alternative theories of admissibility are likewise unpersuasive. Plaintiffs assert that King's trial testimony is admissible under Rule 804(b)(3) as a statement against his penal interest because he exposed himself to criminal liability for making a false statement to the police when he recanted his initial statement. However, King was not directly opening himself up to criminal liability, because he claimed that he had been under duress and coerced by the police to lie. *See, e.g.*, *United States v. Slatten*, 865 F.3d 767, 805 (D.C. Cir. 2017) ("[A]s a general matter, a self-defense claim is not 'clearly' against a declarant's interest."). Further, his trial testimony asserted that he was *not* involved with Wooden's murder, therefore minimizing his criminal liability and advancing his own interests.

Finally, Plaintiffs argue that King's trial testimony is admissible under Rule 807—the residual exception to hearsay. Under this rule, a hearsay statement is not excluded if "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence," and the statement "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." "The hallmark of Federal Rule of Evidence 807 is that the hearsay statement

sought to be admitted is trustworthy." *United States v. Lucas*, 836 F. App'x 142, 145 (4th Cir. 2020). In evaluating whether the statement contains sufficient guarantees of trustworthiness, a court should not rely on other evidence offered, but rather the circumstances of the hearsay statement itself. *Id.* Here, nothing about King's statement engenders trustworthiness. The entirety of his trial testimony is equivocal and at points contradictory. When asked directly to explain who told him to say what, he does not provide a clear answer and suggests it was someone other than the Officer Defendants. Further, the questioning by the attorneys and judge is admittedly chaotic.[10] Although King testified under oath, he was a thirteen-year-old kid implicating his acquaintances in their murder trial, presented with an opportunity to come to their defense rather than support their prosecution. As explained above, ASA Holback was unprepared for King's recantation, and so she did not have the opportunity to fully and thoughtfully question King about his allegations of fabrication. Rather, Plaintiffs' trial defense counsel repeatedly objected and interrupted her questioning, to the point that the court had to repeatedly admonish defense counsel for improper objections. *See, e.g.*, ECF 93-4 at 186 ("Mr. Brown, please. Oh, sit down, I'll make the rulings. You make the objections."); *id.* at 187 ("Mr. Brown, please don't testify. Now, you'll have a chance to examine the young man when your turn comes. Go ahead, Ms. Holback."). In short, the totality of the circumstances regarding King's recantation does not demonstrate the requisite degree of trustworthiness necessary to permit the introduction of his trial testimony under Rule 807. King's trial testimony is therefore inadmissible.

---

[10] *See, e.g.*, ECF 93-4 at 202–03 ("*The Court:* Well, where did you get the story you told on the tape? *King:* Somebody was – well, Whitey – well, Whitey told – when I was – when I was –. *Holback*: So you're saying Whitey told you what to tell the police? *Brown:* No, that's not what he's saying and that's --. *The Court:* I don't know what he's saying. Mr. Brown, please sit down. *Brown:* It's very clear. *The Court:* Mr. Brown, will you please sit down. It's not clear to the Court and I'm going to clarify it and you're going to sit down and we're going to do that.").

### ii. Statements by King to Doctors and Counselors

As described above, various doctors treated King after his arrest and prepared medical reports. ████████████████████████████████████████████████████████
████████████████████████████████████████ ECF 105-60; ECF 105-61; ECF 124-1. The medical records are (double) hearsay by an unavailable witness. Nonetheless, Plaintiffs assert that this Court can rely on King's statements in these reports "when evaluating corroborating facts," citing a case that analyzed admissibility under Rule 807. ECF 129 at 19. Given King's trial transcript is not admissible, these medical reports are not corroborative of other evidence to be considered by this Court. Regardless, this Court would not admit King's statements in the reports under Rule 807 because the reports themselves cast doubt on King's trustworthiness. *E.g.*, ECF 105-61 at 1 ("Marcus was cooperative throughout the evaluation, responding to all questions about is background, but displaying a lack of insight, providing little detail and showing some inconsistencies in his reports."). Plaintiffs also assert that King's statements in the reports are admissible as prior consistent statements, ECF 129 at 19. However, Rule 801(d)(1)(B) applies to witness-declarants, and King cannot serve as a witness because he is deceased. Thus, King's statements in the medical reports are not admissible.

### iii. King's Taped Statement to Detectives

Defendants rely on King's statements during his taped police interview throughout their motion for summary judgment. Unlike his statements during trial, the statements to police were directly against his penal interest because he implicated himself in a murder. Rule 804(b)(3). Nonetheless, Plaintiffs argue that the taped statement is unreliable because he later recanted to both psychologists and at trial. ECF 135 at 2. Defendants make no contrary argument. *See* ECF 134. Therefore, this Court agrees that King's taped statement to the Officer Defendants is also insufficiently reliable to be admissible.

### iv.    Trial Testimony of Diane Bailey

Bailey's statement to the police and her testimony at trial are likewise hearsay to the extent the parties seek to use her statements for the truth of the matter asserted. Rule 801. Bailey is an unavailable witness due to her intervening death. Rule 804(a)(4). For the same reasons as with King's trial testimony, Bailey's trial testimony is inadmissible. Unlike King, who claimed coercion, Bailey made no such claim. Therefore, ASA Holback had even less motivation to cross-examine Bailey on any potential coercion by Defendants or any knowledge of the falsity of Bailey's statements, further distancing ASA Holback from the interests of the Officer Defendants in this case.

Although Plaintiffs' entire case is premised on discrediting Bailey's testimony, for the purposes of reviewing her testimony's admissibility, Plaintiffs argue that her testimony is trustworthy. And inexplicably, Defendants attempt to concede admissibility and assert that ASA Holback "had a sufficiently similar motivation as Officer Defendants to examine Bailey's testimony." ECF 134 at 12. This position directly contradicts their arguments about why ASA Holback did not share a similar interest as the Officer Defendants when she cross-examined King.

In short, both parties appear to be taking results-oriented legal positions, rendering their arguments sometimes inconsistent and illogical. Ultimately, this Court does not find that Bailey's testimony would be admissible at trial. Nonetheless, given that neither party objects to its admissibility, for the sake of complete analysis this Court will consider her trial testimony for the purposes of this motion.

### v.    Statement of Keisha Thompson to SAO Investigator Ellis

Today, Thompson repeatedly refuses to cooperate and insists that she does not remember anything about the events in question. *See generally* ECF 93-18; *e.g.*, *id.* at 6:13–14 ("I told you since you all been reaching out going to everybody's house, I don't remember."); *id.* at 11:9–11

("We're wasting time for all these years, because I keep telling you I don't remember. You're not going to make me say anything."); *see also* ECF 72 (court-ordered deposition). Therefore, Plaintiffs reasonably anticipate that Thompson would be an unavailable witness under Rule 804 at trial. They argue that a statement she made to Investigator Ellis in 2019 would therefore be admissible under the unavailable declarant exception. Specifically, Plaintiffs seek to admit a statement by Thompson to Ellis that she "knew the murder occurred, but she did not see anything." Plaintiffs hope to use this statement to show that Thompson was in fact not a witness to the murder, suggesting the Officer Defendants fabricated her witness statement.

This alleged statement by Thompson comes from the CIU Memorandum, which in context reads:

> Keisha Thompson actively avoided contact with our office. Inv. Ellis received multiple texts from Thompson that she did not know anything and we should have spoken to her mother. On 3/6/19, Thompson told Inv. Ellis that she was at the house the night of the murder and saw something, but then hung up without elaboration. On 3/8/19, after receiving multiple notices to contact us, Thompson called. She advised that *she knew the murder occurred, but she did not see anything*. She indicated that she was not actually living on North Washington Street at the time.

ECF 106-4 at 6 (emphasis added). Plaintiffs assert that the italicized statement is admissible under Rule 804(b)(3) because it is against her interest given it "may have exposed her to criminal liability for making false statements to the police" or that it "opened her up to civil liability for malicious prosecution." ECF 130-1 at 22–23. Alternatively, Plaintiffs argue that this statement is admissible under the residual exception to hearsay. *Id.* at 23.

Thompson's statement from the report introduces three levels of hearsay: the report's author (Lauren Lipscomb), Investigator Ellis, and Thompson. Plaintiffs circumvent this triple threat by suggesting they would call Investigator Ellis to testify to Thompson's words. Although

he initially did not recall his conversation with Thompson, upon reviewing the CIU Memorandum, he now remembers it. ECF 135 at 7. Thus, Plaintiffs are only left with one level of hearsay.

Assuming Thompson would in fact be unavailable, her statement would nonetheless be inadmissible. At the heart of all hearsay rules is an attempt to admit only statements with sufficient indicia of reliability. *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 233 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999) (explaining that the trustworthiness of hearsay exceptions is a function of their ability to minimize the classic risks of hearsay). Nothing about Thompson's statement signals its trustworthiness. For one, she has been actively attempting to avoid contact by investigators and has expressed her intent to say whatever they want to hear in order to be left alone. The report notes that "Keisha Thompson actively avoided contact with our office. Inv. Ellis received multiple texts from Thompson that she did not know anything and we should have spoken to her mother." She has likewise made this position clear throughout the entirety of her deposition. *E.g.*, ECF 93-18 at 27:18–24 ("Ma'am, I don't remember. I don't want to be here. I don't care. Like what's next. What do you want me to say? What is it that you want me to say? Let's start there. Because I've been telling you this for almost what, two and a half years since you all started coming. What is that you want me to say. What do you want to know. I don't remember."). Also, the statement immediately prior to the one Plaintiffs seek to use suggests the exact opposite happened, *i.e.*, "she was at the house the night of the murder and saw something." The rules of evidence exist to safeguard a trial from unreliable hearsay statements such as either of these.

Plaintiffs' assertion that her statement opened her up to civil or criminal liability is unpersuasive. Plaintiffs' whole case assumes that Thompson never gave a statement to the police at the time of the murder. But for the purposes of admissibility, Plaintiffs ask this Court to assume that she *did* give a statement, rendering her latter assertion that she *did not* give a statement

admissible because it was against her penal interest. Plaintiffs then try to use the latter statement for its truth to show that she did in fact *not* give a statement initially. Essentially, Plaintiffs attempt to have it both ways at once. Regardless, this Court finds that Thompson's alleged statement was not against her penal interest and is not admissible.[11]

### B. § 1983 Claims Against the Officer Defendants

With the admissibility of the various hearsay statements determined, this Court turns to Plaintiffs' legal claims and the evidence remaining to prove them. 42 U.S.C. § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). To prove a § 1983 claim, a plaintiff must establish a violation of a right secured by the Constitution or laws of the United States by a "person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Here, there is no dispute that the Officer Defendants were acting under the color of state law as members of the BPD.

In cases that allege unconstitutional action by an arm of the executive branch of government, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" such that a substantive due process violation lies. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Specifically, the U.S. Supreme Court in *Lewis* reaffirmed that only official conduct that "shocks the conscience" will give rise to a substantive due process violation. *Id.* at 846–47; *see also*, *e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process'

---

[11] The likelihood of anyone either prosecuting Thompson for false statements or suing her for malicious prosecution would be extremely remote, and there is no likelihood she would have recognized that threat.

prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" (citations omitted)); *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 720 (4th Cir. 1991) ("[C]onduct which 'amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience,' violates the substantive guarantees of the Due Process Clause . . . ." (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980))). The "most likely" sort of conduct to "shock the conscience," the U.S. Supreme Court noted, was "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 532 U.S. at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

### i.   Fabrication of Evidence (Count I)

In their Complaint, Plaintiffs first allege the Officer Defendants violated their substantive due process rights by fabricating evidence in their case. ECF 1 ¶120. The manufacturing of evidence can constitute a substantive due process violation when it deprives a plaintiff of the right to a fair trial and results in a deprivation of liberty. *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) ("Demonstration of a violation of Washington's constitutional rights requires, in this context, proof that Wilmore fabricated evidence and that the fabrication resulted in a deprivation of Washington's liberty.").

To succeed on a fabrication claim, the law requires Plaintiffs to present evidence that (1) the Officer Defendants fabricated evidence in the Wooden investigation, and (2) that the fabrication caused a deprivation of Plaintiffs' liberty. *See Washington*, 407 F.3d at 282; *see also Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) ("We have recognized a due process 'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'") (quoting *Washington*, 407 F.3d at 282); *White v. Wright*, 150 F. App'x 193, 198 (4th Cir. 2005) ("At a general level, the right at stake here . . . is the right not to be deprived of liberty or property based on the deliberate use of evidence *fabricated by* or

*known to be false* to a law enforcement official.") (emphasis in original). "[T]he false statements must have been made 'deliberately or with a reckless disregard for the truth,' which may be proved by showing that 'when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Massey*, 759 F.3d at 357; *see also Howard v. City of Durham*, 487 F. Supp. 3d 377, 404–05 (M.D.N.C. 2020), *aff'd in part, rev'd in part and remanded*, No. 22-1684, 2023 WL 3698751 (4th Cir. May 30, 2023). Thus, "[t]o survive a motion for summary judgment, the plaintiff must 'adduce evidence showing that the defendants deliberately fabricated or falsified information; . . . unsupported allegations and speculation' are insufficient." *Martin v. Conner*, 882 F. Supp. 2d 820, 847 (D. Md. 2012) (quoting *White*, 150 Fed. App'x. at 199).

Plaintiffs present multiple modern-day depositions—from themselves, family members, and friends—corroborating Plaintiffs' innocence regarding the Wooden murder. *See, e.g.*, ECF 105-4 (deposition of Plaintiff McPherson); ECF 105-5 (deposition of Plaintiff Simmons); ECF 105-9 (deposition of Plaintiff McPherson's former girlfriend Alfreda Costley); ECF 105-10 (deposition of Shanna Thomas Marshall as alibi for Plaintiff McPherson at party on Chapel Street); ECF 105-13 (deposition of Plaintiff Simmons's former girlfriend Ebony Paige); ECF 105-14 (deposition of Michelle Christian, an "aunt" figure to Plaintiffs). However, this case is not about Plaintiffs' innocence, it is about the alleged misconduct of their investigators. None of the above depositions provides information about the Officer Defendants' actions during the investigation. Unfortunately for Plaintiffs, given the age of this homicide case, there are few remining witnesses who can speak to the actual investigation by the Officer Defendants. Those who are available either do not recall the investigation or provide no testimony suggesting fabrication. Nonetheless,

Plaintiffs allege that the Officer Defendants either fabricated or recklessly believed the evidence originally presented by Thompson and King. Each witness is addressed in turn.

*Keisha Thompson*

Plaintiffs allege that the Officer Defendants fabricated the statements of Keisha Thompson, Bailey's daughter. Specifically, Plaintiffs argue that the Officer Defendants never obtained inculpatory information from Thompson, yet nonetheless used her as a witness to bring charges against Plaintiffs. ECF 105 at 45. Again, no present-day witnesses can attest to this allegation. When deposed in July, 2022, the now-adult Thompson had no recollection of the events in 1994–95 and insisted counsel stop contacting her about this case. *See* ECF 93-18. Similarly, neither Officer Defendant recalls interviewing Thompson and likewise cannot provide relevant information. ECF 105-18 at 49, 186:7–16 (Detective Barlow); ECF 105-20 at 39, 147:8–13 (Detective Patton). Thus, Plaintiffs must infer fabrication of Thompson's statement based solely on the nearly-thirty-year-old homicide file.[12]

For evidence of fabrication, Plaintiffs first point to the fact that the Officer Defendants interviewed the mother and daughter at the same time, violating BPD's best practices. ECF 105 at 23, 48. Plaintiffs likewise point to the "glaring lack of documentation" of Thompson's own statement and assert this supports the inference that the Officer Defendants never took her statement. *Id.* at 46–47. This Court disagrees. In a nearly-thirty-year-old homicide case file, the "glaring lack of documentation" merely reflects the lack of evidence Plaintiffs can find decades later to support their fabrication claim. If a missing report in a homicide file from before the time

---

[12] This issue highlights the fundamental problem with this case: the sheer absence of any live witnesses who can shed any light on what happened and allow a jury some basis to assess witness credibility. Instead, Plaintiffs seek to put forth a series of facts equally amenable to a benign interpretation and to ask a jury to infer fabrication based on speculation alone.

the BPD had computers could establish intentional fabrication by investigators, there would be no limit to the number of fabrication claims that could survive summary judgment. *Cf. Johnson v. Baltimore Police Dep't*, No. CV ELH-19-0698, 2022 WL 9976525, at *59 (D. Md. Oct. 14, 2022) ("[T]he BPD Officers may have been sloppy. But, . . . [t]he conduct simply does not equate to bad faith."). Further, evidence that the Officer Defendants violated BPD policy by interviewing a mother and daughter together does not suggest fabrication. As explained, at this stage of litigation, "'unsupported allegations and speculation' are insufficient." *Martin*, 882 F. Supp. 2d at 847 (quoting *White*, 150 Fed. App'x at 199). And these facts do not support an inference of fabrication.

Plaintiffs likewise attempt to infer fabrication of Thompson's statement by analyzing her choice of language during her photographic identification. Plaintiffs assert the natural meaning of her words—words such as "That's Country, that's him right here"—makes clear that she was simply identifying people she knew, not the shooter or people involved in the homicide. *See* ECF 105 at 48; *see also* ECF 105-50 (photographic array provided to Bailey and Thompson with documentation of their remarks). Plaintiffs further suggest this is evidence that Defendants knew she did not see the shooting or else they would have asked her to make suspect identifications. In short, this argument is purely speculative. No reasonable juror could infer fabrication of an entire witness statement from the fact that the witness in a photographic lineup responds, "that's him right here."

Plaintiffs also argue that Defendant Patton "does not deny attributing statements to Thompson that she never said." ECF 105 at 24. For evidence of this allegation, they point to his recent deposition, which reads:

> Q:   Did you attempt to bolster – or did you attempt to bolster Ms. Bailey's statement by saying that Keisha Thompson also made the same exact statement as Ms. Bailey?
>
> A:   I don't recall.

> Q:   Did you attribute the statements to Ms. Thompson that she never made in this investigation?
>
> A:   I don't recall.
>
> Q:   Okay. Would it be proper for you to attribute statements to a witness that they never made?
>
> A:   In this case, I don't recall doing that, and it would be improper.

ECF 105-20 at 83, 325:7–20. Much like the rest of the questioning around the Wooden investigation, Defendant Patton repeats, "I don't recall" for every question, *see generally id.*, but on this matter, he confirms that such an action would be improper. Simply, a lack of memory thirty years later is not evidence of fabrication or a "failure to deny" committing misconduct decades prior. *Cf. Cosenza v. City of Worcester, Massachusetts*, No. CV 4:18-10936-TSH, 2021 WL 5138493, at *10 (D. Mass. Nov. 4, 2021) (present lack of memory does not render evidence false).

Finally, Plaintiffs argue that this Court must accept Plaintiffs' innocence as true for the purposes of summary judgment, and therefore, this Court must accept that Thompson's statement was false. ECF 105 at 46. However, as a matter of logic, Plaintiffs' innocence does not establish that the Officer Defendants fabricated Thompson's witness statement. Both can be true: Plaintiffs are innocent, and Thompson either told what she mistakenly believed to be the truth or knowingly provided a false witness account at no fault of the Officer Defendants. In short, Plaintiffs offer nothing but speculation that the Officer Defendants fabricated Thompson's statement.

*Marcus King*

Plaintiffs next allege that the Officer Defendants "fed" King facts about the crime during his interview in order to get him to adopt those facts into a statement they knew was false. ECF 1 ¶ 50. As above, there are no present-day witnesses available to support these allegations. Unfortunately, King was subsequently murdered, so counsel cannot question him about his conflicting statements in 1994–95 or about his interview with the Officer Defendants. *See* ECF

105-21 at 28, 105:1–13. Today, neither Officer Defendant recalls interviewing King. ECF 105-18 at 60, 231:15–19 (Detective Barlow); ECF 105-20 at 106, 416:12–14 (Detective Patton). King's mother, Phyllis Smith, recalls certain portions of the 1994 police interrogation of her son, but she does not recall the taped recording of King's statement, which includes her own voice. ECF 105-55 at 39, 146:15–18. Further, Smith does not suggest the Officer Defendants knew King's statement was false or that the Officer Defendants forced King to fabricate his story. Smith's testimony only corroborates that the detectives were yelling at her son and pressuring him to tell the truth.[13]

Without any present-day witnesses available, Plaintiffs primarily rely on the trial transcript from their 1995 criminal trial. During this trial, King recanted his taped statement and alleged Defendant Barlow "was making [him] say stuff out of [his] mouth." ECF 105 at 35–36; *see* ECF 93-4 at 178–98, 177:3–4, 183:13–14, 197:23–24. Plaintiffs point to this testimony as evidence that the Officer Defendants forced King to fabricate false testimony. As explained above, however, King's trial testimony is inadmissible hearsay and cannot be used to support Plaintiffs' claims.

Aside from King's testimony, Plaintiffs present sparse admissible evidence that they assert shows fabrication or, at a minimum, reckless disregard for the truth. ECF 105 at 39. Specifically, Plaintiffs point to (1) Detective Patton's concession that he provided certain details of the case to King as an interview tactic, *i.e.*, informing King that the police were aware of his alleged

---

[13] Much like her son's 1995 trial testimony, Smith recalls the officer "hollering" at her son to tell the truth, ECF 105-55 at 14–16, but she states that she never witnessed the Officer Defendants "providing Marcus with any information that would have come from their investigation," *id.* at 40, 151:1–8. Smith speculates that her son ultimately lied because the Officer Defendants disbelieved his denial of involvement, *id.* at 39–40; however, this does not suggest the Officer Defendants knew King's subsequent statement was false.

involvement because he retrieved a bag of guns; (2) the fact that King implicated Plaintiffs in his statement to the police, (3) the hour and a half of unrecorded interview prior to the taped portion; and (4) Detective Patton's forceful interview techniques used with a thirteen-year-old suspect (*i.e.*, shackling him while under arrest, yelling, banging and standing on the table).

Taken together and in the light most favorable to Plaintiffs, this evidence still does not generate a disputed issue of fabrication. Providing certain details about an investigation to a suspect to show familiarity with the facts is a well-used interview tactic and is not evidence of fabrication. There is no evidence that the Officer Defendants provided any details to King relating to Plaintiffs' involvement in the events. Although King's taped statement implicates Plaintiffs in the murder, there are numerous reasons why King could have misstated their involvement—he could have implicated them because he had seen them sitting outside the interrogation room in the police station and inferred that they were suspects; he could have heard that they were involved from someone else in the neighborhood or complied with someone else's directive to implicate them; the Officer Defendants could have accidentally mentioned their suspected involvement in passing; or, as Plaintiffs urge, the Officer Defendants could have fed their names to King and forced him to fabricate his statement. There is no evidence to suggest one option is more likely than the next, and consequently, all are pure speculation.

And although previous courts have found, *inter alia*, that evidence that an officer stopped and started a recorded interview can support a claim of fabrication, *e.g.*, *City of Durham*, 487 F. Supp. 3d at 412, no such tampering by the Officer Defendants is evident from King's recorded statement. According to the former Assistant State's Attorney: "[I]n those days the tape – it was expected that people would be reluctant to tell you anything. So it wasn't uncommon that detectives did pre-interviews. And if a witness said I didn't see anything, I don't know nothing,

I'm not telling, I don't want to tell, I don't want to talk, I'm not going to help you, all that stuff was so incredibly normal and everybody knew that, everybody in the defense bar, everybody in the prosecution bar, it's just the way it was. And then they would turn on the tape when they felt that they – the witness was ready to talk. So that's – and everyone knew that." ECF 105-21 (Holback Deposition) at 28–29, 108:20–109:10; *see also* ECF 105-18 at 250:15 – 21 (Detective Barlow noting that in his opinion "physically intimidating a suspect through jumping on the desk, pounding on the tables and screaming" was not against police procedure).

At best, Plaintiffs highlight examples of how the Officer Defendants could have better treated a thirteen-year-old suspect. But as the former Assistant State's Attorney explained, detectives commonly yelled and demanded the truth in interviews, even for juveniles charged with murder. *See* ECF 105-21 at 27:16–20 ("Frankly, there is nothing unusual about a homicide detective yelling at someone. We are dealing with the most serious of crimes. It's not abnormal for a detective to yell."). Police practices have evolved over time, and standard practices from the 1990s might be viewed with disapproval today. But ultimately, Plaintiffs present no evidence to suggest that Defendants believed their interview behavior was so coercive such that it would yield false information.

For all of these reasons, Plaintiffs' fabrication claims fail.

### ii. *Brady* Claim (Count I)

In their Complaint, Plaintiffs next allege the Officer Defendants violated their due process rights by withholding exculpatory evidence in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963). ECF 1 ¶ 121. The withholding of exculpatory evidence by an officer can constitute a substantive due process violation when it deprives a plaintiff of the right to a fair trial and results in a deprivation of liberty. *See, e.g.*, *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) ("[A] police officer who withholds exculpatory information does not violate the Fourteenth Amendment unless

the officer's failure to disclose plausibly deprived the defendants of the 'right to a fair trial.'") (internal citation omitted).

To plead a *Brady* claim against an investigating officer, a plaintiff must show "(1) the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 396–97 (4th Cir. 2014). "Prejudice ensues if 'there is a reasonable probability' that the jury would have reached a different result had the evidence been properly disclosed." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). The Court can infer bad faith when police officers fail to disclose especially pertinent exculpatory evidence. *See Johnson v. Balt. Police Dep't.*, Civil No. ELH-19-00698, 2020 WL 1169739, at *24 (D. Md. Mar. 10, 2020) ("A plaintiff need not demonstrate bad faith directly; it can be inferred through gross deviations from routine police conduct . . . Moreover, bad faith can be inferred when police officers fabricate evidence and fail to disclose especially pertinent exculpatory evidence.").

For their *Brady* claim, Plaintiffs assert that the Officer Defendants withheld two material pieces of evidence: (1) the fact that Thompson did not actually give a statement, and (2) the information provided by crime-scene witnesses James Martin and Sandra Jackson. ECF 105 at 53. As discussed above, Plaintiffs adduce no evidence suggesting that Keisha Thompson did not give a statement. As a result, there is no argument to be made that Defendants failed to disclose that Thompson did not give a statement. Thus, for Plaintiffs' *Brady* claim to survive summary judgment, Plaintiffs must show evidence that the Officer Defendants suppressed the two crime-scene witnesses in bad faith, causing prejudice to Plaintiffs.

*Suppression of Evidence*

The age of this case and lack of available witnesses makes it challenging to prove that the Officer Defendants suppressed any evidence. Plaintiffs' defense attorney from 1995 has no memory of the case and did not retain his case file. ECF 112-7 at 14, 12:1–2; *id.* at 17, 15:21–22. Therefore, Plaintiffs rely on conclusions drawn by the CIU and State's Attorney's Office as evidence of suppression.

First, Plaintiffs point to the May 3, 2019 Writ of Actual Innocence Hearing. ECF 105 at 6. During this hearing, ASA Lipscomb proffered to the Circuit Court for Baltimore City that she and her team went through the entire Baltimore police homicide file[14] and concluded that "[t]here were three independent witnesses, the statements of whom were not disclosed." ECF 105-32 at 17, 17:2–4. These three witnesses include Martin, Jackson, and White (the third of whom Plaintiffs do not

---

[14] For other allegedly undisclosed witnesses, ASA Lipscomb explained to the court:

> So all of the discovery has been pulled from the case, as well as the transcripts were reviewed, as well as the BP[D] file was reviewed, every single note was cataloged, every single minute that was played up in the transcript was also cataloged and put in an ongoing timeline. And so in terms of what information was available at what point, that is something that was all catalogued by our unit, by me. And I would proffer to the Court that the actual statements of these two individuals [Alfred and Alfreda Costley] – now, the two individuals, also, neither were disclosed by us. But, I'm . . . But in terms of whether . . . or not the Defense was in a position to know or have knowledge of their statements, that I do not know. However, what I will say is that we have accounted for not only the initial discovery, but we've also accounted for all of the supplemental discovery petitions that were filed in this case, and at no point were these individuals disclosed.

*See* Exhibit 32, 11:5 – 12:1.

rely on for their *Brady* claim, *see* ECF 105 at 53). ASA Lipscomb reiterated, "those three witnesses were not known to the Defense. They were not disclosed to the Defense." *Id.* at 18, 18:11–13.[15]

Second, Plaintiffs point to the CIU Memorandum. For Martin, the CIU Memorandum states the handwritten note of Martin's interview "appears to have not made it into the SAO file." ECF 105-33 at 12. Relatedly, ASA Holback testified in her 2022 deposition that it was her practice to "usually copy everything." ECF 105-21 at 15, 53:1. While equivocal, one could infer from these two statements that the Officer Defendants never presented the notes of Martin's interview to the State's Attorney's Office.

In short, it is a disputed fact whether the Officer Defendants suppressed the witness statements from Martin and Jackson.

*Materiality of Evidence*

Assuming Plaintiffs could prove the Officer Defendants withheld these two witness statements in bad faith, Plaintiffs must also show they experienced prejudice as a result, *i.e.*, the statements were material to their case. *See Moore v. Illinois*, 408 U.S. 786, 794–95 (1972) (noting that to establish a *Brady* violation, a plaintiff must prove that (1) the evidence in question was favorable to the defendant in a criminal proceeding; (2) the evidence was material to the defense; and (3) the prosecution possessed the evidence and failed to disclose it).

---

[15] Of note, the State *did* turn over Jackson's name to the defense. *See* ECF 105-33 at 7 & n.40. ASA Lipscomb also proffered to the court that Ebony Paige (Plaintiff Simmons's then-girlfriend) was not interviewed pretrial and was not known by defense counsel pretrial. ECF 105-32 at 5:9–12. Yet in the CIU Memorandum, it reports that Paige was in touch with defense counsel and he "told her she couldn't testify because she was not credible due to having been arrested at the same time as McPherson and Simmons." ECF 105-33 at 8.

Plaintiffs argue that Martin's account was material because it discredited Bailey's statement by presenting a different location of where the shooting began. ECF 105 at 47.[16] Plaintiffs assert that Bailey testified the shooting began the intersection of Washington and Oliver Streets, whereas Martin reported the shooting began around the intersection of Washington and Federal Streets—one block north. Upon close review of the two statements, however, there is no such conflict.

Bailey gave the following statement:

> The witness indicated it was at this time "Country" walked from the side of Lin's Carryout to the front where "JR," "Whitey," Marcus, and "JR's" brother were all standing. The witness stated that when "Country" walked to the front of Lin's Carry Out he yelled out and said "Hey" to the three guys that had just turned onto Washington Street. . . . [Next,] the two guys who were in the back of the one guy who was wearing the red hat started running and "Country," "Whitey," "JR" and "JR's" brother and Marcus all started running after the two guys.

> The witness stated it was during this same time "Country," "Whitey", and "JR" and "JR's" brother all pulled out [their] guns and started shooting as they chased the two guys down the street.

> The witness stated that the guy in the red hat who was carrying the shoulder bag did not start to run until the shooting started. The witness stated that the three guys all ran up Washington Street towards Federal with "Country," "JR," "Whitey," "JR's" brother, and Marcus behind them shooting.

ECF 93-2 at 89–91. Thus, she describes the shooting as starting while the five suspects "all started running" north from the corner of Oliver Street towards the corner of Federal Street. Martin was

---

[16] The State's Attorney's Office made a similar argument during Plaintiffs' joint motion hearing. *See* ECF 105-32 at 19, 19:2–10 ("[T]hey all said different things because they all were at different – in different areas when they witnessed it, but they were all consistent that the shooting erupted at the corner of Federal and Washington Street[.]").

sitting across the street from where the homicide occurred. The single page of handwritten notes of Martin's interview reads, in its entirety:

> James Kevin Martin
> M/B/25 DOB [redacted]
> 1642 N Washington
> T/P None
> T/P Roy Rodgr [sic] Security Blvd
>
> (W) sitting on steps to 1640 N. Washington talking to Sharion. (W) heard 3 shots, saw (V) running up street with bag on shoulder, and as he [sic] running (V) is shooting back. (W) saw [victim] fall.
>
> (W) stated second person was standing at NE corner of Federal and Washington.
>
> (W) stated that a pick-up truck was blocking his view.
>
> (W) stated second subject was shooting back at (V).

ECF 93-2 at 117. Thus, the notes of Martin's interview do not mention where he believed the shooting began. At most, he states that a "second person was standing at NE corner of Federal and Washington." This is not inconsistent with Bailey's account that had the suspects running towards that same corner. Thus, his statement is not exculpatory for Plaintiffs.

As for Jackson, Plaintiffs argue that Jackson's notes revealed that she could identify the shooter, and therefore, she could have exculpated Plaintiffs. ECF 105 at 56. However, Plaintiffs were not convicted as the shooter, they were convicted as co-conspirators. ECF 105-65 at 2–3, 3:21–4:7. Jackson identified at least five people present. The fact that the shooter was not either Plaintiff says nothing about the identities of the remaining four.[17]

---

[17] Of note, Defendant Patton attempted to find Jackson to follow up on her interview but was unable to locate her. The State provided her name to the defense, but apparently Plaintiffs' defense counsel likewise could not locate her. *See* ECF 105-33 at 12 & n.40; *see also id.* at 14 (noting that "the defense attorney stopped working because they weren't able to keep up with payments").

Finally, Plaintiffs argue that Martin and Jackson (and White) only identified a single shooter, while Bailey identified multiple shooters. ECF 105 at 13, 47. Plaintiffs therefore assert that the withholding of these witnesses' notes prejudiced their case because they could have attacked Bailey's credibility and story. *Id.* This argument manipulates the evidence in the record and disregards common sense. The notes from the interviews of Martin, White, and Jackson reflect one individual with a gun. Each of these witnesses saw certain portions and perspectives of the murder, but no witness purports to give an exhaustive account of the events or individuals involved. To present evidence of a single shooter, Plaintiffs cite the deposition of Defendant Patton (who does not recall this investigation). *See* ECF 105 at 13. In his deposition, counsel walked Defendant Patton through his notes of each of these witnesses, and then asked him the following:

> Q: Okay. Those individuals, those three individuals indicate that there's one suspect shooter?
>
> A: As indicated in those documents that we reviewed, yes, each person indicates something different, yes.
>
> Q: So my question is they indicate –
>
> A: They indicate that they see shootings, they see people shooting, yes.
>
> Q: So my question is they indicate that there's one suspect shooting?
>
> [Objection]
>
> A: -- documents only say that they see one person, each person sees someone shooting.
>
> Q: Right.
>
> A: So I think that adds up to three on these three people.
>
> Q: So you're assuming that there are three different people that they're saying?
>
> A: I'm assuming the same thing you're assuming, that there's more people or only one person shooting. But only those documents, those particular phrases and captions, they are only referring to one person by three people. So I can't say for certain if all three or more shooters are not, other than

> they say – or even the same person, there's just three people
> shooting in those three little paragraphs.

ECF 105-20 at 86, 236:3–237:10. Defendant Patton's deposition plainly does not present evidence that there was exclusively one shooter. Further, the notes of Jackson and Martin do not exclude multiple shooters but simply reflect that they each saw one.[18]

In summary, even assuming the witness statements of Jackson and Martin were suppressed in bad faith, their suppression was not material to Plaintiffs' case. Therefore, Plaintiffs' *Brady* claim fails.

### iii.     Malicious Prosecution (Count II) and Unlawful Detention (Count III)

Plaintiffs' Complaint asserts counts for malicious prosecution under both federal and state law. *See* Counts II and VII, respectively. Although Plaintiffs assert their federal malicious prosecution claim pursuant to § 1983, the Fourth Circuit has held "there is no such thing as a '§ 1983 malicious prosecution' claim." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000), *cert. denied*, 531 U.S. 1130 (2001); *see also id.* at 260 ("We now hold that § 1983 does not empower a plaintiff to bring a claim for malicious prosecution *simpliciter*. What is conventionally referred to as a '§ 1983 malicious prosecution' action is nothing more than a § 1983 claim arising from a Fourth Amendment violation."). Instead, a federal claim for malicious prosecution "is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." *Hupp v. Cook*, 931 F.3d 307, 323–34 (4th Cir. 2019) (quoting *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)). Therefore, Plaintiffs' federal

---

[18] In contrast, much of the undisputed record evidence suggests that there was more than one shooter. Ellison provides an eyewitness account with three shooters. ECF 105-58. Jackson saw a man with a gun run west on Federal Street, ECF 93-2 at 63, while White reported the shooter ran east on Federal Street, ECF 93-2 at 69. Taken together, these eyewitness accounts suggest there were at least two shooters.

malicious prosecution claim overlaps with their claim asserting unlawful detention under the Fourth Amendment, as set forth in Count III of their Complaint. This Court will therefore consider both claims together.

The crux of either claim is the absence of probable cause. *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983); *see also Thompson v. Clark*, __ U.S. __, 142 S. Ct. 1332, 1337 (2022) ("the gravamen of the Fourth Amendment claim for malicious prosecution . . . is the wrongful initiation of charges without probable cause"); *see also Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). Probable cause is "not a high bar." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019). Instead, it "is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).[19]

Bailey's eyewitness statement implicating Plaintiffs in the murder plainly constitutes sufficient probable cause.[20] *See Bailey v. Town of Smithfield, Va.*, 19 F.3d 10, at *3, *6 (4th Cir.1994) (unpublished decision) (finding that a single positive identification of the defendant as the robber from a photo array suffced to establish probable cause); *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) (reasoning that "[i]t is surely reasonable for a police officer to base

---

[19] It is unsettled whether "a plaintiff bringing a Fourth Amendment claim under § 1983 for malicious prosecution must establish malice (or some other *mens rea*) in addition to the absence of probable cause." *See Thompson*, 142 S. Ct. at 1338 n.3; *see also Lambert v. Williams*, 223 F.3d 257, 262 n.2 (4th Cir. 2000) (finding that "malice was not an element of the § 1983 claim since the reasonableness of a seizure under Fourth Amendment jurisprudence should be analyzed from an objective perspective" (internal quotation marks omitted)).

[20] The homicide file documents two eyewitnesses that placed Plaintiffs at the crime scene—Bailey and Thompson, who constituted probable cause for Plaintiffs' arrest. *See* ECF 105-46, ECF 105-47 ("Witnesses were located. These witnesses will remain anonymous at this time for reasons of safety. Both witnesses stated that they know this defendant…"). However, the homicide record only includes notes of "Interview of Diane Bailey." ECF 93-2 at 89.

his belief in probable cause on a victim's reliable identification of his attacker," as "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself."). Therefore, to create a triable issue on probable cause, Plaintiffs attack the credibility of Bailey's statement and assert that Defendants knew, or should have known, that her statement was false. ECF 105 at 57–58.

Without any new evidence,[21] Plaintiffs rely on impeachment evidence, specifically: (1) the risk of her story being influenced by neighborhood gossip, (2) the distance between her bedroom window and the street corner,[22] (3) her account of a police car driving the wrong way on a one-

---

[21] According to the parties, Bailey passed away in 2011 and therefore she is not available for further examination. ECF 93 at 6; ECF 93-18 at 1–10. Both Officer Defendants likewise cannot remember interviewing Bailey or investigating her story. ECF 105-18 at 49, 186:7–16 (Defendant Barlow); ECF 105-20 at 39, 147:8–13 (Defendant Patton). Thus, Plaintiffs are left re-analyzing evidence that was available to them at the time of their trial.

[22] At Plaintiffs' criminal trial, Defendant Patton testified as to Bailey's vantage point, having gone himself to her apartment and looked out her window. *See* ECF 93-4 at 502, 55:6–8; *id.* at 562–66; ECF 105-40 at 23:13–21; *id.* at 24:12–15.

Today, like in many cases, Plaintiffs and the Officer Defendants present "a battle of the experts" opining on whether Bailey likely could have seen and heard what she reported in her statement. Defendants present an expert investigative report that documents auditory measurements collected at the same street corner. *See* ECF 93-3 at 7–10. The report concluded, "[b]ased on this on-site testing and basic acoustical principles of physics, it was determined that Ms. Bailey likely heard the words to which she testified." *Id.* at 26. In contrast, Plaintiffs' own expert concluded that it was "unlikely that a person in the position of Ms. Bailey would have been able to recognize the faces of the individuals standing near Lynn's Carryout at the time of the incident" given the likely low-lighting visibility from streetlamps at nighttime in an urban environment. ECF 105-31 at 28–29.

way street further up the street, (4) discrepancies between her account and that of other eyewitnesses, and (5) her financial compensation for her cooperation with the police. ECF 105 at 19–22.

Viewing these issues together in the light most favorable to Plaintiffs, they do not create a triable issue of probable cause. Of note, Plaintiffs' counsel made many of these arguments before the jury three decades ago. *See, e.g.*, ECF 93-4 at 922 (defense attorney making the closing argument that Bailey lied to receive financial compensation); *id.* at 636 (defense attorney cross-examining Bailey about her ability to see 150 feet away in the darkness with trees on the street and no streetlights, and about her ability to hear the suspects talking with a busy street and the television on). Today, Plaintiffs cannot relitigate these arguments, repackaged as a malicious prosecution claim.

The fact that a witness *could* be impeached—because of financial motivation, because of physical impairments, or because of discrepancies between her story and that of others—does not make it unreasonable for an officer to have credited that witness's story. Indeed, the fact that a grand jury and jury heard Bailey's story and nonetheless indicted and convicted Plaintiffs further demonstrates the reasonableness of the Officer Defendants' reliance. *Cf. Webb v. United States*,

---

Plaintiffs also cite the CIU Memorandum, which describes a test conducted sometime during the winter of 2018–19 by a CIU investigator, ASA Lipscomb, and a law clerk. ECF 105-33 at 8; ECF 105-48 at 34; 130:5–19. During the CIU investigator's deposition, he explained that they went during the daytime to the intersection of Oliver and Washington Streets where Bailey once lived. ECF 105-48 at 34. He described, "myself and on one of the occasions, I believe, our par – our law clerk was with us and Ms. Lipscomb was on the opposite corner, and we would attempt to communicate across that road at – at various levels, you know, audible levels. And it was extremely difficult to hear anything, if nothing, really, from – from that distance." *Id.* at 35, 135:18–36:2. Based on this experiment, the report concluded that "it *is* possible to hear that someone is yelling but *not actual* words." ECF 105-33 at 8 (emphasis in original).

789 F.3d 647, 660 (6th Cir. 2015) ("As a general rule, 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause.'"). Plaintiffs fail to present evidence that no reasonable officer would have credited Bailey's eyewitness account. At best, Plaintiffs present evidence of poor police work, but "an 'incompetent or negligent investigation' is insufficient to establish a constitutional violation." *Garner v. Harrod*, 656 F. App'x 755, 761 (6th Cir. 2016) (quoting *Seigel v. City of Germantown*, 25 Fed. App'x. 249, 250 (6th Cir. 2001)).

Alternatively, even if Plaintiffs presented evidence of a constitutional violation, Defendants would nonetheless have qualified immunity. *See Washington v. Napolitano*, 29 F.4th 93, 105 (2d Cir. 2022) ("An arresting officer is entitled to qualified immunity even if probable cause is lacking so long as arguable probable cause was present when the arrest was made.").

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "To determine whether an officer is entitled to qualified immunity, the court must examine (1) whether the plaintiff has demonstrated that the officer violated a constitutional right and (2) whether that right was clearly established at the time of the alleged violation." *E.W. ex rel. T.W. v. Dolgos*, 884 F.3d 172, 178 (4th Cir. 2018) (internal quotation marks omitted). "The doctrine 'gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.'" *Quarles v. Weeks*, 815 F. App'x 735, 737 (4th Cir. 2020) (quoting *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015)).

It has not been clearly established that an officer violates a defendant's constitutional rights by crediting a witness subject to routine impeachment. In contrast, courts have found that an officer

nonetheless has probable cause even when a witness's statement contains inconsistencies. *E.g.*, *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 744–45 (7th Cir. 2003) (noting that although the "story had inconsistencies, the officers were under no constitutional obligation to exclude every possibility that she was not telling the truth, unless the inconsistencies were such that a reasonable officer would become suspicious"); *see also Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014) ("Any discrepancy at worst shows negligence or perhaps a lack of attention to detail, which does not amount to malicious prosecution."). Likewise, an officer nonetheless has probable cause even when a witness's statement contradicts other known facts in the record. *E.g.*, *Price v. Montgomery Cnty., Kentucky*, 72 F.4th 711, 725 (6th Cir. 2023) (finding probable cause existed when an officer credited a witness's statement, where "some of her statements were contradicted by the record, [and] other parts corroborated what the investigators knew and did not share with her or the public").

In short, even if all alleged deficiencies with Bailey's statement could render it insufficient for probable cause, it was not clearly established that reliance on a witness statement with physical impairments and potential bias would constitute a constitutional violation. Thus, this Court holds that the Officer Defendants are entitled to qualified immunity and Plaintiffs' Fourth Amendment malicious prosecution claim fails.

### iv.    Failure to Intervene (Count IV)

The duty to intervene "attaches when an officer observes or has reason to know that a constitutional violation is being committed by other officers and possesses a realistic opportunity to intervene to prevent the harm from occurring." *Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1030 (D. Md. 2019) (internal citations and quotation marks omitted). Here, as analyzed above, no constitutional violation was committed, and therefore summary judgment for the Officer Defendants is appropriate as to the failure to intervene claim.

### v.    Conspiracy (Counts V and IX)

Plaintiffs' Complaint asserts counts for conspiracy under both federal and state law. *See* Counts V and IX, respectively. In their Opposition, Plaintiffs report that they "are no longer pursuing their conspiracy count against any Defendant." ECF 105 at 62. Thus, summary judgment for the Officer Defendants is appropriate on these claims.

### C. State Law Claims

### i.    Malicious Prosecution (Count VII)

Under Maryland law, "[t]he necessary elements of a case for malicious prosecution of a criminal charge are . . . (a) a criminal proceeding instituted or continued by the defendant against the plaintiff, (b) termination of the proceeding in favor of the accused, (c) absence of probable cause for the proceeding, and (d) 'malice,' or a primary purpose in instituting the proceeding other than that of bringing an offender to justice." *Exxon Corp. v. Kelly*, 281 Md. 689, 693 (1978). Plaintiffs have not presented any evidence of malice or an ulterior motive by Defendants. Today, neither Officer Defendant recalls the investigation and cannot speak to their intent during the investigation. *See generally* ECF 105-18 (Detective Barlow); ECF 105-20 (Detective Patton). Without any present-day witnesses available, Plaintiffs must speculate and infer bad motives from the nearly-thirty-year-old homicide file and the 1995 criminal trial transcript. But Plaintiffs' arguments that attack the credibility of witnesses or prove Plaintiffs' innocence do not speak to the Officer Defendants' intent. Thus, Plaintiffs' state malicious prosecution claim fails.

### ii.    Intentional Infliction of Emotional Distress (Count VIII)

To successfully bring an intentional infliction of emotional distress claim, a plaintiff must show: (1) that the conduct in question was intentional or reckless; (2) that the conduct was extreme and outrageous; (3) that there was a causal connection between the conduct and the emotional distress; and (4) that the emotional distress was severe. *See Harris v. Jones*, 281 Md. 560, 566

(1977). Under Maryland law, "the tort of intentional infliction of emotional distress is rarely viable." *Farasat v. Paulikas*, 32 F. Supp. 2d 244, 247 (D. Md. 1997). Even demonstrating a defendant's intent to cause emotional distress is insufficient. "If a defendant intends to cause a plaintiff emotional distress and succeeds in doing so, the defendant is nonetheless not liable unless his or her conduct is also extreme and outrageous." *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663, 670–71 (1992). Liability accrues only "for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. The requirements of the rule are rigorous, and very difficult to satisfy." *Id.* at 670.

As discussed above, Plaintiffs present no evidence that the Officer Defendants fabricated any witness statements. A miscalculation or mistaken belief about a witness's credibility does not "exceed all bounds tolerated by decent society." Therefore, Plaintiffs cannot prove the requisite extreme and outrageous conduct to mount an intentional infliction of emotional distress claim.

### iii.    Maryland Constitutional Claim (Count X)

Plaintiffs' state constitutional claims are duplicative because Plaintiffs bring them pursuant to the state analogues of their federal constitutional claims. Thus, summary judgment is also warranted on those claims for the reasons addressed above.

## IV.    CONCLUSION

For the reasons stated above, the Officer Defendants' Motion for Summary Judgment, ECF 92, is GRANTED. A separate Order follows. Chambers will be in contact to set a teleconference to discuss the case's status.

Dated: August 3, 2023                                    _____/s/_____
                                                         Stephanie A. Gallagher
                                                         United States District Judge